1   PAUL A. HILDING, ESQ.
    State Bar No. 110656
2   PETER Q. SCHLUEDERBERG, ESQ.
     State Bar No. 137995
3   HILDING LAW FIRM
    501 W. Broadway, Suite 1760
4   San Diego, California 92101
    Tel:    (619) 233-4200
5   Fax:    (619) 233-4211

6   Attorneys for Defendant and Counter-Claimant
    Otay Water District

7

8                    **UNITED STATES DISTRICT COURT**

9                   **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  AMERICAN PROTECTION INSURANCE        )   Case No. 08-CV-0662-JM-POR
    COMPANY,                             )
12                                       )   **OTAY WATER DISTRICT'S FIRST**
                        Plaintiff,       )   **AMENDED ANSWER AND**
13                                       )   **COUNTERCLAIM FOR BREACH OF**
              v.                         )   **CONTRACT AND BREACH OF THE**
14                                       )   **IMPLIED COVENANT OF GOOD**
    OTAY WATER DISTRICT,                 )   **FAITH AND FAIR DEALING**
15                                       )
                        Defendant        )   Judge:      Hon. Jeffrey T. Miller
16                                       )   Dept:       16
                                         )   Action Filed:  4/11/08
17  _____  )
                                         )
    OTAY WATER DISTRICT                  )   **DEMAND FOR JURY TRIAL**
18                                       )
                    Counter-Claimant     )
19                                       )
              v.                         )
20                                       )
                                         )
21  AMERICAN PROTECTION INSURANCE        )
    COMPANY,                             )
22                                       )
                    Counter-Defendant    )
23                                       )
    _____  )

24

25          Defendant and Counter-Claimant Otay Water District ("the District" or "Defendant" or

26  "Counter-Claimant") hereby amends its counterclaim against Plaintiff American Protection

27  Insurance Company ("APIC" or "Plaintiff" or "Counter-Defendant"), as follows:

28

# I. ANSWER AND AFFIRMATIVE DEFENSES

## NATURE OF DISPUTE

1.      The District admits that this is an insurance coverage action involving a liability policy issued by APIC to the District.  The District further admits that at least three separate underlying lawsuits are at issue, each of which includes allegations of employment discrimination against the District and/or certain board members.  The District further admits it gave notice of the Pamela Aubrey lawsuit to APIC.  The District alleges on information and belief that APIC seeks a declaration that it owes no coverage for the Underlying Lawsuits under the APIC policy.  Except as expressly admitted herein, the District denies the remaining allegations in paragraph 1 of the first amended complaint.

## THE PARTIES

2.      The District lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 2 of the first amended complaint, and on that basis, denies each and every allegation contained therein.

3.      The District admits the allegations of paragraph 3 of the first amended complaint.

## JURISDICTION AND VENUE

4.      Based upon information and belief, The District admits the allegations of paragraph 4 of the first amended complaint.

5.      The District admits the allegations of paragraph 5 of the first amended complaint.

6.      The District admits the allegations of paragraph 6 of the first amended complaint.

## THE POLICY

7.      The District admits APIC issued Policy No. 3QX 113 478 00 to the District which was originally effective June 1, 2000 to June 1, 2003 ("the Policy").  The District alleges on information and belief that Exhibit A to the first amended complaint is a true and correct copy of the Policy and that the Policy speaks for itself.  Though paragraph 7 of the complaint sets forth select portions from Section F. of the Policy's Common Policy Conditions form, it does not accurately set forth the entirety of such Policy section, nor does it set forth all pertinent parts of

1    the Policy, and on that ground, the District denies the remaining allegations of paragraph 7 of the

2    complaint.

3        8.        The District alleges on information and belief that Exhibit A to the first amended

4    complaint is a true and correct copy of the Policy and that the Policy speaks for itself.  Though

5    paragraph 8 of the fist amended complaint sets forth a select portion from Section F. of the

6    Policy's Common Policy Conditions form, it does not accurately set forth the entirety of such

7    Policy section, nor does it set forth all pertinent parts of the Policy, and on that ground, the

8    District denies the allegations of paragraph 8 of the first amended complaint.

9        9.        The District alleges on information and belief that Exhibit A to the first amended

10   complaint is a true and correct copy of the Policy and that the Policy speaks for itself.   Though

11   paragraph 9 of the fist amended complaint sets forth a portion from Section VII. of the Policy's

12   Liability Coverage Part, it does not accurately set forth the entirety of such Policy section, nor

13   does it set forth all pertinent parts of the Policy, and on that ground, the District denies the

14   allegations of paragraph 9 of the first amended complaint.

15                          **THE UNDERLYING LAWSUITS**

16                              **<u>The Aubrey Suit</u>**

17       10.       The District admits the allegations of paragraph 10 of the first amended

18   complaint, except that the referenced Exhibit B is a copy of the original complaint filed in the

19   Aubrey Suit, rather than a copy of the Aubrey Suit itself, and Ms. Aubrey filed amended

20   complaints in the lawsuit.

21       11.       The District admits the allegations of paragraph 11 of the first amended

22   complaint.

23       12.       The District denies the allegations of paragraph 12 of the first amended

24   complaint.

25       13.       The District denies the allegations of paragraph 13 of the first amended

26   complaint.

27       14.       The District denies the allegations of paragraph 14 of the first amended

28   complaint, on information and belief.

15.      The District admits that it incurred approximately $483,241 in attorney's fees and costs defending the claims asserted in the underlying Aubrey Suit.

16.      The District admits it has requested that APIC reimburse it for attorney's fees and costs, as well as settlement payments, incurred by the District in the underlying Aubrey Suit. Except as expressly admitted herein, the District denies the remaining allegations of paragraph 16 of the first amended complaint.

<u>**The Harron Suit**</u>

17.      The District admits that Thomas Harron filed a lawsuit in the Superior Court of the State of California, County of San Diego, in an action styled *Thomas Harron v. Otay Water District, Antonio Inocentes, Jaime Bonilla, and Does 1-20, inclusive,* Case Number GIC773848. The District further admits that a copy of the Fourth Amended Complaint For Damages filed by Mr. Harron in the Harron Suit is attached to the first amended complaint as Exhibit D and that the pleading speaks for itself.  Except as expressly admitted herein, the District denies the remaining allegations of paragraph 17 of the first amended complaint.

18.      The District denies the allegations of paragraph 18 of the first amended complaint, on the grounds that to the extent APIC participated at all in the defense of the Harron Suit, any such participation was limited and failed to satisfy its obligations to the District under its insurance policy issued to the District.

19.      The District admits a confidential settlement was reached in the underlying Harron Suit in September 2007, and that pursuant to the settlement the District made a payment to Mr. Harron, a separate payment to Mr. Harron's attorneys, and was required to pay for further employment related benefits to Mr. Harron.

20.      The District admits the allegations of paragraph 20 of the first amended complaint.

<u>**The Bartlett-May Suit**</u>

21.      The District admits the allegations of paragraph 21 of the first amended complaint, except that, on information and belief, the Case Number for the Federal Suit was 02-CV-2281.

22.    The District admits that in October 2005, Donna Bartlett-May, among others, filed a lawsuit in the Superior Court of San Diego County, in an action styled *Bartlett-May, et al. v. Otay Water District, et al.* Case Number GIC855421, and that a copy of the complaint filed by Ms. Bartlett-May is attached to the first amended complaint as Exhibit E.  The District alleges that the pleading speaks for itself and, on that basis, the District denies the remaining allegations of paragraph 22 of the first amended complaint.

23.    The District denies the allegations of paragraph 23 of the first amended complaint on the grounds that APIC failed to provide any defense or pay for any of the defense costs during the Bartlett-May lawsuit, and to the extent it participated at all by simply agreeing to provide a defense, any such participation was minimal and failed to satisfy its obligations to the District under its insurance policy issued to the District.

24.    The District admits that a settlement was reached in the underlying Bartlett-May Suit.  Except as expressly admitted herein, the District denies the allegations of paragraph 24 of the first amended complaint.

25.    The District admits the allegations of paragraph 25 of the first amended complaint.

## COUNT I

26.    The District incorporates by reference the admissions, denials, and averments set forth above in paragraphs 1 through 25 as if they were fully set forth herein.

27.    The District alleges that the Policy speaks for itself.  The District further admits that while there is language in Section F. of the Policy's Common Policy Conditions form consistent with the allegations of paragraph 27 of the first amended complaint, such paragraph does not accurately set forth the entirety of such Policy section, nor does it set forth all pertinent parts of the Policy, and on that ground, the District denies the allegations of paragraph 27 of the first amended complaint.

28.    The District admits the Aubrey Suit was filed in April 2003.  Except as expressly admitted herein, the District denies the allegations of paragraph 28 of the first amended complaint.

1    29.    The District denies the allegations of paragraph 29 of the first amended
2    complaint.

3    30.    The District denies the allegations of paragraph 30 of the first amended
4    complaint.

5    31.    The District denies the allegations of paragraph 31 of the first amended
6    complaint.

7    **COUNT II**

8    32.    The District incorporates by reference the admissions, denials, and averments set
9    forth above in paragraphs 1 through 31 as if they were fully set forth herein.

10    33.    The District alleges on information and belief that Exhibit A to the first amended
11    complaint is a true and correct copy of the Policy and that the Policy speaks for itself.  Though
12    paragraph 33 of the first amended complaint sets forth a select portion from Section F. of the
13    Policy's Common Policy Conditions form, it does not accurately set forth the entirety of such
14    Policy section, nor does it set forth all pertinent parts of the Policy, and on that ground, the
15    District denies the allegations of paragraph 33 of the first amended complaint.

16    34.    The District admits it incurred approximately $483,241 in attorney's fees and
17    costs defending the claims asserted in the Aubrey Suit.

18    35.    The District denies the allegations of paragraph 35 of the first amended
19    complaint.

20    36.    The District denies the allegations of paragraph 36 of the first amended complaint
21    as the allegations imply the District voluntarily incurred fees in the Aubrey Suit.

22    37.    The District denies the allegations of paragraph 37 of the first amended
23    complaint.

24    **COUNT III**

25    38.    The District incorporates by reference the admissions, denials, and averments set
26    forth above in paragraphs 1 through 37 as if they were fully set forth herein.

27    39.    The District admits the allegations of paragraph 39 of the first amended
28    complaint.

OTAY WATER DISTRICT'S FIRST AMENDED ANSWER AND COUNTERCLAIM
Case No. 08-CV-0662-JM-POR

1    40.    The District denies the allegations of paragraph 40 of the first amended

2    complaint.

3    41.    The District denies the allegations of paragraph 41 of the first amended

4    complaint.

5    42.    The District denies the allegations of paragraph 42 of the first amended

6    complaint.

7    **COUNT IV**

8    43.    The District incorporates by reference the admissions, denials, and averments set

9    forth above in paragraphs 1 through 42 as if they were fully set forth herein.

10    44.    The District alleges on information and belief that Exhibit A to the first amended

11    complaint is a true and correct copy of the Policy and that the Policy speaks for itself.  Though

12    paragraph 44 of the first amended complaint sets forth a select portion from Section V of the

13    Policy's Liability Coverage Part, it does not accurately set forth the entirety of such Policy

14    section, nor does it set forth all pertinent parts of the Policy, and on that ground, the District

15    denies the allegations of paragraph 44 of the first amended complaint.

16    45.    The District alleges on information and belief that there were several complaints

17    filed by Mr. Harron in the underlying Harron Suit and that such pleadings speak for themselves.

18    As phrased, the allegations of paragraph 45 of the first amended complaint are vague, ambiguous

19    and unintelligible and on that ground, the District denies the allegations of paragraph 45 of the

20    first amended complaint.

21    46.    The District denies the allegations of paragraph 46 of the first amended

22    complaint.

23    **COUNT V**

24    47.    The District incorporates by reference the admissions, denials, and averments set

25    forth above in paragraphs 1 through 46 as if they were fully set forth herein.

26    48.    The District admits the allegations of paragraph 48 of the first amended

27    complaint.

28

49.    The District denies the allegations of paragraph 49 of the first amended complaint.

50.    The District lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 50 of the first amended complaint, and on that basis, denies each and every allegation contained therein.

51.    The District denies the allegations of paragraph 51 of the first amended complaint.

**COUNT VI**

52.    The District incorporates by reference the admissions, denials, and averments set forth above in paragraphs 1 through 51 as if they were fully set forth herein.

53.    The District denies the allegations of paragraph 53 of the first amended complaint.

54.    The District denies the allegations of paragraph 54 of the first amended complaint.

55.    The District denies the allegations of paragraph 55 of the first amended complaint.

**COUNT VII**

56.    The District incorporates by reference the admissions, denials, and averments set forth above in paragraphs 1 through 55 as if they were fully set forth herein.

57.    The District admits that a portion of the settlement in the Harron Action was for certain of Mr. Harron's attorney's fees and costs.

58.    The District denies the allegations of paragraph 58 of the first amended complaint.

59.    The District denies the allegations of paragraph 59 of the first amended complaint.

60.    The District denies the allegations of paragraph 60 of the first amended complaint.

OTAY WATER DISTRICT'S FIRST AMENDED ANSWER AND COUNTERCLAIM
Case No. 08-CV-0662-JM-POR

61.     The District denies the allegations of paragraph 61 of the first amended complaint.

## COUNT VIII

62.     The District incorporates by reference the admissions, denials, and averments set forth above in paragraphs 1 through 61 as if they were fully set forth herein.

63.     Based upon information and belief, the District admits the allegations of paragraph 63 of the first amended complaint.

64.     Based upon information and belief, the District admits the allegations of paragraph 64 of the first amended complaint.

65.     The District denies the allegations of paragraph 65 of the first amended complaint.

66.     The District alleges on information and belief that Exhibit A to the first amended complaint is a true and correct copy of the Policy and that the Policy speaks for itself.  Though paragraph 66 of the first amended complaint sets forth a select portion from Section III of the Policy's Liability Coverage Part, it does not accurately set forth the entirety of such Policy section, nor does it set forth all pertinent parts of the Policy, and on that ground, the District denies the allegations of paragraph 66 of the first amended complaint.

67.     The District denies the allegations of paragraph 67 of the first amended complaint.

## COUNT IX

68.     The District incorporates by reference the admissions, denials, and averments set forth above in paragraphs 1 through 67 as if they were fully set forth herein.

69.     The District lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 69 of the first amended complaint, and on that basis, denies each and every allegation contained therein.

70.     As the hypothetical set forth in paragraph 70 of the first amended complaint is incomplete, the District lacks sufficient knowledge or information to form a belief as to the truth

1    of the allegations contained in paragraph 70 of the first amended complaint, and on that basis,

2    denies each and every allegation contained therein.

3        71.    The District admits that APIC belatedly paid some money to reimburse the

4    District for a limited portion of its defense fees and costs in the underlying Harron and Bartlett-

5    May Suits.  As for the remaining allegations in paragraph 71 of the first amended complaint, the

6    District lacks sufficient knowledge or information to form a belief as to the truth of such

7    allegations, and on that basis, denies each and every allegation contained therein.

8        72.    The District lacks sufficient knowledge or information to form a belief as to the

9    truth of the allegations contained in paragraph 72 of the first amended complaint, and on that

10   basis, denies each and every allegation contained therein.

11                          **PLAINTIFF'S RELIEF SOUGHT**

12       73.    The District denies the allegations of paragraph 73 of the first amended complaint

13   and further denies that Plaintiff is entitled to have any judgment entered in its favor.

14                          <u>**AFFIRMATIVE DEFENSES**</u>

15                          <u>**First Affirmative Defense**</u>

16                          **(Failure to State a Claim)**

17       74.    The first amended complaint, and every purported claim for relief contained

18   therein, fails to state facts sufficient to constitute a claim for relief against the District.

19                          <u>**Second Affirmative Defense**</u>

20                          **(Waiver)**

21       75.    By virtue of its acts and conduct, APIC has waived its right to recover the relief

22   sought in the first amended complaint.

23                          <u>**Third Affirmative Defense**</u>

24                          **(Estoppel)**

25       76.    By virtue of its acts and conduct, APIC is estopped from asserting any and all

26   claims in the first amended complaint, and is estopped from recovering any relief sought in the

27   first amended complaint.

28

OTAY WATER DISTRICT'S FIRST AMENDED ANSWER AND COUNTERCLAIM
Case No. 08-CV-0662-JM-POR

1                                           **Fourth Affirmative Defense**

2                                                    **(Laches)**

3       77.    The relief sought by APIC in the first amended complaint is barred by reason of

4  laches.

5                                            **Fifth Affirmative Defense**

6                                          **(Unclean Hands)**

7       78.    The relief sought by APIC in the first amended complaint is barred by reason of

8  APIC's own unclean hands.

9                                         **Sixth Affirmative Defense**

10                                  **(Statute of Limitations)**

11      79.    The first amended complaint and each of the claims asserted therein is barred by

12 the applicable Statute of Limitations.

13                                **Seventh Affirmative Defense**

14                  **(Failure to Name Indispensable Parties)**

15      80.    APIC is not entitled to any relief on its claim for equitable contribution due to its

16 failure to name any insurer as a party defendant in its first amended complaint.

17                                **Eighth Affirmative Defense**

18                               **(Forfeiture of Rights)**

19      81.    APIC has forfeited any right to insist upon its insureds' compliance with Policy

20 conditions and provisions, including the "voluntary payments" provision, as a result of its prior

21 failure to satisfy its own contractual obligations.

22                                  **Ninth Affirmative Defense**

23                                **(Anticipatory Breach)**

24      82.    The District's conduct in connection with protecting its own interests in the

25 underlying lawsuits was justified by APIC's anticipatory breach of its defense obligations.

26                                  **Tenth Affirmative Defense**

27                                 **(Lack of Prejudice)**

28      83.    APIC's claims for declaratory relief based upon the District's purported failure to

OTAY WATER DISTRICT'S FIRST AMENDED ANSWER AND COUNTERCLAIM

Case No. 08-CV-0662-JM-POR

1  comply with certain provisions or conditions of the Policy is barred because APIC was not

2  prejudiced by the District's actions.

3  **PRAYER FOR RELIEF**

4      **WHEREFORE**, the District prays for judgment as follows:

5      1.    That APIC take nothing by way of its first amended complaint, and that the first

6  amended complaint be dismissed with prejudice;

7      2.    For a judicial determination that APIC had a duty to defend and indemnify

8  the District in the underlying Aubrey Suit under the Policy;

9      3.    For a judicial determination that APIC had a duty to defend and indemnify

10  the District in the underlying Harron Suit under the Policy;

11      4.    For a judicial determination that APIC had a duty to defend and indemnify

12  the District in the underlying Bartlett-May Suit under the Policy;

13      5.    For attorney's fees and costs incurred in this action; and

14      6.    For such other and further relief as this Court deems just and proper.

15  **II. COUNTERCLAIM**

16  **NATURE OF DISPUTE**

17      84.    This insurance coverage dispute arises out of American Protection Insurance

18  Company's unreasonable failure to satisfy its contractual obligations to pay for the defense and

19  indemnity of its insureds in underlying lawsuits involving employment practices liability claims,

20  and claims asserting wrongful acts expressly covered by the insurance policy issued to Otay

21  Water District by APIC.

22  **PARTIES**

23      85.    Counter-Claimant Otay Water District is a publicly owned water and sewer

24  service agency, located in Spring Valley, California, which provides such services within this

25  Court's judicial district.

26      86.    The District alleges on information and belief that Counter-Defendant American

27  Protection Insurance Company is a corporation organized and existing under the laws of the

28  State of Illinois and has its principal place of business in Illinois.  The District further alleges on

1    information and belief that APIC is an insurance company that at all relevant times was a

2    member of the Kemper Insurance Group of Companies.

3    **JURISDICTION AND VENUE**

4    87.    The District alleges on information and belief that this Court has subject matter

5    jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  The District further alleges on

6    information and belief that there is complete diversity of citizenship between the District and

7    APIC, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and

8    costs.

9    88.    The District alleges on information and belief that this Court has personal

10   jurisdiction over APIC in this matter.

11   89.    Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) because, on information and

12   belief, APIC resides in this District and in the State of California.

13   90.    In the alternative, venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because, on

14   information and belief, a substantial part of the events giving rise to the claims at issue in this

15   action occurred in this judicial district.

16   91.    In the alternative, venue is proper pursuant to 28 U.S.C. § 1391(a)(3) because, on

17   information and belief, APIC is subject to personal jurisdiction in this district.

18   **THE POLICY**

19   92.    Counter-Defendant American Protection Insurance Company issued a California

20   Rural Special Districts Insurance Program insurance policy No. 3QX 113478 00 to Counter-

21   Claimant Otay Water District effective for the policy period from 6/01/2000 to 6/01/003, with

22   per occurrence liability insurance policy limits of $25 million (the "Policy").

23   93.    A true and correct copy of the Policy is attached hereto as Exhibit 1 and is

24   incorporated herein by this reference.

25   94.    The insuring agreement in the Liability Coverage Part of the Policy provides, in

26   pertinent part, as follows:

27       **A.**    We shall pay on behalf of the Insured those sums that the
                   Insured becomes legally obligated to pay as damages
28                 because of … "personal Injury"…or "wrongful acts" to

which this Coverage Part applies.  We shall have the right and duty to defend the Insured against any "suit" seeking those damages, even if the allegations are groundless, false or fraudulent.

95.     The insuring agreement in the Policy further provides that the Liability Coverage Part applies to "personal injury" caused by an offense arising out of the District's business if the offense was committed in the "coverage territory" during the policy period.

96.     The insuring agreement in the Policy further provides that the Liability Coverage Part "applies to 'wrongful acts' which take place during the policy period."

97.     The Policy, in pertinent part, defines "personal injury" as follows:

O.      "Personal injury" means injury arising out of one or more of the following offenses:

. . . .

2.      Libel, slander or defamation of character;

. . . .

7.      "Employment practices liability".

98.     The Policy defines "Employment practices liability" as follows:

H.      "Employment practices liability" means:

1.      Refusal to employ that person;

2.      Termination of that person's employment;

3.      Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination; or

4.      Consequential loss to the spouse, child, parent, brother or sister of that person whom any of the employment-related practices described in subsections **1.**, **2.** and **3.** above apply.

"Employment practices liability" applies:

1.      Whether the Insured may be liable as an employer or in any other capacity; and

2.      To any obligation to share damages with or repay someone else who must pay damages because of injury.

14

1     99.    The Policy defines "coverage territory" to include "The United States of America

2     (including its territories and possessions), Puerto Rico and Canada."

3     100.    The Policy defines "wrongful act" to include "any actual or alleged error,

4     omission, misstatement, misleading statement, neglect or breach of duty by any Insured in the

5     discharge of his/her duties for you, including service with any other entity at your direction…."

6     101.    The Policy provides that the District is the Named Insured.  It further provides

7     that the term "Insured" in the Policy includes "[a]ll persons who were, now are or shall be

8     elected, appointed or employed as members of your board, commission or agency while acting

9     within the scope of their duties."  The Policy also provides that the term "Insured" includes

10    "[y]our employees or authorized volunteers but only for acts within the scope of employment by

11    you or in the course of their duties for you and at your direction."

12    102.    The District alleges on information and belief that APIC canceled the Policy early

13    because the District submitted claims under the Policy.

14    103.    Accordingly, APIC changed the Policy's effective date from 6/01/00-6/01/03 to

15    6/01/00-7/01/01.

16                                    THE *HARRON* CLAIM

17    104.    In early 2001, Thomas Harron made a claim for damages against the District and

18    certain of its directors and employees, alleging that those parties engaged in wrongful acts during

19    the month of January 2001, including alleged defamation, discrimination, wrongful termination

20    and other alleged employment-related practices.

21    105.    The District timely notified APIC of Mr. Harron's claim and tendered it for

22    defense and indemnity.

23    106.    Mr. Harron eventually filed suit against the District and certain directors and

24    employees, in the Superior Court of the State of California for the County of San Diego, Case

25    No. GIC773848, titled *Thomas J. Harron v. Otay Water District, et al.* ("the *Harron*ꞏaction"),

26    alleging causes of action for wrongful termination, discrimination, slander, breach of contract

27    and breach of the implied covenant of good faith and fair dealing.

28

107.    The *Harron* action alleged claims against the District, and certain of its directors and/or employees, that were potentially covered under the terms of the Policy issued by APIC.

108.    The *Harron* action alleged claims against the District and certain directors and employees which triggered APIC's duty to defend those insureds under the Policy.

109.    APIC agreed to defend the District and its co-defendant directors and employees against Mr. Harron's claim and in the *Harron* action.

110.    APIC initially appointed attorney Mitchel Stanton as counsel to defend its insureds in the *Harron* action.

111.    The District alleges on information and belief that at the time APIC appointed Mr. Stanton to represent it in the *Harron* action, he was not experienced in representing public entities such as the District in employment-practices litigation.

112.    APIC eventually agreed to the appointment of the law firm Foley & Lardner to represent one of the insured defendants in the *Harron* action, Mr. Bonilla.

113.    In 2003, after the District raised concerns about Mr. Stanton's experience and competence in handling its defense in three separate employment-practices lawsuits, APIC agreed with the District's request to replace Mr. Stanton with Christopher Carlton as its defense counsel in the *Harron* action.

114.    Though APIC agreed to defend the District and its co-defendant insured directors and employees in the *Harron* action, it completely ignored invoices the District provided for payment and it failed to reimburse the District for defense fees and costs the District incurred in defending the *Harron* action for several years.

115.    The following law firms each participated in providing a defense to the District and its co-defendant insureds in the *Harron* action:  Carlton, DiSante & Freudenberger LLP; Foley & Lardner; Burke, Williams & Sorensen LLP; and Garcia, Calderon & Ruiz, LLP.

116.    The District alleges on information and belief that Carlton, DiSante & Freudenberger LLP sent invoices to APIC regarding its work in the *Harron* action, generally on a regular monthly basis.

1    117.    The District alleges on information and belief that Foley & Lardner sent invoices

2    to APIC regarding its work in the *Harron* action, generally on a regular monthly basis.

3    118.    The District alleges on information and belief that Burke, Williams & Sorensen

4    LLP sent invoices to APIC regarding its work in the *Harron* action, generally on a regular

5    monthly basis.

6    119.    The District alleges on information and belief that  Garcia, Calderon & Ruiz, LLP

7    sent invoices to APIC regarding its work in the *Harron* action, generally on a regular monthly

8    basis.

9    120.    The District alleges on information and belief that APIC failed to pay the invoices

10   it received from Carlton, DiSante & Freudenberger LLP, Foley & Lardner, Burke, Williams &

11   Sorensen LLP, and Garcia, Calderon & Ruiz, LLP.

12   121.    On or about January 18, 2005, the District's counsel sent a letter to APIC's

13   counsel, together with invoices for legal services and costs the District paid over the time period

14   from 2001 through 2004, seeking reimbursement for such fees and costs it incurred in defending

15   the *Harron* action and two other lawsuits, *Bartlett-May* and *Dassaro*, APIC had agreed to defend

16   under the Policy.

17   122.     A true and correct copy of the January 18, 2005 letter, without the enclosed

18   invoices, is attached hereto as Exhibit 2 and is incorporated herein by this reference.

19   123.    The District alleges on information and belief that APIC, through its counsel,

20   received the January 18, 2005 letter and invoices on or shortly after January 18, 2005.

21   124.    APIC wrongfully failed and refused to reimburse the District for the invoices it

22   submitted for reimbursement in January 2005.

23   125.    On or about January 8, 2007, the District again sent a letter to APIC's counsel,

24   together with invoices for legal services and costs the District paid over the time period that now

25   extended from 2001 through October 2006, seeking reimbursement for such fees and costs it

26   incurred in defending the *Harron* action and *Bartlett-May* action.

27   126.    A true and correct copy of the January 8, 2007 letter, without the enclosed

28   invoices, is attached hereto as Exhibit 3 and is incorporated herein by this reference.

OTAY WATER DISTRICT'S FIRST AMENDED ANSWER AND COUNTERCLAIM

Case No. 08-CV-0662-JM-POR

1      127.    The District alleges on information and belief that APIC, through its counsel,

2  received the January 8, 2007 letter and invoices on or shortly after January 8, 2007.

3      128.    The total amount of defense fees and costs the District had paid in the *Harron*

4  action through October 2006 was $612,298.90.

5      129.    Though the District made several attempts to follow-up with the reimbursement

6  request, APIC failed to respond to the request for several months.

7      130.    On April 3, 2007, the District sent another letter to APIC's counsel, together with

8  additional invoices for defense fees and costs it paid for the November-December 2006 time

9  period in the *Harron* and *Bartlett-May* actions, seeking reimbursement for such defense fees and

10  costs.

11      131.    A true and correct copy of the April 3, 2007 letter, without the enclosed invoices,

12  is attached hereto as Exhibit 4 and is incorporated herein by this reference.

13      132.    The District alleges on information and belief that APIC, through its counsel,

14  received the April 3, 2007 letter and invoices on or shortly after April 3, 2007.

15      133.    The total amount of defense fees and costs the District had paid in the *Harron*

16  action during the period from November-December 2006 was $21,510.56.

17      134.    After APIC asked for some additional information regarding the invoices

18  submitted by the District in April, the District promptly provided further detailed invoices for

19  reimbursement on April 30, 2007.  In that letter, the District also again asked for payment on the

20  invoices it had submitted in January.

21      135.    A true and correct copy of the April 30, 2007 letter, without the enclosed

22  invoices, is attached hereto as Exhibit 5 and is incorporated herein by this reference.

23      136.    The District alleges on information and belief that APIC received the April 30,

24  2007 letter and invoices on or shortly after April 30, 2007.

25      137.    The District alleges on information and belief that APIC, through its counsel,

26  received the April 30, 2007 letter and invoices on or shortly after April 30, 2007.

27      138.    The unpaid invoices the District had submitted to APIC for its defense fees and

28  costs in the *Harron* and *Bartlett-May* actions through 2006 totaled $1,109,267.43.

139.    On June 6, 2007, APIC finally made a partial payment to the District in the amount of $465,557, without specifying whether the payment was reimbursement for the *Harron* action, the *Bartlett-May* action, or some unidentified allocation between such actions.

140.    APIC did not identify which of the numerous invoices and defense costs previously submitted by the District and its counsel were being reimbursed by its partial payment.  However, the payment was only approximately 40 % of the defense fees and costs the District incurred and paid through 2006, without including the additional hundreds of thousands of dollars the District had incurred in defending the actions through June 6, 2007.

141.    On July 10, 2007, the District's counsel sent a letter to APIC's counsel requesting a breakdown from APIC explaining how the partial payment was to be allocated between the two lawsuits and detailing which of the invoices had been approved or denied.

142.    In that letter, the District also reminded APIC that the *Harron* case was set for trial on September 17, 2007.

143.    A true and correct copy of the July 10, 2007 letter is attached hereto as Exhibit 6 and is incorporated herein by this reference.

144.    The District alleges on information and belief that APIC, through its counsel, received the July 10, 2007 letter on or shortly after July 10, 2007.

145.    APIC ignored the District's request for a breakdown of its partial payment and failed to respond to the July 10, 2007 letter.

146.    APIC also ignored numerous further attempts by the District to follow up with its July 10 request for a breakdown.

147.    As trial approached in the *Harron* action, APIC simply ignored the District and failed to communicate with it or its defense counsel.

148.    Accordingly, the District was left on its own to resolve the case.

149.    In September 2007, as trial was set to begin, the District reached a settlement in the *Harron* litigation.

150.    On February 12, 2008, the District again sent a letter to APIC, together with invoices for defense fees and costs it paid in the *Harron* action during the 2007 time period, and

1    a copy of the *Harron* settlement agreement and its settlement payments to date, seeking

2    reimbursement for such defense costs and settlement payments.

3          151.    A true and correct copy of the February 12, 2008 letter, without the enclosures, is

4    attached hereto as Exhibit 7 and is incorporated herein by this reference.

5          152.    The District alleges on information and belief that APIC, through its counsel,

6    received the February 12, 2008 letter and invoices on or shortly after February 12, 2008.

7          153.    At the time of its February 2008 reimbursement request, the District had paid over

8    $1 million in defense fees and costs in the *Harron* action that remained un-reimbursed, in

9    addition to more than $450,000 in settlement payments in that action.

10          154.    On April 24, 2008, APIC sent a letter responding to the District's reimbursement

11    request which asserted various "questions and concerns" about the invoices submitted, and in

12    which it now claimed that some of the invoices were prepared by defense counsel in a format it

13    did not find acceptable, such as including "block-billed" time entries.

14          155.    In the letter, APIC also unreasonably demanded that the invoices be changed by

15    defense counsel and re-submitted in a format it found acceptable, even though it had never raised

16    any of these billing format issues before while consistently receiving the invoices on a monthly

17    basis from defense counsel over a period of several years.  Meanwhile, it failed to pay a single

18    dime to reimburse the District for the defense costs and settlement payments.

19          156.    A true and correct copy of the April 24, 2008 letter is attached hereto as Exhibit 8

20    and is incorporated herein by this reference.

21          157.    In response to the "questions and concerns" raised in the letter, the District's

22    defense counsel in the *Harron* action, Mr. Carlton, promptly sent a letter to APIC's counsel

23    answering the questions raised about the defense costs and settlement in that action.

24          158.    A true and correct copy of Mr. Carlton's letter is attached hereto as Exhibit 9 and

25    is incorporated herein by this reference.

26          159.    The District alleges on information and belief that APIC, through its counsel,

27    received Mr. Carlton's letter in or around June 2008.

28

OTAY WATER DISTRICT'S FIRST AMENDED ANSWER AND COUNTERCLAIM
Case No. 08-CV-0662-JM-POR

1    160.    Despite Mr. Carlton's letter, APIC still failed to reimburse the District for any of

2    its outstanding defense costs or settlement payments in the *Harron* action, which totaled in

3    excess of $1.5 million.

**THE *BARTLETT-MAY* CLAIM**

5    161.    In April 2002, the District timely notified APIC of a wrongful termination claim

6    submitted to its Board of Trustees by five former employees (the *Bartlett-May* claim) and

7    requested that APIC appoint defense counsel to represent it against such claim.

8    162.    APIC agreed to defend the District against the claim and appointed Mr. Stanton as

9    defense counsel.

10    163.    Eventually, the *Bartlett-May* claim became a lawsuit filed in the United States

11    District Court for the Southern District of California, Case No. 02 CV 2281 BTM, titled *Bartlett-*

12    *May, et al v. Otay Water District, et al.* (the "*Bartlett-May* federal suit").

13    164.    The *Bartlett-May* federal lawsuit alleged claims for wrongful discharge,

14    employment discrimination and violation of due process in connection with employment

15    termination.

16    165.    The employment terminations at issue in the lawsuit occurred during the

17    February-June 2001 time period, which was also during the APIC Policy period.

18    166.    The complaint in the *Bartlett-May* federal suit alleged claims against the District,

19    and certain of its insured directors and/or employees, that were potentially covered under the

20    terms of the Policy issued by APIC.

21    167.    The complaint in the *Bartlett-May* federal suit alleged claims against the District,

22    and certain of its directors and/or employees, that triggered APIC's duty to defend such insureds

23    under the Policy.

24    168.    APIC agreed to defend the District and its co-defendant directors/employees in

25    the *Bartlett-May* federal suit, and appointed Mr. Stanton to continue with his defense of the

26    District.

27    169.    In 2003, after the District raised concerns about Mr. Stanton's experience and

28    competence in handling its defense in three separate employment-practices lawsuits, APIC

OTAY WATER DISTRICT'S FIRST AMENDED ANSWER AND COUNTERCLAIM

Case No. 08-CV-0662-JM-POR

1    agreed with the District's request to replace Mr. Stanton with Christopher Carlton as its defense

2    counsel in the *Bartlett-May* federal suit.

3        170.    Eventually, APIC agreed to provide for separate counsel for the various co-

4    defendants due to the potential conflicts between them.

5        171.    Despite its promise to defend the District and pay for the costs of separate counsel

6    for each of the co-defendants, APIC never paid for any of the defense fees or costs throughout

7    the entire *Bartlett-May* federal suit, effectively abandoning its insureds in the process.

8        172.    In 2005, the *Bartlett-May* federal suit was dismissed and the plaintiffs in that

9    action re-filed their action in the Superior Court for the State of California, County of San Diego,

10   titled *Bartlett-May, et al. v. Otay Water District, et al,* Case No. GIC 855421 (the "*Bartlett-May*

11   state suit"), alleging the same wrongful conduct against the same defendants.

12       173.    Just as they did in the federal suit, the plaintiffs in the *Bartlett-May* state suit

13   alleged claims for wrongful discharge, employment discrimination, and violation of due process

14   in connection with employment termination.

15       174.    The complaint in the *Bartlett-May* state suit alleged claims against the District,

16   and certain of its insured directors and/or employees, that were potentially covered under the

17   terms of the Policy issued by APIC.

18       175.    The complaint in the *Bartlett-May* state suit alleged claims against the District,

19   and certain of its directors and/or employees, that triggered APIC's duty to defend such insureds

20   under the Policy.

21       176.    The District timely tendered the *Bartlett-May* state suit to APIC for defense and

22   indemnity and APIC agreed to defend it and its co-defendant directors/officers.

23       177.    APIC agreed that the same defense counsel could continue to defend the same

24   parties in the *Bartlett-May* state suit, as in the *Bartlett-May* federal suit (the two related suits are

25   collectively referred to herein as the "*Bartlett-May* action").

26       178.    The following law firms each participated in providing a defense to the District

27   and its co-defendant insureds in the *Bartlett-May* action:  Zimmerman & Kahanowitch; Carlton,

28

1    DiSante & Freudenberger LLP; Foley & Lardner; Wilson Petty Kosmo & Turner LLP; Burke,

2    Williams & Sorensen LLP; and Garcia, Calderon & Ruiz, LLP.

3        179.    The District alleges on information and belief that Zimmerman & Kahanowitch

4    sent invoices to APIC regarding its work in the *Bartlett-May* action, generally on a regular

5    monthly basis.

6        180.    The District alleges on information and belief that Carlton, DiSante &

7    Freudenberger LLP sent invoices to APIC regarding its work in the *Bartlett-May* action,

8    generally on a regular monthly basis.

9        181.    The District alleges on information and belief that Foley & Lardner sent invoices

10    to APIC regarding its work in the *Bartlett-May* action, generally on a regular monthly basis.

11        182.    The District alleges on information and belief that Wilson Petty Kosmo & Turner

12    LLP sent invoices to APIC regarding its work in the *Bartlett-May* action, generally on a regular

13    monthly basis.

14        183.    The District alleges on information and belief that Burke, Williams & Sorensen

15    LLP sent invoices to APIC regarding its work in the *Bartlett-May* action, generally on a regular

16    monthly basis.

17        184.    The District alleges on information and belief that Garcia, Calderon & Ruiz, LLP

18    sent invoices to APIC regarding its work in the *Bartlett-May* action, generally on a regular

19    monthly basis.

20        185.    Just as it did in the federal suit, however, APIC failed to pay any of the defense

21    fees and costs incurred by the District in the *Bartlett-May* state suit, and failed to reimburse it for

22    such costs despite being provided with the invoices on a regular basis and despite the District's

23    reimbursement requests.

24        186.    The District's reimbursement requests in the *Bartlett-May* action, which were

25    ignored by APIC, included the aforementioned January 18, 2005 and January 8, 2007

26    reimbursement requests.

27        187.    The District alleges on information and belief that APIC failed to pay for any of

28    the defense fees and costs of the District and its co-defendant directors or employees, or to

1    reimburse it for any such defense fees and costs, at any time during the course of the *Bartlett-*

2    *May* action.

3        188.    In effect, despite its hollow promise to provide a defense, APIC abandoned its

4    insureds and left them to fend for themselves in the *Bartlett-May* action, which lasted five years.

5        189.    After Mr. Stanton was replaced as the District's defense counsel, APIC basically

6    ignored the District and its defense counsel throughout the *Bartlett-May* action and failed to

7    participate in or make any effort toward settlement negotiations.

8        190.    Having been abandoned by APIC and effectively provided with no defense, the

9    District was left to negotiate its own settlement in the *Bartlett-May* state suit, and the case was

10    settled in late March 2007.

11        191.    After the District notified APIC of the settlement, APIC still made no effort to

12    pay for the settlement.

13        192.    APIC's first partial reimbursement of the District's defense costs in the *Bartlett-*

14    *May* action was not until nearly three months after the *Bartlett-May* action settled, and more than

15    five years after it agreed to defend the District, when APIC finally made its aforementioned June

16    6, 2007 partial reimbursement of the District's defense costs.

17        193.    On August 27, 2007, the District's general counsel sent a letter to APIC's counsel,

18    together with invoices for over $85,000 in defense fees and costs incurred during 2007 in the

19    *Bartlett-May* action, a copy of the settlement agreement in that action, and a copy of the

20    settlement check in the amount of $371,250, requesting reimbursement for such defense costs

21    and settlement payments.

22        194.    A true and correct copy of the August 27, 2007 letter, without the enclosures, is

23    attached hereto as Exhibit 10 and is incorporated herein by this reference.

24        195.    The District alleges on information and belief that APIC, through its counsel,

25    received the August 27, 2007 letter and enclosures, on or shortly after August 27, 2007.

26        196.    APIC simply ignored the District's August 2007 reimbursement request and failed

27    to provide any response or even a partial payment toward the defense and settlement costs

28    reflected in that reimbursement request until after the District hired coverage counsel.

OTAY WATER DISTRICT'S FIRST AMENDED ANSWER AND COUNTERCLAIM
Case No. 08-CV-0662-JM-POR

## THE *DASARRO* CLAIM

197.    On or about January 27, 2003, Joseph Dassaro filed a *Qui Tam* action in the Superior Court for the State of California, County of San Diego, Case No. GIC 804495, styled *Otay Water District, Ex Rel. Joseph Dassaro v. Jaime Bonilla, Bonifacio Garcia, Roberto Griego, Roberta Sistos, Burke Williams & Sorensen, LLP.* (the "*Dassaro* action").

198.    The District timely tendered the *Dassaro* action to APIC for defense and indemnity.

199.    The complaint in the *Dassaro* action alleged potentially covered claims for damages against the District's then General Manager, Roberto Griego, and Jaime Bonilla, who was then a member of the District's Board of Directors, because of alleged "wrongful acts", as that term is defined by the Policy, relating to the submission and approval of certain invoices for legal work performed by the District's attorneys Bonifacio Garcia, Roberta Sistos and Burke Williams & Sorensen.

200.    Mr. Bonilla was an insured under the Policy, potentially covered for the claims asserted in the *Dassaro* action.

201.    Mr. Griego was an insured under the Policy, potentially covered for the claims asserted in the *Dassaro* action.

202.    The complaint in the *Dassaro* action alleged claims that were potentially covered under the Policy.

203.    The complaint in the *Dassaro* action alleged claims that triggered APIC's duty to defend its insureds under the Policy, Mr. Bonilla and Mr. Griego.

204.    On or about May 23, 2003, APIC agreed to provide a defense to the District's director defendant, Mr. Bonilla, and General Manager, Mr. Griego, under a reservation of rights pursuant to a letter from APIC's agent and adjuster, Scott Towns of Sierra West Adjusters.

205.    Though APIC agreed to provide a defense to both Mr. Bonilla and Mr. Griego in its May 23, 2003 reservation of rights letter, APIC reserved its right to deny coverage to Mr. Bonilla and Mr. Griego under California Insurance Code section 533 based upon the *Dassaro* complaint's allegations of willful conduct.

206.    Though APIC's reservation of the rights created a conflict of interest requiring APIC to advise its insureds of their right to the appointment of independent counsel, and to appoint such counsel to represent its insureds, APIC failed to appoint such independent counsel or to advise the District, Mr. Bonilla or Mr. Griego of the insureds' right to independent counsel.

207.    In its May 23 reservation of rights letter, APIC denied coverage for the claims in the *Dassaro* action alleged against the District's counsel.

208.    Despite its promise to provide a defense for Mr. Bonilla and Mr. Griego, APIC failed and refused to pay for their defense and ignored the District's requests for such payment or reimbursement of defense costs.

209.    As a result of APIC's failure to provide and pay for the defense of Mr. Bonilla and Mr. Griego in the *Dassaro* action, the District hired counsel to represent those insureds and paid their defense costs.

210.    In 2003, the counsel hired by the District successfully defended the insureds and eventually obtained a dismissal of the claims alleged in the *Dassaro* action.

211.    Despite the efficient and successful defense provided by counsel for Mr. Bonilla and Mr. Griego in the *Dassaro* action, APIC failed and refused to reimburse the District for any of the defense costs Mr. Bonilla and Mr. Griego incurred in the *Dassaro* action.

212.    As stated above, on or about January 18, 2005, the District's counsel sent a letter to APIC's counsel requesting reimbursement of the defense fees and costs it had paid in the *Dassaro, Harron* and *Bartlett-May* actions, but APIC failed and refused to reimburse the District for such defense fees.

213.    To date, APIC has failed to reimburse the District for any of the attorney's fees and defense costs it paid in the *Dassaro* action.

## THE *AUBREY* CLAIM

214.    In April 2003, a former employee of the District, Pamela Aubrey, filed an employment discrimination lawsuit against the District in the Superior Court for the State of California, County of San Diego, Case No. GIE 017207, titled *Aubrey v. Otay Water District* (the "*Aubrey* action").

1    215.    Just as it had done with the *Bartlett-May* claim, the District promptly notified its

2    insurance broker, James Swanson of Swanson Insurance Agency, of the *Aubrey* action and by

3    letter to Mr. Swanson dated May 9, 2003, tendered it to its insurers for defense and indemnity.

4    216.    A true and correct copy of the May 9, 2003 letter, without enclosures, is attached

5    hereto as Exhibit 11 and is incorporated herein by this reference.

6    217.    The District alleges on information and belief that APIC received the May 9, 2003

7    letter and the *Aubrey* complaint on or around May 9, 2003.

8    218.    The District alleges on information and belief that at the time of the tender, Mr.

9    Swanson was authorized by APIC to receive notice of claims against the District potentially

10   covered under the Policy.

11   219.    The District alleges on information and belief that APIC received actual notice of

12   the *Aubrey* action in or around May 2003.

13   220.    The District alleges on information and belief that APIC received constructive

14   notice of the *Aubrey* action in or around May 2003.

15   221.    The complaint in the *Aubrey* action alleged claims for discrimination, harassment

16   and retaliation relating to the District's purported failure to hire or promote Ms. Aubrey for

17   various positions over the course of her employment.

18   222.    The complaint in the *Aubrey* action alleged claims against the District that were

19   potentially covered under the terms of the Policy issued by APIC.

20   223.    The complaint in the *Aubrey* action alleged claims against the District that

21   triggered APIC's duty to defend the District under the Policy.

22   224.    On November 5, 2003, promptly after Ms. Aubrey filed a First Amended

23   Complaint ("FAC") in the *Aubrey* action, the District's general counsel timely sent a letter to

24   Scott Towns of Sierra West Adjusters, with the FAC enclosed, tendering the FAC and the

25   *Aubrey* action for defense and indemnity.

26   225.    A true and correct copy of the November 5, 2003 letter, without enclosures, is

27   attached hereto as Exhibit 12 and is incorporated herein by this reference.

28

1    226.    The District alleges on information and belief that Mr. Towns received the

2    November 5, 2003 letter, and the enclosed FAC, on or shortly after November 5, 2003.

3    227.    The District alleges on information and belief that APIC, through its

4    representative and adjuster, Scott Towns, received the November 5, 2003 tender letter and the

5    enclosed FAC, on or shortly after November 5, 2003.

6    228.    At that time, Mr. Towns was the adjuster for APIC responsible for handling the

7    *Harron* and *Bartlett-May* actions, as well as two other lawsuits against the District, *Rodriguez*

8    and *Dassaro*, which APIC had agreed to defend under the Policy.

9    229.    The District alleges on information and belief that Mr. Towns was APIC's

10   authorized agent with respect to such actions.

11   230.    The District alleges on information and belief that Mr. Towns was APIC's

12   authorized agent with respect to receiving notice of the *Aubrey* claim.

13   231.    Throughout the time that APIC and the District discussed replacing Mr. Stanton

14   as the District's defense counsel in the various actions, Mr. Towns was APIC's representative in

15   several of those communications.

16   232.    Accordingly, in its November 5, 2003 tender letter to Mr. Towns, the District

17   specifically requested that Mr. Carlton be appointed as the District's counsel in the *Aubrey*

18   action, just as had been done in the other pending employment-practices cases APIC had agreed

19   to defend.

20   233.    Although the *Bartlett-May*, *Harron, Rodriguez* and *Dassaro* actions all triggered

21   coverage under the APIC Policy, and APIC had agreed to defend such actions under the Policy,

22   its prior coverage counsel at the law firm of Nixon & Peabody always erroneously referred to a

23   subsequent liability insurance policy issued to the District by another Kemper company,

24   Specialty National Insurance Company ("SNIC"), in letters to the District's general counsel

25   discussing coverage issues in those actions.

26   234.    Thus, the November 5, 2003 tender letter to Scott Towns refers to the SNIC

27   policy.  However, Mr. Towns was fully aware that the employment-practices liability policy

28

OTAY WATER DISTRICT'S FIRST AMENDED ANSWER AND COUNTERCLAIM
Case No. 08-CV-0662-JM-POR

1    issued by Kemper to the District for the relevant time period was issued by APIC, rather than

2    SNIC.

3         235.    The District further alleges that the November 5, 2003 tender letter provided

4    APIC with actual and/or constructive notice of the *Aubrey* action, the FAC, and the District's

5    tender of defense and indemnity.

6         236.    The FAC in the *Aubrey* action alleged wrongful conduct that allegedly occurred

7    during the Policy period.

8         237.    The FAC further alleged conduct during the Policy period that potentially

9    constituted "wrongful acts" under the Policy.

10        238.    The FAC further alleged conduct that potentially constituted offenses arising out

11   of the District's business during the Policy period, as well as claims for "personal injury" caused

12   by such offenses.

13        239.    The FAC in the *Aubrey* action alleged claims against the District that were

14   potentially covered under the terms of the Policy issued by APIC.

15        240.    The FAC in the *Aubrey* action alleged claims against the District that triggered

16   APIC's duty to defend The District under the Policy.

17        241.    Despite the District's timely tender and notice to APIC of the *Aubrey* action,

18   APIC wrongfully failed to provide any defense to the District in that action and left the District

19   to fend for itself.

20        242.    As a result, the District hired its own counsel, paid for its own defense, which cost

21   in excess of $483,000 and, because it had been abandoned by APIC and left without a defense, it

22   settled the *Aubrey* lawsuit in or around September 2005.

23        243.    Pursuant to the *Aubrey* settlement, the District paid $50,000 and had to purchase

24   five years of CALPERS service credit for Ms. Aubrey which cost the District an additional

25   $36,489.22.

26        244.    On or about June 25, 2007, the District sent a letter to APIC's counsel, together

27   with a copy of the invoices for legal services and costs it paid in defending the *Aubrey* action,

28   seeking reimbursement for such defense fees and costs under the Policy.

1    245.    APIC attached a true and correct copy of the letter, without the enclosed invoices,

2    as Exhibit C to its first amended complaint in this action.

3    246.    The District alleges on information and belief that on or shortly after June 25,

4    2007, APIC, through its counsel, received the June 25, 2007 letter and the invoices referenced

5    therein.

6    247.    In November 2007, APIC's counsel, Mr. Brunner, asked the District to provide

7    him with a copy of the *Aubrey* settlement agreement and with further information about the

8    *Aubrey* case.

9    248.    In response, the District promptly provided Mr. Brunner with a copy of the

10    settlement agreement and with other documentation verifying that the total cost of the settlement,

11    including the settlement payment and the cost to purchase the CALPERS credit, was $86,489.22.

12    249.    The District alleges on information and belief that APIC, through its counsel,

13    received the *Aubrey* settlement agreement and the documentation of the cost of settlement on or

14    about November 27, 2007.

15    250.    In December 2007, at the request of Mr. Brunner, the District also provided

16    APIC's counsel with copies of the May 9, 2003 and November 5, 2003 tender letters.

17    251.    The District alleges on information and belief that in December 2007, APIC,

18    through its counsel, received the copies of the May 9, 2003 and November 5, 2003 tender letters

19    forwarded by the District.

20    252.    Despite receiving this information, on April 4, 2008, APIC's counsel, Mr.

21    Brunner, faxed a letter to the District's general counsel, dated April 3, 2008, which denied

22    coverage for the *Aubrey* action and in which APIC refused to reimburse the District for its

23    defense costs and settlement payments in *Aubrey* on the false grounds that it had first received

24    notice of the *Aubrey* action in June 2007.

25    253.    A true and correct copy of the April 3, 2008 letter is attached hereto as Exhibit 13

26    and is incorporated herein by this reference.

27    254.    In that letter, APIC falsely claimed that neither APIC nor Kemper had been

28    notified of the *Aubrey* action until June 2007.

1    255.    APIC further stated in the denial letter that it had requested documentation of

2    when APIC notified Kemper and that the District provided a copy of the May 9, 2003 letter to

3    the District's broker, Jim Swanson.  APIC claimed that Mr. Swanson never notified Kemper of

4    the lawsuit and that notice to the District's insurance broker was not sufficient to give Kemper

5    notice.

6    256.    In its denial letter, however, APIC completely failed to discuss the notice and

7    tender that the District provided to Kemper's claims adjuster and agent, Scott Towns, on

8    November 5, 2003.

9    257.    On April 11, 2008, APIC filed this lawsuit, seeking declaratory judgment that it

10   owes no coverage for the *Aubrey* lawsuit based upon its misrepresentation to the Court that it did

11   not receive notice of the *Aubrey* lawsuit until June 2007.

12   258.    In its complaint, APIC completely failed to disclose to the Court that on

13   November 5, 2003, the District timely notified APIC's claims adjuster and authorized

14   representative, Mr. Towns, of the *Aubrey* action and the FAC filed by Ms. Aubrey.

15   259.    On or about August 6, 2008, APIC filed its First Amended Complaint For

16   Declaratory Judgment in this action and in that pleading, APIC again completely failed to

17   disclose to the Court that on November 5, 2003, the District timely notified APIC's

18   representative, Mr. Towns, of the *Aubrey* Action and the FAC.

19   260.    Moreover, in its First Amended Complaint For Declaratory Judgment, APIC

20   repeated its misrepresentation that it was not notified of the *Aubrey* action until June 2007 and

21   fraudulently seeks judgment based on such misrepresentation.

22                      **THE DISTRICT HIRES COVERAGE COUNSEL**

23   261.    As a result of APIC's failure to provide a defense to the District or otherwise

24   satisfy its contractual obligations under the Policy in connection with the *Bartlett-May, Harron,*

25   *Dassaro* and *Aubrey* actions, the District was required to incur and has incurred legal fees and

26   costs in an effort to obtain the insurance benefits wrongfully withheld by APIC.

27

28

262.    Eventually, the District was required to hire insurance coverage counsel to pursue the Policy benefits wrongfully withheld by APIC, as well as to defend it against the misrepresentations asserted by APIC in the present lawsuit.

263.    On June 24, 2008, the District's coverage counsel sent a detailed letter to APIC's counsel seeking reimbursement for the outstanding defense fees, costs, and settlement payments that the District paid in the *Harron* and *Bartlett-May* actions.

264.     A true and correct copy of the June 24, 2008 letter is attached hereto as Exhibit 14 and is incorporated herein by this reference.

265.    The District alleges on information and belief that APIC, through its counsel, received the June 24, 2008 letter on or about June 24, 2008.

266.    Though APIC had already filed this declaratory relief action as to the insurance coverage issues in the *Aubrey* action, the District's June 24, 2008 letter for reimbursement provided APIC with an opportunity to pay its outstanding obligations as to the underlying *Harron* and *Bartlett-May* actions, and avoid litigation as to such obligations, by making payment prior to the time the District was required to file its answer and counterclaim.

267.    As outlined in the letter, the defense fees and costs paid by the District in the *Harron* and *Bartlett-May* actions, which APIC had not reimbursed, and many of which had been outstanding for several years, were in excess of $1.6 million, not including interest.

268.    In addition, the settlement costs incurred by the District in those two lawsuits are in excess of $1 million.

269.    APIC requested additional time to respond to the letter and agreed to extend the time for the District to file its answer and counterclaim.

270.    A true and correct copy of the July 2, 2008 letter from the District's counsel to APIC's counsel is attached hereto as Exhibit 15 and is incorporated herein by this reference.

271.    The District alleges on information and belief that APIC, through its counsel, received the July 2, 2008 letter on or about that date.

OTAY WATER DISTRICT'S FIRST AMENDED ANSWER AND COUNTERCLAIM
Case No. 08-CV-0662-JM-POR

272.    In both the June 24 letter and the July 2 letter, the District demanded that APIC pay the full amount owed for the two matters, or in the alternative, pay the undisputed amount and provide an explanation for any disputed invoices or payments.

273.    On July 17, 2008, APIC's counsel sent APIC's response to the District's request for reimbursement.  In its lengthy response, APIC asserted a variety of excuses for failing to pay its obligations, claiming that it had previously requested information about certain invoices that it alleged had not been received, though failing to specify which invoices were missing and failing to provide the District with an opportunity to provide any needed information.

274.    A true and correct copy of the July 17, 2008 letter is attached hereto as Exhibit 16 and is incorporated herein by this reference.

275.    While APIC's letter was full of excuses, misrepresentations and inconsistencies, it failed to include any payment or to acknowledge any undisputed amount APIC agreed to pay.

276.    APIC's July 17, 2008 letter also failed to provide any discussion or explanation for APIC's failure to pay invoices totaling $156,512 which had been submitted in April 2007, or its failure to pay invoices totaling $85,121.30 which had been submitted by the District for reimbursement in August 2007.

277.    APIC further stated in the letter that it would not pay for the settlements in either action on the unsupported grounds that such settlements were purportedly for intentional conduct that was uncovered by the Policy and included payments for attorneys fees which APIC claimed to be uncovered.

278.    On July 29, 2008, the District's counsel sent a final letter to APIC's counsel to address the allegations and misrepresentations in APIC's denial letter and to provide APIC with a final chance to avoid adding the two matters to the coverage litigation.

279.    In that letter, the District addressed the issues raised in APIC's denial letter, pointed out that no explanation had been provided by APIC for its failure to pay the April and August invoices, noted the interest that had been accumulating on APIC's obligations, and gave APIC one last chance to pay such obligations, which totaled over $2.7 million for just the *Harron* and *Bartlett-May* actions.

280.    A true and correct copy of the July 29, 2008 letter is attached hereto as Exhibit 17 and is incorporated herein by this reference.

281.    The District alleges on information and belief that APIC, through its counsel, received the July 29, 2008 letter on or about that date.

282.    In response, APIC finally agreed to pay the April 2007 invoices totaling $156,512 and the August 2007 invoices totaling $85,121.30, but failed and refused to offer any payment toward the remaining obligations on the two matters, which are still in excess of $2.45 million.

283.    Of course, APIC's agreement to pay the April and August 2007 invoices, which APIC has never disputed and which it failed to even mention in its July 17, 2008 letter, demonstrates that APIC had no basis for ever withholding payment on such invoices.

284.    Moreover, the fact that APIC failed to respond to numerous previous requests from the District for payment of such invoices, and only agreed to offer payment after receiving two letters from the District's coverage counsel which specifically threatened litigation, proves that APIC acted unreasonably and in bad faith by withholding payment, and that the damages suffered by the District for such unreasonable bad faith conduct includes not only interest for the unreasonable delay, but also the attorney's fees and costs the District incurred in seeking the recovery of such benefits.

285.    APIC's conduct has been similarly unreasonable with regard to its remaining obligations to reimburse the District for defense fees and costs, as well as settlement payments made in connection with the *Bartlett-May, Harron,* and *Aubrey* matters.

286.    On or about August 6, 2008, apparently aware that it had left the District with no choice but to file a counterclaim to seek the Policy benefits APIC had wrongfully withheld in connection with the *Harron* and *Bartlett-May* actions, APIC filed its first amended complaint, which added claims for declaratory judgment regarding its reimbursement obligations in connection with the *Harron* and *Bartlett-May* actions.

287.    The District alleges on information and belief that all of the above-described conduct of APIC and its attorneys, representatives and adjusters was authorized, approved and or ratified by APIC and its managing agents, officers or directors.

1

## CLAIMS FOR RELIEF

2

## FIRST CAUSE OF ACTION

3

**(Breach of Contract-*Harron* Action)**

4     288.    The District incorporates by reference in this cause of action, as though set forth

5   at length herein, all of the allegations contained in each of the preceding paragraphs in this

6   counterclaim.

7     289.    The Policy imposed a duty upon Counter-Defendant APIC to defend the District

8   and its directors and/or employees in the underlying *Harron* action.

9     290.    The District has performed all acts and conditions on its part to be performed

10   under the Policy.

11     291.    Counter-Defendant APIC has breached its contractual obligations to the District

12   under the Policy, and its duty to defend and indemnify the District in the *Harron* action by:

13   (a) failing and refusing to pay for its defense fees and costs incurred in that lawsuit, despite

14   repeated demands for payment and/or reimbursement for such fees and costs; (b) failing to

15   actively participate in the District's defense and communicate with defense counsel; (c) failing to

16   involve itself with settlement communications; (d) failing to settle the lawsuit and take its

17   insureds out of harm's way; (e) failing to advise its insureds of their right to separate

18   independent counsel, while reserving the right to deny coverage on the grounds that the insureds

19   engaged in willful conduct; (f) failing to indemnify the District for its settlement payments and

20   costs; (g) initially failing to satisfy its obligation to appoint competent, experienced counsel to

21   defend its insureds; and (h) misrepresenting the bases for its wrongful withholding of policy

22   benefits.

23     292.    As a direct, proximate and legal result of APIC's breach of its contractual duties

24   in connection with the defense of the *Harron* action, the District has suffered damages, including

25   the attorney's fees and costs it incurred in defending the *Harron* action, the settlement payments

26   and obligations it incurred to resolve the lawsuit, and special, consequential and incidental

27   damages in an amount according to proof.

28

## <u>SECOND CAUSE OF ACTION</u>

### (Breach of Contract-*Bartlett-May* Action)

293.    The District incorporates by reference in this cause of action, as though set forth at length herein, all of the allegations contained in each of the preceding paragraphs in this counterclaim.

294.    The Policy imposed a duty upon APIC to defend the District and its directors and/or employees in the underlying *Bartlett-May* action.

295.    The District has performed all acts and conditions on its part to be performed under the Policy.

296.    APIC has breached its contractual obligations to the District under the Policy and its duty to defend and indemnify the District in the *Bartlett-May* action by:  (a) failing and refusing to pay for the defense fees and costs incurred by the District in those related lawsuits, despite repeated demands for payment and/or reimbursement for such fees and costs; (b) failing to actively participate in the District's defense and communicate with defense counsel; (c) failing to involve itself with settlement communications; (d) failing to settle the *Bartlett-May* action and take its insureds out of harm's way; (e) failing to advise its insureds of their right to separate independent counsel, while reserving the right to deny coverage on the grounds that the insureds engaged in intentional conduct; (f) failing to indemnify the District for its settlement payment; (g) initially failing to satisfy its obligation to appoint competent, experienced counsel to defend its insureds; and (h) misrepresenting the bases for its wrongful withholding of policy benefits.

297.    As a direct, proximate and legal result of APIC's breach of its contractual duties in connection with the defense of the *Bartlett-May* action, the District has suffered damages, including the attorney's fees and costs it incurred in defending the *Bartlett-May* action, the settlement payment it made to resolve the lawsuit, and special, consequential and incidental damages in an amount according to proof.

/ / /

/ / /

/ / /

**THIRD CAUSE OF ACTION**

**(Breach of Contract-*Aubrey* Action)**

298.     The District incorporates by reference in this cause of action, as though set forth at length herein, all of the allegations contained in each of the preceding paragraphs in this counterclaim.

299.     The Policy imposed a duty upon APIC to defend the District in the underlying *Aubrey* action.

300.     The District has performed all acts and conditions on its part to be performed under the Policy.

301.     APIC breached its duty to defend the District in the *Aubrey* action by abandoning its insured and failing to provide any defense in the lawsuit.

302.      APIC further breached its duty to defend and indemnify the District by refusing, after repeated demand, to reimburse it for any defense costs it paid, or for the settlement payments it made, while wrongfully denying coverage on the fraudulent grounds that Kemper had never received notice of the *Aubrey* action prior to June 2007.

303.     As a direct, proximate and legal result of APIC's breach of its duty to defend the District in the *Aubrey* action, the District has suffered damages, including the attorney's fees and costs it incurred in defending the *Aubrey* action, the settlement payment and costs it incurred to resolve the lawsuit, and special, consequential and incidental damages in an amount according to proof.

**FOURTH CAUSE OF ACTION**

**(Breach of Contract-*Dassaro* Action)**

304.     The District incorporates by reference in this cause of action, as though set forth at length herein, all of the allegations contained in each of the preceding paragraphs in this counterclaim.

305.     The Policy imposed a duty upon APIC to defend the District's former director, Mr. Bonilla, and former General Manager, Mr. Griego, in the underlying *Dassaro* action.

306.    The District has performed all acts and conditions on its part to be performed under the Policy.

307.    APIC has breached its contractual obligations to the District under the Policy and its duty to defend its insureds in the *Dassaro* action by:  (a) failing and refusing to pay for the defense fees and costs incurred by the District in the *Dassaro* action, despite repeated demands for payment and/or reimbursement for such fees and costs; (b) failing to actively participate in its insureds' defense and communicate with defense counsel; and (c) failing to advise its insureds of their right to separate independent counsel, while reserving the right to deny coverage on the grounds that the insureds engaged in willful conduct.

308.    As a direct, proximate and legal result of APIC's breach of its contractual duties in connection with the defense of the *Dassaro* action, the District has suffered damages, including the attorney's fees and costs it incurred in defending the *Dassaro* action, and special, consequential and incidental damages in an amount according to proof.

## FIFTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

309.    The District incorporates by reference in this cause of action, as though set forth at length herein, all of the allegations contained in each of the preceding paragraphs in this counterclaim.

310.    The Policy contains by nature of the agreement and by operation of law, an implied covenant of good faith and fair dealing, that no party to the agreement will take any action which would deprive or jeopardize the rights or benefits of the other party under the agreement.

311.    In response to the District's tender of the underlying *Harron, Bartlett-May, Aubrey,* and *Dassaro* actions, APIC had a duty to the District, as an  insured under the Policy, to promptly and reasonably: (1) conduct a fair and impartial investigation to determine coverage; (2) review and consider all potential bases for coverage under the Policy; (3) disclose to the District all benefits or coverages that might apply to the underlying actions; (4) provide the District and its directors and officers with an immediate defense in each of the underlying

1  *Harron, Bartlett-May, Dassaro,* and *Aubrey* actions; (5) timely pay or offer to pay all reasonable

2  and necessary defense costs; (6) timely communicate regarding coverage issues and settlement

3  opportunities; (7) evaluate and participate meaningfully in efforts to settle the lawsuits; (8)

4  promptly reimburse the District for all of its reasonable defense fees and costs incurred in the

5  underlying *Harron, Bartlett-May, Dassaro* and *Aubrey* actions; (9) advise its insureds of their

6  right to independent counsel, pursuant to the provisions of California Civil Code section 2860, in

7  the *Harron, Bartlett-May* and *Dassaro* actions, based upon the conflict created by APIC's

8  reservation of rights; and (10) appoint or agree to appoint independent counsel pursuant to

9  California Civil Code section 2860.

10      312.    APIC breached the duty of good faith and fair dealing by engaging in all of the

11  wrongful conduct described hereinabove, which included its failure to promptly and reasonably

12  perform each of the duties discussed in the foregoing paragraph.

13      313.    The District alleges on information and belief that APIC further breached the duty

14  of good faith and fair dealing by acting to protect its own interests, rather than the interests of its

15  insureds, and withholding any payments for the District's costs of defense in the underlying

16  actions, thus effectively abandoning its insureds and leaving them to fend for themselves in the

17  underlying litigation, while the District incurred defense costs in excess of $2.5 million in the

18  *Bartlett-May, Harron, Dassaro* and *Aubrey* matters.

19      314.    APIC compounded its bad faith by refusing and failing to respond to the District's

20  numerous requests for reimbursement and by refusing and failing to reimburse the District for

21  the defense costs and settlement payments it made in the underlying actions.

22      315.    Even with respect to the minimal partial payments APIC eventually made toward

23  the *Harron* and *Bartlett-May* defense costs, APIC acted unreasonably and in bad faith by

24  withholding such payments for extensive periods of time, exceeding several years as to certain

25  invoices, and by requiring the District to incur substantial attorney's fees and costs pursuing the

26  payment of policy benefits.

27      316.    The District alleges on information and belief that APIC further breached the

28  implied covenant of good faith and fair dealing by unreasonably failing to advise its insureds of

1   their right to independent counsel in the *Harron, Bartlett-May,* and *Dassaro* actions and by

2   failing to:  1) appoint such independent counsel; 2) agree to the appointment of independent

3   counsel; and 3) pay for such independent counsel.

4        317.    Moreover, APIC appointed inexperienced and/or incompetent counsel to

5   represent the District and its employees and directors in the underlying *Harron, Bartlett-May* and

6   *Dassaro* actions, and fraudulently disputed the District's right to select experienced independent

7   counsel to represent their interests in those lawsuits.

8        318.    In response to the District's reimbursement requests, APIC also acted

9   unreasonably, fraudulently and in bad faith by misrepresenting to the District that it had not

10  received invoices that had been previously provided, by falsely claiming it had requested

11  information that had not been provided, and by falsely stating that it had never received notice of

12  the *Aubrey* lawsuit prior to June 2007.

13       319.    APIC further acted unreasonably, fraudulently and in bad faith by filing the

14  present lawsuit without a reasonable basis for doing so, on the false grounds that it never

15  received notice of the *Aubrey* action until June 2007, and by repeatedly making such

16  misrepresentations to the Court, in both the original and first amended complaints, despite the

17  fact that it knew full well it had been provided with timely notice of the lawsuit no later than

18  November 2003.

19       320.    The District alleges on information and belief that APIC further breached the

20  covenant of good faith and fair dealing by terminating the Policy two years before its agreed

21  effective date, simply because the District had submitted claims under the Policy.

22       321.    The District further alleges on information and belief that APIC's wrongful and

23  unreasonable conduct in refusing to reimburse the District for certain defense costs and/or

24  settlement payments in the *Harron, Bartlett-May, Aubrey* and *Dassaro* actions, as well as

25  unreasonably delaying reimbursement of other defense costs incurred by the District in the

26  *Bartlett-May* and *Harron* actions until more than a year after the invoices were submitted for

27  reimbursement, was part of an intentional and consistent pattern and practice designed to avoid

28

1   and minimize its performance of obligations under the Policy, for the benefit of its own

2   economic interests, and to the detriment of its insureds.

3       322.    As a direct, proximate and legal result of APIC's breach of the implied covenant

4   of good faith and fair dealing, the District has suffered general, special, consequential and

5   incidental damages according to proof.

6       323.    As a further direct, proximate and legal result of APIC's wrongful conduct, the

7   District was required to retain counsel to pursue recovery of benefits under the Policy that were

8   unreasonably withheld and to file this counterclaim in order to procure said wrongfully withheld

9   policy benefits, resulting in further damages in the form of attorney's fees and costs recoverable

10  pursuant to the California Supreme Court decision in *Brandt v. Superior Court,* 37 Cal.3d 813

11  (1985), in a sum according to proof at trial.

12      324.    The District further alleges on information and belief that in committing the

13  wrongful acts described herein above, APIC acted with malice, oppression and fraud, and with a

14  conscious disregard for its insured's rights.

15      325.    The District further alleges on information and belief that each of the wrongful

16  acts of APIC and or its agents described herein above, was either performed, authorized or

17  ratified by an officer, director or managing agent of APIC and the District is entitled to punitive

18  damages in an amount sufficient to punish and make an example of APIC.

19      **WHEREFORE,** Counter-Claimant Otay Water District prays for judgment against

20  Counter-Defendant American Protection Insurance Company as follows:

21                      **PRAYER FOR RELIEF**

22          **FOR THE FIRST, SECOND, THIRD AND FOURTH CAUSES OF ACTION**

23      1.      For general, special, consequential and incidental damages in a sum according to

24  proof at trial;

25      2.      For prejudgment interest at the legal rate;

26      3.      For the costs of suit herein; and

27      4.      For such other and further relief as the Court deems just, equitable and proper.

28

1    **FOR THE FIFTH CAUSE OF ACTION**

2        5.    For general, special, consequential and incidental damages in a sum according to

3    proof at trial;

4        6.    For prejudgment interest at the legal rate;

5        7.    For reasonable attorneys fees, as damages pursuant to *Brandt v. Superior Court,*

6    *supra,* according to proof at trial;

7        8.    For punitive damages;

8        9.    For the costs of suit herein; and

9        10.    For such other and further relief as the Court deems just, equitable, and proper.

10

11    DATED: August 26, 2008                    HILDING LAW FIRM

12

13                               By:  s/ Peter Q. Schluederberg

14                                  PAUL A. HILDING
15                                  PETER Q. SCHLUEDERBERG
                              hilding@hildinglaw.com
16                                  pschluederberg@hildinglaw.com
                              Attorneys for Defendant and Counter-
17                                  Claimant Otay Water District

18    **DEMAND FOR JURY TRIAL**

19        Otay Water District hereby demands a jury trial.

20    DATED:  August 13, 2008                 HILDING LAW FIRM

21

22                               By:  s/ Peter Q. Schluederberg

23                                  PAUL A. HILDING
                              PETER Q. SCHLUEDERBERG
24                                  hilding@hildinglaw.com
                              pschluederberg@hildinglaw.com
25                                  Attorneys for Defendant and Counter-
                              Claimant Otay Water District

26

27

28

OTAY WATER DISTRICT'S FIRST AMENDED ANSWER AND COUNTERCLAIM
Case No. 08-CV-0662-JM-POR

**Exhibit 1**

# Kemper.
American Protection Insurance Company

Administrative Office:

7501 E. McCormick Parkway, 200 North
Scottsdale, AZ 85258

## CALIFORNIA RURAL SPECIAL DISTRICTS INSURANCE PROGRAM
## COMMON POLICY DECLARATIONS

Policy No. 3QX 113478 00
Replacement No. New

NAMED INSURED AND MAILING ADDRESS:
Otay Water District
10595 Jamacha Road
Spring Valley CA 92078

AGENT NAME AND ADDRESS:
S. N. Potter Insurance Agency, Inc.
P. O. Box 7187
Stockton CA 95267

AGENT NO.:    430103

*GARY KELLEY* ✓

*NOV 2 0 2000*

POLICY PERIOD:    From 06/01/2000    To 06/01/2003
at 12:01 a.m. Standard Time at your mailing address shown above.

TYPE OF DISTRICT:  ☒ Water District  ☐ Emergency Services District  ☐ Cemetery District
☐ Other:

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This policy consists of the following Coverage Parts for which a premium is indicated. This premium may be subject to adjustment.

P 370
G 004
A 041
Q 009
B 003
PC 419

| | PREMIUM |
|---|---|
| Property and Inland Marine Coverage Part | $ INCL. |
| Liability Coverage Part | $ INCL. |
| Crime Coverage Part | $ INCL. |
| | $ |
| | $ |
| | $ |
| | $ |

| TOTAL PREMIUM | | |
|---|---|---|
| | First Year | $ 125,700 |
| | Second Year | $ TBD |
| | Third Year | $ TBD |

FORMS APPLICABLE TO ALL COVERAGE PARTS: CARSDI 1004 8/99; CARSDI 1103 8/99

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART SUPPLEMENTAL DECLARATIONS, COVERAGE PARTS, FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

COUNTERSIGNED _____    by_____
DATE                                            AUTHORIZED REPRESENTATIVE

CARSDI 1000 (8/99)
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1998

Exhibit 1        0001

M004  X

 Kemper.
Insurance Companies

ENDORSEMENT NO.  4

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (Standard Time) | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 A.M. | NOON | | |
| 3QX 113478 00 | 06 | 01 | 2001 | X | | Otay Water District | 430103 |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Policy is extended from 06/01/2001 to 07/01/2001

Additional Premium Charged: $10,475

STACY BROWN

MAY 2 4 2002

1.083

EXP. 5/1/04

105,700

136,175

86,804 -40

90-9,168

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

Paul R. Full
AUTHORIZED REPRESENTATIVE

JUN 1 2 2001
DATE

CARSDI 1214 (8/99)

Exhibit 1    0002


Insurance Companies

ENDORSEMENT NO.    3

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (Standard Time) | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 A.M. | NOON | | |
| 3QX 113478 00 | 06 | 01 | 2001 | X | | Otay Water District | 430103 |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Policy is non-renewed due to a Material Adverse Change in Liability Exposure.

GARY KELLEY

JAN 1 4 2002

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

_____
AUTHORIZED REPRESENTATIVE

JUN 1 2 2001
_____
DATE

CARSDI 1214 (8/99)

Exhibit 1        0003

ENDORSEMENT NO.    2

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (Standard Time) | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 | NOON | | |
| | | | | A.M. | | | |
| 3QX 113478 00 | 12 | 28 | 2000 | x | | Otay Water District | 430103 |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:
**LIABILITY COVERAGE PART**

### SCHEDULE

Name of Person or Organization:
SDG&E
As respects use of easement.

KELLIE TRAVIS

JAN 0 9 2001

SECTION IV – WHO IS AN INSURED is amended to include as an Insured the person or organization shown in the Schedule as an Insured but only with respect to liability arising out of your operations or premises owned by or rented to you.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

_____
AUTHORIZED REPRESENTATIVE

DEC 2 8 2000
DATE

CARSDI 1206 (8/99)

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1984

Exhibit 1          0004

ENDORSEMENT NO.    1

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (Standard Time) | | | | | INSURED | AGENCY AND CODE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | MO. | DAY | YR. | 12:01 A.M. | NOON | | |
| 3QX 113478 00 | 06 | 01 | 2000 | X | | Otay Water District | 430103 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:
**LIABILITY COVERAGE PART**

### SCHEDULE

**Name of Person or Organization:**
Price, Troncone & Associates
701 "B" Street Suite 1400
San Diego CA 92101

KELLIE TRAVIS

DEC 1 9 2000

SECTION IV — WHO IS AN INSURED is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your operations or premises owned by or rented to you.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

_____
AUTHORIZED REPRESENTATIVE

DEC 0 4 2000
_____
DATE

CARSDI 1206 (8/99)

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1984

Exhibit 1    0005

## CALIFORNIA RURAL SPECIAL DISTRICTS INSURANCE PROGRAM
## PROPERTY COVERAGE PART
## SUPPLEMENTAL DECLARATIONS

These Supplemental Declarations form a part of policy number    3QX 113478 00

### SCHEDULE OF COVERAGES AND LIMITS OF INSURANCE

| Policy Limit of Insurance | $100,000,000 Per Occurrence |
|---|---|

| Deductibles | $1,000  Per Occurrence |
|---|---|
| | $25  Per Horsepower/Boiler & Machinery Per Occurrence |
| | $1,000  Per Occurrence Auto Comprehensive and Collision |

| Covered Property | Limit of Insurance |
|---|---|
| Aboveground Piping | Included in Policy Limit |
| Above and Belowground Penstock | Included in Policy Limit |
| Commandeered Property | Included in Policy Limit |
| Communication Equipment | Included in Policy Limit |
| Computer Equipment and Electronic Media | Included in Policy Limit |
| Emergency Service Portable Equipment | Included in Policy Limit |
| Fine Arts | Included in Policy Limit |
| Mobile Equipment (Owned) | Included in Policy Limit |
| Mobile Equipment (Non-owned) | Included in Policy Limit |
| Outdoor Property including Signs | Included in Policy Limit |
| Paved Surfaces | Included in Policy Limit |
| Property in the Course of Construction | Included in Policy Limit |
| Real and Personal Property (Owned) | Included in Policy Limit |
| Real and Personal Property (Of Others) | Included in Policy Limit |
| Automobiles (Owned) | Included in Policy Limit |
| Automobiles (Rented or Borrowed) | Included in Policy Limit |
| Trees, Shrubs, and Landscape Plantings | $50,000 Per Occurrence |

| Coverage Extensions | Limit of Insurance |
|---|---|
| Accounts Receivable | Included in Policy Limit |
| Ammonia Contamination | Included in Policy Limit |
| Arson and Crime Reward | $10,000 Per Occurrence |
| Automobile Glass Repair and Replacement | Included in Policy Limit |
| Debris Removal | Included in Policy Limit |
| Demolition and Increased Cost of Construction | Included in Policy Limit |
| Expediting Expenses | Included in Policy Limit |
| Extra Expense | Included in Policy Limit |
| Fire Department Service Charge | $25,000 Per Occurrence |
| Loss of Income | Included in Policy Limit |
| Personal Effects of Insureds | $50,000 Per Occurrence |
| Personal Effects of Patients and Fire Victims | $50,000 Per Occurrence |
| Personal Automobiles of Insureds | Included in Policy Limit |
| Pollutant Clean Up and Removal | $250,000 Per Occurrence |
| Preservation of Property | Included in Policy Limit |
| Recertification of Equipment and Automobiles | $50,000 Per Occurrence |
| Rental Value | Included in Policy Limit |
| Towing and Transportation Expenses | $5,000 Per Occurrence |
| Utility Interruption | Included in Policy Limit |
| Vacant Buildings | Included in Policy Limit |
| Valuable Papers and Records | Included in Policy Limit |

CARSDI 1001 (8/99)

Exhibit 1          0006

FORMS AND ENDORSEMENTS
Forms and endorsements applying to this Coverage Part and made part of this policy at time of issue:
CARSDI 1100a  10/99; CARSDI 1217  8/99; CARSDI 1220  8/99

|  |  |  |  |
|---|---|---|---|
| Premium: | First Year | $ | INCL. |
|  | Second Year | $ | TBD |
|  | Third Year | $ | TBD |

THIS SUPPLEMENTAL DECLARATIONS AND THE COMMON POLICY DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

CARSDI 1001 (8/99)

Exhibit 1    0007

## CALIFORNIA RURAL SPECIAL DISTRICTS INSURANCE PROGRAM
## LIABILITY COVERAGE PART
## SUPPLEMENTAL DECLARATIONS

These Supplemental Declarations form a part of policy number   3QX 113478 00

### SCHEDULE OF COVERAGES AND LIMITS OF INSURANCE

Insurance is only provided for the coverages indicated by an X.

| Coverage | Limit of Insurance |
|---|---|
| ☒ Bodily Injury and Property Damage | $ 25,000,000 Per Occurrence<br>$ 50,000,000 Bodily Injury and Property Damage Aggregate |
| ☒ Personal Injury and Advertising Injury | $ 25,000,000 Any One Person or Organization<br>$ 50,000,000 Personal Injury and Advertising Injury |
| ☒ Professional Liability | $ 25,000,000 Per Claim<br>$ 50,000,000 Professional Liability Aggregate |
| ☒ Wrongful Acts | $ 25,000,000 Per Claim<br>$ 50,000,000 Wrongful Acts Aggregate |
| ☒ Fire Damage | $ 1,000,000 Per Fire |
| ☐ | $ |

RETROACTIVE DATE: 06/01/2000

FORMS AND ENDORSEMENTS
Forms and endorsements applying to this Coverage Part and made part of the policy at time of issue:
CARSDI 1101 8/99; CARSDI 1202 8/99; CARSDI 1203 8/99; CARSDI 1206 8/99

Premium:   First Year     $   INCL.
           Second Year    $   TBD
           Third Year     $   TBD

THIS SUPPLEMENTAL DECLARATIONS AND THE COMMON POLICY DECLARATIONS, TOGETHER WITH THE
COMMON POLICY CONDITIONS, COVERAGE PART(S), FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE
ABOVE NUMBERED POLICY.

CARSDI 1002 (8/99)

Exhibit 1      0008

## CALIFORNIA RURAL SPECIAL DISTRICTS INSURANCE PROGRAM
## CRIME COVERAGE PART
## SUPPLEMENTAL DECLARATIONS

These Supplemental Declarations form a part of policy number   3QX 113478 00

### SCHEDULE OF COVERAGES, LIMITS OF INSURANCE AND DEDUCTIBLES

Insurance is only provided for the coverages indicated by an X.

| | Coverage | Limit of Insurance | Deductible |
|---|---|---|---|
| ☒ | Employee Dishonesty Coverage | $500,000 | $1,000 |
| ☒ | Forgery or Alteration Coverage | $500,000 | $1,000 |
| ☒ | Theft, Disappearance and Destruction Coverage | | |
| | Inside | $ 25,000 | $1,000 |
| | Outside | $ 25,000 | $1,000 |
| ☒ | Computer Fraud Coverage | $100,000 | $1,000 |
| ☐ | | $ | $ |

**CANCELLATION OF PRIOR INSURANCE:** By acceptance of this Coverage Part you give us notice cancelling Prior policy or bond numbers   N/A
the cancellation to be effective at the time this Coverage Part becomes effective.

FORMS AND ENDORSEMENTS
Forms and endorsements applying to this Coverage Part and made part of this policy at time of issue:
CARSDI 1102  8/99

| | Premium: | | |
|---|---|---|---|
| | First Year | $ | INCL. |
| | Second Year | $ | TBD |
| | Third Year | $ | TBD |

THIS SUPPLEMENTAL DECLARATIONS AND THE COMMON POLICY DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY.

CARSDI 1003 (8/99)

Exhibit 1          0009

## Automobile Schedule -- Property Coverage

| Automobile Description | Vehicle Identification Number (VIN) | Covered Yes | Covered No | Deductible |
|---|---|---|---|---|
| 1995 Ford F47 | 1FDLF47G2SEA22962 | X | | $1000 |
| 1995 Ford F800 | 1FDXF80E1SVA47305 | X | | $1000 |
| 1985 F-L T9000 DT | 1FDYU90WXFVA23079 | X | | $1000 |
| 1993 Ford F800 | 1FDXKB4AXPVA09159 | X | | $1000 |
| 1993 Ford F800 | 1FDXKB4AXPVA09467 | X | | $1000 |
| F800 Dump Boy | | X | | $1000 |
| 1993 Ford F800 | 1FDXK84E1PVA23857 | X | | $1000 |
| 1993 Ford Ranger | 1FTCR14X9PTA52901 | X | | $1000 |
| 1989 Pontiac | 1G2HZ54C9KW259360 | X | | $1000 |
| 1991 Ford Truck F800 | 1FDXK84AXMVA14292 | X | | $1000 |
| 1994 F800 | 1FDXK84EXRVA03030 | X | | $1000 |
| 1995 Ford Ranger | 1FTCR14XXSPA2039 | X | | $1000 |
| 1990 Ford Bronco II | 1FMCU14T3LUA30842 | X | | $1000 |
| 1995 Ford Ranger | 1FTCR14X8SPA02041 | X | | $1000 |
| 1993 Ford F450 | 2FDLF47G7PCA55923 | X | | $1000 |
| 1993 Utility body | | X | | $1000 |
| 1995 Ford Ranger | 1FTJE34GOSHA71640 | X | | $1000 |
| 1997 Ford Ranger P/U | 1FTCR10T5HUA93914 | X | | $1000 |
| 1994 3/4 Ton | 1FTHF25GORNA03290 | X | | $1000 |
| 1990 Ford Ranger | 1FTCR10T4LUA54367 | X | | $1000 |
| 1987 2100 Gal Fuel Truck | 1GBJ7D1B2HY109859 | X | | $1000 |
| 1995 Ford Ranger | 1FTCR14X6SPA02040 | X | | $1000 |
| 1988 Ford Ranger | 1FTCR10TBJUA9930B | X | | $1000 |
| Ford F250 White | 1FTHF25G2JPA56209 | X | | $1000 |
| 1988 Ford E250 | 1FTFE24N5JHA52742 | X | | $1000 |
| 1993 Ford 4x4 | 1FTDR15X7PPB62826 | X | | $1000 |
| 1991 Ford Aerostar | 1FMDA31XMZA35328 | X | | $1000 |
| 1988 Ford F-Super Dump Truck | 2FDLF47G6JCA84739 | X | | $1000 |
| 1988 Ford Ranger | 1FTCR10TXJUC96559 | X | | $1000 |
| 1989 Ford 4X4 F250 | 1FTHF26GXKKA56956 | X | | $1000 |
| 1994 Ford LT9000 | 1FDYU90L4RVA25176 | X | | $1000 |
| 1991 Ford Truck | 2FTHF25G8MCA19560 | X | | $1000 |
| 1995 Ford F250 2wheel Drive | 2FTHF25GSSCA24339 | X | | $1000 |
| 1990 Ford Ranger | 1FTCR10AXLUB95099 | X | | $1000 |
| 1994 Ford Ranger | 1FTCR14XXRPA45337 | X | | $1000 |
| 1994 Ford Ranger | 1FTCR14X8RPA45336 | X | | $1000 |
| 1994 Ford XL Supercab | 1FTCR14X4RPB48740 | X | | $1000 |
| 1990 Ford Ranger | 1FTCR10AXLUC13004 | X | | $1000 |
| 1990 Ford Ranger | 1FTCR10A9LUC12975 | X | | $1000 |
| 1984 Ford Cab-Chassis | 1FDJF3767EPB28881 | X | | $1000 |
| 1992 Ford Ranger | 1FTCR10X5NUA9811 | X | | $1000 |
| 1992 Ford Ranger | 1FTCR14XONPA26144 | X | | $1000 |
| 1992 Ford SF345 | 2FDLF47G6NCA17466 | X | | $1000 |
| 1992 Ford Pickup | 1FTCR10X7NUA98112 | X | | $1000 |
| 1992 Ford Supercab | 1FTHX25GXNKA29693 | X | | $1000 |
| 1992 E350 Ford Van | 1FTJE34G3NHA23800 | X | | $1000 |
| 1992 Ford Supercab | 1FTHX25G2NKA29690 | X | | $1000 |
| 1992 Ford Supercab | 1FTHX25G6NKA29692 | X | | $1000 |

CARSDI 1217 (8/99)

Exhibit 1    0010

## Automobile Schedule — Property Coverage

| Automobile Description | Vehicle Identification Number (VIN) | Covered Yes | No | Deductible |
|---|---|---|---|---|
| 1992 Ford F800 | 1FDXK84AONVA10155 | X | | $1000 |
| 1995 Ford Bronco | 1FMEU15H2SL884580 | X | | $1000 |
| 1996 Ford Ranger | 1FTCR14X4TPA49567 | X | | $1000 |
| 1996 Ford Ranger | 1FTCR14X6TPA49568 | X | | $1000 |
| 1996 Ford F250 3/4 Ton Pickup | 1FTHF25G8TEA54494 | X | | $1000 |
| 1996 Ford F250 3/4 Ton Pickup | 1FTHF25GXTEA54495 | X | | $1000 |
| 1996 Ford F800 | 1FDXF80EBTVA24475 | X | | $1000 |
| 1996 Ford F450 | 1FDLF47G2TEB82082 | X | | $1000 |
| 1996 Ford F450 | 1FDLF47G3TEB38026 | X | | $1000 |
| 1997 Ford Ranger 4X4 | 1FTDR15X1VPA32022 | X | | $1000 |
| 1997 Ford F250 Truck | 1FTHF25H8VEA68214 | X | | $1000 |
| 1997 Ford F250 Truck | 1FTHF25H6VEA68213 | X | | $1000 |
| 1997 Ford F800 | 1FDXF80E2VVA37936 | X | | $1000 |
| 1997 Ford Aerostar Van | 1FMDA31X9VZB04139 | X | | $1000 |
| 1997 Ford Aerostar Van | 1FMDA31X2VZC23210 | X | | $1000 |
| 1998 Ford Ranger 1/2Ton Pickup | 1FTYR1448WPA63097 | X | | $1000 |
| 1998 Ford Explorer | 1FMZU34X2WZA99943 | X | | $1000 |
| 1998 Chev C3500 2/3 Yd Dump | 1GBKC34F4WF045646 | X | | $1000 |
| 1987 Chev 4X4 K2500 Ext Cab | 1GCGK29J4WE196150 | X | | $1000 |
| 1998 Chev 3/4 Ton C2500 | 1GCGC24R5WE190612 | X | | $1000 |
| 1998 Ford Diesel Truck F800 | 1FDXF80E6WVA32305 | X | | $1000 |
| 1999 F250 W/Cab | 1FTNX20L9XED68701 | X | | $1000 |
| 1999 GMC 3/4 Ton Cab Pickup | 1GDGC24RXXF047114 | X | | $1000 |
| 1999 GMC 3/4 Ton Cab Pickup | 1GDGC24RXXF048649 | X | | $1000 |
| 1999 Strg Sewer & Well Cleaner | 2FZHRJBB9XAA73370 | X | | $1000 |
| 1999 GMC C8500 Cab Chassis | 1GDP7H1C3XJ512269 | X | | $1000 |
| 1999 GMC C8500 Cab/W Dump | 1GDP7H1C1XJ512299 | X | | $1000 |
| 2000 Ford Explorer | 1FMZU73EOYZA21767 | X | | $1000 |
| 2000 Ford F250 XCab | 1FTYR14XXYPA21494 | X | | $1000 |
| 2000 Ford F250 XCab | 1FTYR14X8YPA21493 | X | | $1000 |
| 2000 Ford F250 XCab | 1FTNX20L7YE99261 | X | | $1000 |
| 2000 Ford F250 XCab | 1FTNX20L9YEA99262 | X | | $1000 |
| 2000 Ford F250 XCab | 1FTNX21SOYEB06752 | X | | $1000 |
| 1963 Zieman Trailer | Z115528 | X | | $1000 |
| 1994 Zieman Tilt Trailer | 1ZCT29AXRZP18018 | X | | $1000 |
| 1984 Eager Beaver 20TXT | 112TXT207EA200014 | X | | $1000 |
| 1990 Tilt Trailer Case Eager Beaver | 112TDV304LA034535 | X | | $1000 |
| 1991 Trail King Trailer TKT | TKU01014MM118026 | X | | $1000 |
| 1992 Callen 28" Trailer | | X | | $1000 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CARSDI 1217 (8/99)

Exhibit 1    0011

# Kemper

IN WITNESS WHEREOF, the Company has caused this policy to be signed by its President and a Secretary, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized representative of the Company.

American Protection Insurance Company

Secretary          President

CARSDI 1004 (8/99)

Exhibit 1     0012

# CALIFORNIA RURAL SPECIAL DISTRICTS INSURANCE PROGRAM
## COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the Common Policy Conditions.

### A. Arbitration

All disputes between any Insured and us regarding our respective rights and obligations under this policy will be resolved by binding arbitration. Either party may initiate the arbitration process by making a written demand for arbitration. When this demand is made, each party will select an arbitrator within thirty (30) days. Should any party fail to select an arbitrator, then the other party may select the second arbitrator. These two arbitrators will select the third arbitrator. If they cannot agree upon a third arbitrator within thirty (30) days, then the selection will be made by a court of jurisdiction. Each party will pay the expenses and fees of the arbitrator selected by that party and will bear half the expenses and fees of the third arbitrator.

The arbitration hearing will take place in the county in which the address shown in the Declarations for the first Named Insured is located. Local rules of law as to the procedure and evidence applicable to binding arbitration will apply. A decision agreed to by two of the arbitrators will be binding.

The arbitrators may award only the following damages:

1. Amounts payable under the policy.

2. Economic damages recoverable by law for failure to perform any contractual obligation.

3. Attorneys' and arbitrators' fees and costs to the prevailing party.

The arbitrators' award will be the sole and exclusive remedy for any claim or dispute subject to arbitration under this policy.

### B. Assistance and Cooperation of the Insured

The Insured will cooperate with us and, at our request and expense, will attend hearings and trials. The Insured will also assist in effecting settlements, in securing and giving evidence, in obtaining the attendance of witnesses, and in conducting "suits".

### C. Bankruptcy or Insolvency

Bankruptcy or insolvency of the Insured or the Insured's estate will not relieve us of our obligations under this policy.

### D. Cancellation and Nonrenewal

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance notice of cancellation.

2. If this policy has been in effect for sixty (60) days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the address shown in the Declarations and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

   a. Ten (10) days before the effective date of cancellation if we cancel for:

      (1) Nonpayment of premium; or

      (2) Discovery of fraud or material misrepresentation by any Insured or his or her representative in obtaining this insurance, or by you or your representative in pursuing a claim under this policy.

   b. Thirty (30) days before the effective date of cancellation if we cancel for any other reason.

3. If this policy has been in effect for more than sixty (60) days, or is a renewal of a policy we issued, we may cancel this policy only upon occurrence, after the effective date of the policy, of one or more of the following:

   a. Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

   b. Discovery of fraud or material misrepresentation by:

CARSDI 1103 (8/99)                     Page 1 of 4

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission

Exhibit 1          0013

(1) Any Insured or his or her representative in obtaining this insurance; or

(2) You or your representative in pursuing a claim under this policy.

c. A judgment by a court or an administrative tribunal that you have violated a California or federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

d. Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

e. Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

f. A determination by the Commissioner of Insurance that the:

a. Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

b. Continuation of the policy coverage would:

(1) Place us in violation of California law or the laws of the state where we are domiciled; or

(2) Threaten our solvency.

g. A change by you or your representative in the activities or property of commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

4. We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the Declarations, and to the producer of record, at least:

a. Ten (10) days before the effective date of cancellation if we cancel for a reason listed in 3.a. or 3.b.; or

b. Thirty (30) days before the effective date of cancellation if we cancel for any other reason listed in paragraph 3.

5. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

6. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

7. Subject to 8. below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least sixty (60) days, but not more than one-hundred twenty (120) days, before the expiration or anniversary date. We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the Declarations.

8. We are not required to send notice of nonrenewal in the following situations:

a. If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

b. If the policy has been extended for ninety (90) days or less, provided that notice has been given in accordance with 7. above.

c. If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within sixty (60) days of the termination of the policy, to obtain that coverage.

d. If the policy is for a period of no more than sixty (60) days and you are notified at the time of issuance that it will not be renewed.

e. If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within sixty (60) days of the end of the policy period.

CARSDI 1103 (8/99)                    Page 2 of 4

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission

Exhibit 1     0014

f.  If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in 7. above, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

9.  If notice is mailed, proof of mailing will be sufficient proof of notice.

E.  Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

F.  Duties in the Event of Occurrence, Offense, Claim or Suit

1.  An insured has certain duties if a claim or "suit" is brought against it, or in the event of an "occurrence", accident or "wrongful act" that may result in claim under this policy.

2.  Regardless of perceived liability, an insured must see to it that we are notified as soon as practicable of an "occurrence", accident or "wrongful act" that may result in a claim. To the extent possible, notice should include:

    a.  How, when and where the "occurrence", accident or "wrongful act" took place;

    b.  The names and addresses of any injured persons and witnesses; and

    c.  The nature and location of any injury or damage arising out of the "occurrence", accident or "wrongful act".

2.  If a claim is made or "suit" is brought against any insured, you must:

    a.  Immediately record the specifics of the claim or "suit" and the date received;

    b.  Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

3.  You and any other involved insured must:

    a.  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

b.  Authorize us to obtain records and other information;

c.  Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

d.  Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this policy may also apply.

4.  No insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

G.  Examination of Your Books and Records

We may, but are not obligated to, examine and audit your books and records as they relate to this policy at any time during the policy period and up to three (3) years afterward.

H.  Inspections and Surveys

We have the right but are not obligated to:

1.  Make inspections and surveys at any time;

2.  Give you reports on the conditions we find; and

3.  Recommend changes.

Any inspection, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1.  Are safe or healthful; or

2.  Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

I.  Legal Action Against Us

No person or organization has a right under this policy to join us as a party or otherwise bring us into a "suit" asking for damages from an insured or to sue us on this policy unless all of its terms have been fully complied with. A person or organization may sue us to recover on an agreed

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission

Exhibit 1          0015

settlement or on a final judgment against an Insured obtained after actual trial; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the Insured, and the claimant or the claimant's legal representative.

J.  **Liberalization**

If we are required by statute to adopt any revision that would broaden the coverage under this policy without additional premium within forty-five (45) days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

K.  **Multiple Year Policies**

The following provisions apply for any policy written for more than one (1) annual period:

1.  The premium shown in the Declarations is a deposit premium for the first anniversary and was computed based on rates and rules in effect at the time the policy was issued. Such rates and rules will be used to calculate the premium at each subsequent anniversary, for the entire term of the policy.

2.  The Limits of Insurance apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the policy period shown in the Declarations.

L.  **Premiums**

The first Named Insured shown in the Declarations:

1.  Is responsible for the payment of all premiums; and

2.  Will be the payee for any return premiums we pay.

M.  **Separation of Insureds**

Any rights or duties specifically assigned in the policy to the first Named Insured applies

1.  As if each Named Insured were the only Named Insured; and

2.  Separately to each Insured against whom claim is made or suit is brought.

It is understood that the separation of Insureds will not increase the Limits of Insurance.

N.  **Statutory Provisions**

Terms of this policy which conflict with state statutes are amended to conform to such statutes.

O.  **Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

P.  **Transfer of Rights of Recovery Against Others to Us**

If the Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The Insured must do nothing after the loss to impair them. At our request, the Insured will bring suit or transfer those rights to us and help us enforce them.

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission

Exhibit 1          0016

## CALIFORNIA RURAL SPECIAL DISTRICTS INSURANCE PROGRAM
## PROPERTY COVERAGE PART

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" and "Named Insured" refer to the entity identified as the "Named Insured" in the Declarations. The words "Insured" or "Insureds" refer to any person or organization qualifying as an "Insured" under SECTION II. WHO IS AN INSURED. The words "we", "us", "our" and "Company" refer to the Company stated in the Declarations as providing this insurance.

Other words and phrases that appear in quotation marks have special meanings. Refer to SECTION X. DEFINITIONS and other provisions of this policy for such meanings.

All Coverage Parts included in this policy are subject to the Common Policy Conditions.

### SECTION I -- INSURING AGREEMENT

We will pay for direct physical loss of or damage to Covered Property caused by or resulting from any Covered Cause of Loss.

### SECTION II -- WHO IS AN INSURED

Each of the following is an Insured to the extent set forth below:

A. The Named Insured shown in the Declarations and all affiliated, associated, or subsidiary organizations;

B. Any individual or entity under the management or operating control of any of the organizations designated in paragraph A.; and

C. Lessors, mortgagors, and other parties having an interest in buildings, fixed equipment, mobile equipment, "automobiles", personal property or rental income of any of the entities designated in A. and B. above but only for their respective rights and interests.

### SECTION III -- COVERED PROPERTY

A. Aboveground piping;

B. Aboveground and belowground "penstock";

C. "Commandeered property";

D. Communication equipment;

E. Computer equipment and electronic "media";

F. "Emergency service portable equipment";

G. "Fine arts";

H. "Mobile equipment" owned by an Insured;

I. "Mobile equipment" rented or borrowed from others for or on behalf of an Insured for which the Insured is legally responsible;

J. Outdoor property including signs;

K. Paved surfaces;

L. Property in the course of construction;

M. Real and personal property of the Insured including the Insured's interest in improvements and betterments to buildings occupied but not owned by the Insured;

N. Real and personal property of others while in the care, custody, or control of the Insured, and for which the Insured is legally liable;

O. "Automobiles" owned by an Insured;

P. "Automobiles" rented or borrowed from others for or on behalf of an Insured for which the Insured is legally responsible;

Q. Trees, shrubs and landscape plantings; and

R. Property acquired after the inception of this policy until the next anniversary date without additional premium except that the following property will not be Covered Property unless it is reported to us within thirty (30) days of its acquisition and any premium due thereon is paid:

1. Any newly acquired single piece of property, other than "automobiles" or "mobile equipment", whose value exceeds $1,000,000.

2. Any property in the course of construction the completed value of which exceeds $1,000,000.

3. Any newly acquired "automobiles" or "mobile equipment".

The most we will pay for loss to newly acquired "automobiles" or "mobile equipment" is $1,000,000 unless such property has been reported and an appropriate premium paid thereon. Property automatically covered under this section during the remainder of the coverage period in which it was acquired will not continue to have coverage

CARSDI 1100a (10/99)                    Page 1 of 9

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994

Exhibit 1        0017

under a subsequent coverage period, unless reported to us at the policy anniversary date.

## SECTION IV -- PROPERTY NOT COVERED

This policy does not cover the following property:

A. Aircraft;

B. Dams;

C. Ditches, canals, levees, flumes, aqueducts or any other type of water or wastewater conveyance;

D. Excavations, underground flues or drains;

E. Foundations, piers or other supports which are below the undersurface of the lowest basement floor or below the surface of the ground;

F. Furs, fur garments, jewels, jewelry, watches, pearls, precious and semi-precious stones, gold, silver, platinum or other precious metals and alloys;

G. Land, atmosphere or any body of water;

H. Power transmission and feeder lines;

I. Property which is separately described and specifically covered, in whole or in part, by any other insurance policy;

J. Stamps, letters of credit, cash or tickets;

K. Standing timber, growing crops or animals;

L. Wells and underground piping except submersible pumps; and

M. Saltwater piers, docks and wharves.

## SECTION V -- COVERED CAUSES OF LOSS

Covered Causes of Loss includes all risk of direct physical loss or damage to Covered Property except as hereinafter excluded or limited. Any loss or damage caused by "earthquake" or windstorm that occurs within any period of seventy-two (72) consecutive hours shall constitute a single occurrence. The expiration of this policy will not reduce the seventy-two (72) hour period.

## SECTION VI -- EXCLUSIONS

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

A. Loss or shortage disclosed upon taking inventory or mysterious disappearance of property;

B. Rain, sleet, snow or ice to personal property in the open;

C. Weight of the load imposed on a machine exceeding the capacity for which such machine was designed;

D. "Earthquake", unless a cause of loss not otherwise excluded ensues, in which case we will pay only for such ensuing loss. This exclusion does not apply to "mobile equipment" or "automobiles";

E. Misappropriation, conversion, infidelity or any dishonest act on the part of an insured, its employees or agents, or others to whom the property may be entrusted.

F. Shrinkage, evaporation, reduction in weight, leakage, breakage of fragile articles, marring, scratching, exposure to light, or change in color, texture or flavor, to personal property. This exclusion does not apply to loss or damage caused by a "specified cause of loss";

G. Nuclear reaction or radiation, or reactive contamination, however, caused. But if nuclear reaction or radiation contamination results in fire, we will pay for the loss or damage caused by that fire;

H. Moths, vermin, termites, or other insects, inherent vice, latent defect, wear, tear or gradual deterioration, contamination, rust, wet or dry rot, or the normal settling, shrinkage, or expansion of the building or foundation. This exclusion does not apply to loss or damage by a cause of loss not otherwise excluded;

I. Water below the surface of the ground, including that which exerts pressure on or flows, seeps or leaks through sidewalks, driveways, foundations, walls, basements or other floors, or through doors, windows or other openings in such sidewalks, driveways, foundations, walls or floors. This exclusion does not apply to loss or damage from the overflowing or breaking of boundaries of lakes, ponds, reservoirs, rivers, streams, harbors or similar bodies of water caused by rain, snow or ice immediately derived from storm run-off.

J. Wear and tear, freezing, mechanical or electrical breakdown to "mobile equipment" and "automobiles" or blowouts, punctures or other road damage to tires thereof, unless first caused by a cause of loss not otherwise excluded;

K. Interference at the insured's premises covered under this policy with rebuilding, repairing or replacing property or with the resumption or continuation of business. This exclusion also applies to any increase in loss or damage which may be occasioned by:

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994

Exhibit 1          0018

1. The suspension, lapse or cancellation of any lease, contract or order unless such suspension, lapse or cancellation results directly from the interruption of business, and then we will only cover such loss or damage as it affects the Insured's "extra expense" covered under this policy; or

2. Loss of income or any other consequential or remote loss or damage, unless specifically covered herein;

L. War, including undeclared or civil war; warlike action by a military force, including action in hindering or defending against an actual or expected attack by any government, sovereign or other authority using military personnel or other agents; or insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

M. Defective, faulty or inadequate:

1. Planning, zoning, development, surveying, siting, construction, building codes, ordinances or building inspections;

2. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction;

3. Materials, parts or equipment used in repair, construction, renovation, or remodeling; or

4. Maintenance;

of part or all of any Covered Property unless a cause of loss not otherwise excluded ensues, in which case we will pay only for such ensuing loss.

N. Acts or decisions, including failure to act or decide, of any person, group, organization or governmental body, unless a cause of loss not otherwise excluded ensues, in which case we will pay only for such ensuing loss.

O. Except as provided under SECTION VIII. COVERAGE EXTENSIONS, N. Pollutant Cleanup and Removal:

1. The actual, alleged or threatened release, discharge, escape, seepage, migration or dispersal of "pollutants", whether direct or indirect, proximate or remote, sudden, accidental or gradual. This subsection 1. does not apply to loss or damage from a "specified cause of loss";

2. The enforcement, direction, or request of any civil or governmental authority regulating the testing, monitoring, prevention, control, removal, tearing down, demolition, disposal, treatment, clean-up, contamination, detoxification, neutralization or containment of "pollutants", or the restoration, construction, reconstruction or replacement of property contaminated by "pollutants"; and

3. Any fines, penalties, compensatory damages, punitive damages or any other damages, awards or settlements adjudged against the Insured by any civil or judiciary body, or board of arbitration, nor any sums which the Insured will voluntarily agree to pay to any third party, nor any legal fees or other costs of defense of legal actions, claim or proceedings and appeals arising out of or attributed to any damage or loss caused by or resulting from "pollutants".

P. Use of an "automobile" in any professional or organized racing or demolition contest or stunting activity, or practice for such contest or activity.

## SECTION VII — LOSS PAYMENT

A. Valuation

1. Subject to the applicable Limit of Insurance, we will pay the market value, or the cost to repair if less, of "fine arts", paved surfaces and "valuable papers and records";

2. Subject to the applicable Limit of Insurance, we will pay the "replacement cost value", or the cost to repair if less, of "automobiles", "geomembrane" covers", "mobile equipment", buildings, other structures, fixed equipment, personal property, outdoor property, communication equipment, computer equipment and electronic "media", "emergency service portable equipment", "commandeered property", trees, shrubs and landscape planting. We will not pay the "replacement cost value" until the covered property is actually repaired or replaced. The Insured must repair the covered property within a reasonable period of time not to exceed two (2) years. We will pay for loss or damage on an "actual cash value" basis until the repair or replacement is completed.

3. Subject to the applicable Limit of Insurance, in case of loss or damage to any part of a machine or unit consisting of two or more parts when complete, we will pay the value of the part or parts lost or damaged. At the Insured's option, we will pay to replace or duplicate the lost or damaged part or parts, or repair the machine or units. But the option selected by the Insured shall not exceed 125% of the lowest cost of the above.

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994

Exhibit 1    0019

B. Application of Deductible

We will not pay for loss or damage in any one occurrence until the loss or damage exceeds the deductible shown in the Declarations. All covered loss as a result of a single occurrence will be subject to one deductible. When more than one classification of property is involved in an occurrence, the applicable deductible will be the highest amount indicated in the Declarations for any classification of property involved in the occurrence.

In the event of loss or damage caused by windstorm and earthquake, a single occurrence means loss or damage occurring or commencing within a period of seventy-two (72) consecutive hours.

## SECTION VIII -- COVERAGE EXTENSIONS

Subject to the applicable Limit of Insurance, this policy also covers:

A. Accounts Receivable

We will pay for the actual loss sustained to your "accounts receivable" from a Covered Cause of Loss not otherwise excluded.

1.  When there is proof that a loss has occurred but the Insured cannot accurately establish the total amount of "accounts receivable" outstanding as of the date of such loss, such amount will be based on the Insured's monthly statements and will be computed as follows:

    a.  Determine the amount of all outstanding "accounts receivable" at the end of the same fiscal month in the year immediately preceding the year in which the loss occurred;

    b.  Calculate the percentage of increase or decrease in the average monthly total of "accounts receivable" for the twelve (12) months immediately preceding the month in which the loss occurred as compared with the average for the same months of the preceding year;

    c.  The amount determined under a. above, increased or decreased by the percentage calculated under b. above, will be the total amount of "accounts receivable" as of the last day of the fiscal month in which the loss occurred;

    d.  The amount determined under c. above will be increased or decreased in conformity with the normal fluctuations in the amount of "accounts receivable" during the fiscal month involved, due

consideration being given to the experience of the business since the last day of the last fiscal month for which a statement has been rendered.

We will deduct from the total amount of "accounts receivable", however established, the amount of such accounts evidenced by records not lost or damaged, or otherwise established or collected by the Insured, and an amount to allow for probable bad debts which would normally have been uncollectible by the Insured.  On deferred payment "accounts receivable", we will deduct unearned interest and service charges.

2.  We will further adjust the monthly amount of "accounts receivable" in accordance with any demonstrable variance from the average for the particular month in which the loss occurred, giving due consideration to the normal fluctuations in the amount of "accounts receivable" within the fiscal month involved. There will be deducted from the total amount of "accounts receivable", however established, the amount of such accounts as evidenced by records, not lost or damaged, or otherwise established or collected by the Insured and an amount to allow for probable bad debts which would normally have been uncollectible by the Insured.

3.  This policy also covers:

    a.  Interest charges on any loan to the Insured to offset impaired collection, pending repayment of such sums, of "accounts receivable" because of loss to records of "accounts receivable";

    b.  Collection expenses in excess of normal collection expenses which are made necessary by loss to records of "accounts receivable"; and

    c.  Other expenses, when reasonably incurred by the Insured, in re-establishing records of "accounts receivable" following loss.

B. Ammonia Contamination

We will pay for direct physical loss or damage to covered property arising from ammonia contamination or ammonia pollution.

C. Automobile Glass Repair and Replacement

We will pay the cost to repair or replace direct physical loss or damage to any glass on a covered "automobile". Such coverage will not be subject to the policy deductible.

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994

Exhibit 1        0020

D. **Arson and Crime Reward**

We will pay up to $10,000 for rewards you pay for information leading to convictions of perpetrators who caused direct physical loss or damage to Covered Property from a Covered Cause of Loss not otherwise excluded.

E. **Debris Removal**

We will pay for expenses incurred in the removal of debris of Covered Property resulting from direct physical loss or damage from a Covered Cause of Loss not otherwise excluded.

We will not pay for costs to:

1. Extract or remove "pollutants" from land, atmosphere or any body of water;

2. Extract or remove "pollutants" from the debris;

3. Remove, restore or replace contaminated or polluted land, atmosphere or any body of water;

4. Remove or transport property debris to a site for storage or decontamination required because the property or debris is affected by "pollutants", whether or not such removal, transportation or decontamination is required by law or regulation; or

5. Store any property or debris requiring specialized storage because the property or debris is affected by "pollutants", whether or not such storage is required by law or regulation;

regardless of any other cause or event which contributes concurrently or in any sequence to the direct physical loss or damage.

F. **Demolition and Increased Cost of Construction**

Where Covered Property has sustained direct physical loss or damage from a Covered Cause of Loss not otherwise excluded, we will pay for:

1. The cost of demolishing the undamaged property including the cost of clearing the site;

2. The value of the undamaged part of the property which must be demolished;

3. The increased cost of repair or reconstruction of the damaged and undamaged property on the same or another site required by law or ordinance regulating the repair or reconstruction of the damaged property, but we will not pay more than it would have cost had it been repaired or reconstructed on the original site, nor will we pay for the cost to acquire land. The increased rebuilding costs must be kept to the minimum needed to

satisfy legal requirements. We will not pay for any increased cost of construction unless the property is actually rebuilt or replaced within two (2) years; and

4. Any increase in loss of income, "extra expense" or loss of "rental value" arising out of the reasonably required additional time required to comply with any law or ordinance regulating the repair or reconstruction of the damaged property compared with the time it would have taken to repair or reconstruct the property with materials of like kind and quality.

G. **Expediting Expenses**

We will pay the actual loss sustained to:

1. Make temporary repairs;

2. Expedite permanent repairs; and

3. Expedite permanent replacement

of Covered Property resulting from direct physical loss or damage from a Covered Cause of Loss not otherwise excluded.

H. **Extra Expense**

We will pay the necessary "extra expense" incurred by the insured in order to continue as nearly as practicable the normal operation of the insured's business following direct physical loss or damage to Covered Property from a Covered Cause of Loss not otherwise excluded.

We will pay for such necessary expense incurred for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property as has been damaged or destroyed, commencing with the date of damage or destruction and not limited by the date of expiration of the policy.

I. **Fire Department Service Charge**

We will pay up to $25,000 for:

1. Fire department charges and other extinguishing expenses for which the insured may be assessed; and

2. The cost of fire extinguishing materials expended by the insured

resulting from direct physical loss or damage to Covered Property from a Covered Cause of Loss not otherwise excluded. This Coverage Extension, however, does not apply if you are a fire department or a fire district.

J. **Loss of Income**

We will pay the actual loss of income sustained by the insured during the term of this policy due to interruption of business resulting from direct

CARSDI 1100a (10/99)                    Page 5 of 9

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994

Exhibit 1          0021

physical loss or damage to Covered Property from a Covered Cause of Loss not otherwise excluded. Such loss will not exceed the reduction in gross earnings less charges and expenses which do not necessarily continue during interruption of business. We will pay only for such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such part of the property as has been damaged or destroyed commencing with the date of such damage or destruction and not limited by the date of expiration of the policy. We will not pay normal charges and expenses including payroll expenses, to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the loss.

K.  **Personal Effects of Insureds**

We will pay up to $50,000 to repair or replace the personal effects of your director, employee, authorized volunteer or medical director if the personal effects are lost or damaged while responding to, during the course of or returning directly from "emergency operations", or during "training operations", and while the director, employee, authorized volunteer or medical director is otherwise engaged in his duties for you.

L.  **Personal Effects of Patients and Fire Victims**

We will pay up to $50,000 for the cost to repair or replace the personal effects of fire victims, medical patients and their immediate relatives, if the personal effects are lost or damaged while in your care, custody, and control during "emergency operations" or in transit to a medical care facility.

M.  **Personal Automobiles of Insureds**

We will pay the cost to repair not to exceed the actual cash value of the damage to the personal "automobiles" of a director, employee, authorized volunteer or medical director if the "automobile" is damaged while responding to, during the course of or returning directly from "emergency operations", during "training operations", or while the director, employee, authorized volunteer or medical director is engaged in duties for the Insured. If an "automobile" is insured under another insurance policy, our coverage is limited to reimbursing the amount of the deductible that applies to the "automobile" under the other policy.

N.  **Pollutant Clean Up and Removal**

We will pay up to $250,000 for any damages and expenses you incur to extract "pollutants" from land or water at premises owned by or leased to an Insured if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" occurs during the policy period and not from a "specified cause of loss". Damages and expenses will be paid only if they are reported to us in writing within one hundred eighty (180) days of the date on which the loss occurs.

We will not pay for costs to test for, monitor or assess the existence, concentration or effects of "pollutants". However, we will pay for testing which is performed in the course of extracting "pollutants" from the land or water.

SECTION VI. EXCLUSIONS, subsection O. does not apply to subsection N.

O.  **Preservation of Property**

We will pay for any direct physical loss or damage occurring during necessary removal of Covered Property to preserve it from a Covered Cause of Loss:

1.  While it is being moved or while temporarily stored at another location; and

2.  Only if direct physical loss or damage occurs within fifteen (15) days after the property is first moved.

P.  **Recertification of Equipment and Automobiles**

We will pay up to $50,000 for recertification expenses for emergency services equipment and "automobiles" resulting from direct physical loss or damage to Covered Property from a Covered Cause of Loss not otherwise excluded.

Q.  **Rental Value**

We will pay the actual loss sustained by the Insured for necessary untenantability of the Covered Property resulting from direct physical loss or damage to Covered Property from a Covered Cause of Loss not otherwise excluded. However, out payment will not exceed the reduction in "rental value" less charges and expenses which do not necessarily continue during the period of untenantability, for only such length of time as would be required with the exercise of due diligence to rebuild, repair or replace the part of the property damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy.

R.  **Towing and Transportation Expenses**

We will pay up to $5,000 for towing and transportation expenses you incur after a covered "automobile" is disabled.

S.  **Utility Interruption**

We will pay for direct physical loss or damage to Covered Property from utility interruption. Utility includes gas, electric, water and telephone services.

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994

Exhibit 1          0022

T. Vacant Buildings

We will pay for direct physical loss or damage to your "vacant buildings" on an "actual cash value" basis subject to the following:

1. The loss must be caused by a "specified cause of loss"; and

2. The "vacant building" is kept locked or secured before the loss.

U. Valuable Papers and Records

We will pay for direct physical loss or damage to "valuable papers and records" from a Covered Cause of Loss not otherwise excluded. Our payment will not exceed the "actual cash value" of the property at the time of loss or the cost to repair or replace the property with other of like kind and quality.

## SECTION IX -- LIMITS OF INSURANCE

A. The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

B. The limits applicable to the Coverage Extensions for Arson and Crime Reward; Fire Department Service Charge; Personal Effects of Insureds; Personal Effects of Patients and Fire Victims; Pollutant Cleanup and Removal; Recertification of Equipment and Automobiles; and Towing and Transportation Expenses are in addition to the Limits of Insurance.

C. Payments under all other Coverage Extensions and Additional Coverages are included within the Policy Limit of Insurance shown in the Declarations.

D. We will not pay for the loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance shown in the Declarations.

## SECTION X -- DEFINITIONS

A. "Accounts receivable" means all sums due the Insured from customers.

B. "Actual cash value" means the cost to replace Covered Property less depreciation.

C. "Automobile" means a land motor vehicle or trailer.

D. "Commandeered property" means any real or personal property not owned by an Insured including aircraft, "automobiles", and watercraft an Insured commandeers, seizes, borrows, or takes over for official use to handle an emergency situation.

E. "Data" is a fact, concept, instruction or program that is converted into a "media" form that can be used in a data processing operation.

F. "Earthquake" means seismic earth movement including the natural faulting of land masses. "Earthquake" does not include subsidence, landslide, rockslide, mudflow, earth rising, earth shifting or settling unless directly caused by seismic earth movement.

G. "Emergency operations" means actions:

1. Which are urgent responses necessary for protection of property, human life, health or safety;

2. Which result from the performing or attempting to perform fire fighting services, hazardous material unit services, first aid, ambulance or rescue squad services, or related services, including the stabilizing or securing of an emergency scene; and

3. Which are sanctioned by an Insured.

H. "Emergency service portable equipment" means portable ambulance, fire fighting or rescue-related equipment that you own, or is furnished for your use, for regular emergency services you perform.

I. "Extra expense" means the actual loss sustained that is excess of the total cost incurred during the period of restoration chargeable to the operation of the Insured's business, over and above the total cost that would normally have been incurred to conduct the business during the same period had no damage or destruction occurred. Any salvage value of property obtained for temporary use during the period of restoration, which remains after the resumption of normal operations, will be deducted in the adjustment of any loss.

J. "Fine arts" means paintings, etchings, pictures, tapestries, art, glass windows, valuable rugs, statuary, marble, bronze, antique silver, manuscripts, porcelain, rare glass, bric-a-brac and similar property of rarity, historical value or artistic merit.

K. "Geomembrane covers" means the rubber or polymetric cover of a water storage or treatment facility which is exposed to the elements. It also includes rubber or polymetric water storage structures which are of single-piece construction if the surface is exposed to the elements. It does not include the lining of such structures or facilities if constructed or installed separately from the cover.

L. "Media" is the material on which "data" is recorded, including but not limited to diskettes, digital discs, drives, magnetic tapes, disk packs, drums, paper tapes, cards, programs, as well as "data" stored on the "media".

CARSDI 1100a (10/99)                Page 7 of 9

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994

Exhibit 1          0023

M. "Mobile equipment" means equipment, implements, tools and watercraft. However, "mobile equipment" does not include:

1. Aircraft;

2. Plans, blueprints, designs or specifications;

3. Property which has become a part of any structure;

4. Property other than watercraft while underground, underwater, airborne or waterborne (except while being transported on a regular ferry line);

5. Property while leased, loaned or rented to others, unless such lease, loan or rental includes an equipment operator employed by the Insured; and

6. "Automobiles".

N. "Penstock" means a conduit constructed of manmade materials built for the purpose of conveying water to a hydroturbine. "Penstock" does not include tunnels, canals, aqueducts or similar excavations, or the cost of these excavations, which are excavated from or consist of natural materials.

O. "Pollutants" means any solid, liquid, gaseous, or thermal irritant or contaminant, including but not limited to asbestos, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material (whether such materials are intended to be or have been recycled, reconditioned or reclaimed) which are designated as "pollutants" in listings published by the United States Environmental Protection Agency (U.S.E.P.A) or by any other governmental authority, or if unlisted, exhibits the characteristics of ignitibility, corrosivity, reactivity or toxicity to a degree which would cause them to be so listed if the subject were to be addressed by the U.S.E.P.A. or by any other governmental authority.

P. "Rental value" is defined as the sum of:

1. The total anticipated gross rental income from tenant occupancy of real property as furnished and equipped by the Insured;

2. The amount of all charges which are the legal obligations of the tenant(s) and which would otherwise be obligations of the Insured; and

3. The fair "rental value" of any portion of said property which is occupied by the Insured.

In determining the "rental value", due consideration will be given to the rental experience before the date of damage or destruction and the probable experience had no direct physical loss or damage occurred.

Q. "Replacement cost value" means the cost to replace Covered Property with like kind and quality without deducting for depreciation.

R. "Specified cause of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or "automobiles"; riot or civil commotion; sinkhole collapse; volcanic action; collision; upset or overturn; vandalism; sprinkler leakage; or falling objects.

S. "Training operations" means activities used to prepare, train, or instruct members of a fire department, hazardous materials unit, or first aid, ambulance or rescue squad in accepted and recognized emergency procedures, including municipal, state, and federal standards.

T. "Vacant building" means any building that:

1. Does not contain enough contents to conduct customary operations; or

2. Has no portion occupied or in use.

A building which otherwise meets this definition of "vacant building" will not be considered a "vacant building" if there are other occupied buildings on the same premises. A building under construction or renovation will not be considered a "vacant building".

U. "Valuable papers and records", means written, printed or otherwise inscribed documents and records including, but not limited to, books, "data", maps, films, drawings, abstracts, deeds, mortgages and manuscripts.

However, "valuable papers and records" does not mean money or securities. Money includes currency, coins, bank notes, travelers checks, register checks and money orders. Securities includes negotiable and non-negotiable instruments or contracts representing either money or other property, such as tokens, tickets, revenue and other stamps and evidences of debt issued in connection with credit or charge cards.

## SECTION XI -- CONDITIONS

This Coverage Part is subject to the Common Policy Conditions and the following conditions:

A. Abandonment

There can be no abandonment to us of Covered Property.

B. Appraisal

In the event that the Insured and we disagree over the amount;

1. To rebuild, repair or replace damaged or destroyed property; or

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994

Exhibit 1        0024

2. The amount to be paid for a loss,

the Insured and we will each appoint a competent appraiser. The two appraisers will:

1. Appoint a disinterested third appraiser as umpire;

2. Obtain reconstruction, replacement or repair estimates; and

3. Calculate the amount due as payment for the property.

If an Insured's appraiser and our appraiser cannot come to an agreement, they will submit their appraisals to the umpire. The agreed upon cost to rebuild, repair or replace will be based on an agreement, in writing, by any two of the three appraisers.

The Insured and we will each pay their own appraisers and equally share the cost of the umpire.

C. Loss to Property of Others

In case of direct physical loss or damage to property of others held by the Insured for which claim is made upon us, we reserve the right to adjust such claim with the owner or owners of the property. If legal proceedings are taken to enforce a claim against the Insured with respect to such loss, we reserve the right at our option without expense to the Insured, to conduct and control the defense on behalf of and in the name of the Insured. No action on our part in such regard will increase the limits under this Coverage Part.

D. No Benefit to Bailee

No entity other than an Insured having custody of Covered Property will benefit from this insurance.

E. Notice of Loss

As soon as practicable after any loss becomes known to the Insured, you will report such loss with full particulars to us.

F. Other Insurance

You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this policy. If you do, except as otherwise provided in the Coverage Part, we will pay our share of the covered loss. Our share is the proportion that the applicable Limit of Insurance bears to the combined limits of all insurance covering on the same basis.

G. Payment of Loss

All adjusted claims will be due and payable sixty (60) days after the presentation and acceptance of a satisfactory proof of loss at our office at 4512 Feather River Drive, Suites F&G, Stockton, California, 95219.

H. Policy Period, Coverage Territory

Under this Coverage Part:

1. We cover loss or damage commencing:

   a. During the policy period shown in the Declarations; and

   b. Within the coverage territory.

2. The coverage territory is the United States of America (including its territories and possessions), Puerto Rico and Canada.

I. Proof of Loss

In the event of loss, it will be necessary for the Insured, within ninety (90) days following demand thereof by us, to render a signed and sworn proof of loss to us or our appointed representative stating: the place, time and cause of the loss; the interests of the Insured and all others in the damaged or destroyed property; the value of the property involved in the loss; and the amount of the loss.

J. Protection of Damaged Property

The Insured will take all reasonable steps to protect the Covered Property from further damage and will keep a record of expenses for emergency or temporary repairs for consideration in the settlement of the claim. Such measures will not increase the Limits of Insurance.

K. Recovered Property

If either an Insured or we recover any property after loss settlement, that party must give the other prompt notice. At the Insured's option, the property will be returned to the Insured. The Insured must then return to us the amount we paid to the Insured for the loss of the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the applicable Limit of Insurance.

L. Unintentional Failure to Report Property

Your failure to report to us all the property, equipment, and automobiles to be insured under this coverage will not prejudice your coverage for that property provided such omission is not intentional on your part and you report the property, equipment or automobiles as soon as you discover the omission.

CARSDI 1100a (10/99)                    Page 9 of 9

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994

Exhibit 1    0025

ENDORSEMENT NO.

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (Standard Time) | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 A.M. | NOON | | |
| | | | | | | | |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:
PROPERTY COVERAGE PART

### SCHEDULE

| Description of Property | Loss Payee (Name & Address) | Provisions Applicable | | |
|---|---|---|---|---|
| | | Loss Payable | Lender's Loss Payable | Contract of Sale |
| 32 X 10 Mobile Office Value $12,500 Serial No. SMC-00100-462 | William Scotsman, Inc. 8211 Town Center Drive Baltimore MD 21236-5997 | | X | |
| | | | | |
| | | | | |
| | | | | |

The following is added to SECTION VII. LOSS PAYMENT, as indicated by an "X" in the Schedule:

A. Loss Payable

For Covered Property in which both you and a Loss Payee shown in the Schedule have an insurable interest, we will:

1. Adjust losses with you; and

2. Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

B. Lenders Loss Payable

1. The Loss Payee shown in the Schedule is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

a. Warehouse receipts;

b. A contract for deed;

c. Bills of lading;

d. Financing statements; or

e. Mortgages, deeds of trust, or security agreements.

CARSDI 1220 (8/99)                     Page 1 of 2

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Copyright, ISO Commercial Risk Services, Inc., 1994

Exhibit 1          0026

2.  For Covered Property in which both you and a Loss Payee have an insurable interest:

   a.  We will pay for covered loss or damage to each Loss Payee in their order of precedence, as interests may appear.

   b.  The Loss Payee had the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

   c.  If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

     (1) Pays any premium due under this Coverage Part at our request if you have failed to do so;

     (2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us or your failure to do so; and

     (3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

    All of the terms of this Coverage Part will then apply directly to the Loss Payee.

   d.  If we pay the Loss Payee for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part;

     (1) The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

     (2) The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

2.  If we cancel this policy, we will give written notice to the Loss Payee at least:

   a.  10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

   b.  30 days before the effective date of cancellation if we cancel for any other reason.

3.  If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

D.  Contract of Sale

1.  The Loss Payee shown in the Schedule is a person or organization you have entered a contract with for the sale of Covered Property.

2.  For Covered Property in which both you and the Loss Payee have an insurable interest we will:

   a.  Adjust losses with you; and

   b.  Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

3.  The following is added to the Other Insurance Condition:

   For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

_____
AUTHORIZED REPRESENTATIVE

_____
DATE

CARSDI 1220 (8/99)            Page 2 of 2

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.
Copyright, ISO Commercial Risk Services, Inc., 1994

# CALIFORNIA RURAL SPECIAL DISTRICTS INSURANCE PROGRAM
## LIABILITY COVERAGE PART

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you", and "your" and "Named Insured" refer to the entity identified as the "Named Insured" in the Declarations. The words "Insured" or "Insureds" refer to any person or organization qualifying as an "Insured" under SECTION IV - WHO IS AN INSURED. The words "we", "us", "our" and "Company" refer to the Company stated in the Declarations as providing this insurance.

Other words and phrases that appear in quotation marks have special meanings. Refer to SECTION VI - DEFINITIONS and other provisions of this policy for such meanings.

All Coverage Parts included in this policy are subject to the Common Policy Conditions.

## SECTION I -- INSURING AGREEMENT

A. We shall pay on behalf of the Insured those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage", "personal injury", "advertising injury", "professional liability" or "wrongful acts" to which this Coverage Part applies. We shall have the right and duty to defend the Insured against any "suit" seeking those damages, even if the allegations are groundless, false or fraudulent. We may, at our discretion, investigate any "occurrence", offense, error, omission or "wrongful act" and settle any claim or "suit" that may result. We will not be obligated to pay any claim or judgment or to defend any "suit" after our Limit of Insurance has been exhausted.

B. This Coverage Part applies to "bodily injury" and "property damage" occurring during the policy period only if the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory".

C. This Coverage Part applies to "personal injury" and "advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period. Coverage is extended to apply to "employment practices liability" caused by an offense prior to the policy period and after the Retroactive Date shown in the Declarations, provided that:

1. At the inception of the policy period, the Insured against whom the claim is made neither knew nor could have reasonably foreseen that such offense might have been the basis of a claim or "suit"; and

2. No other valid or collectible insurance applies to the "employment practices liability".

D. This Coverage Part applies to "professional liability" caused by an error or omission in the "coverage territory" during the policy period only:

1. By a fire district or its employees while acting in the course and scope of their employment for the fire district committed solely in the conduct of either providing or failing to provide "professional health care services" to others;

2. By a water or wastewater district, or other entity whose primary duties are the distribution and treatment of water or wastewater, committed solely in the conduct of testing and treating water or wastewater; or

3. By a cemetery district.

E. This Coverage Part applies to "wrongful acts" which take place during the policy period. Coverage is extended to apply to "wrongful acts" prior to the policy period and after the Retroactive Date shown in the Declarations, provided that:

1. At the inception of the policy period, the Insured against whom the claim is made neither knew nor could have reasonably foreseen that such "wrongful act" might have been the basis of a claim or "suit"; and

2. No other valid or collectible insurance applies to the "wrongful act".

## SECTION II -- LIMITS OF INSURANCE

A. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

1. Insureds under this Coverage Part;

2. Persons or organizations who sustain injury or damage; or

3. Claims made or "suits" brought.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

Exhibit 1                    0028

B. The Bodily Injury and Property Damage Per Occurrence Limit of Insurance is the most we will pay because of all "bodily injury" and "property damage" arising out of any one "occurrence". The Bodily Injury and Property Damage Coverage Aggregate Limit of Insurance is the most we will pay for all damages because of "bodily injury" and "property damage".

C. The Personal and Advertising Per Person or Organization Limit of Insurance is the most we will pay for damages because of all "personal injury" and "advertising injury" sustained by any one person or organization. The Personal Injury and Advertising Injury Coverage Aggregate Limit of Insurance is the most we will pay for all damages because of "personal injury" and "advertising injury".

D. The Professional Liability Per Claim Limit of Insurance is the most we will pay for each such claim. The Professional Liability Coverage Aggregate Limit of Insurance is the most we will pay for all damages because of "professional liability". All claims arising out of the same error or omission or interrelated errors or omissions of one or more of the Insureds shall be considered a single claim.

E. The Wrongful Act Per Claim Limit of Insurance is the most we will pay for each such claim. The Wrongful Act Coverage Aggregate Limit of Insurance is the most we will pay for all damages because of "wrongful acts". All claims arising out of the same "wrongful act" or inter-related "wrongful acts" of one or more of the Insureds shall be considered a single claim.

F. The Fire Damage Limit Per Fire is the most we will pay for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire.

G. If more than one Limit of Insurance in the Declarations applies to an "occurrence", offense, error, omission, or claim, or series of related "occurrences", offenses, errors, omissions, or claims, the most we will pay for the sum of all damages for "bodily injury", "property damage", "personal injury", "advertising injury", "professional liability" and "wrongful acts" is the highest available Per Occurrence, Per Person or Organization, or Per Claim Limit of Insurance, and the multiple applicable Limits of Insurance shall not be aggregated.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months,

starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than twelve (12) months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION III -- SUPPLEMENTARY PAYMENTS

We shall pay, with respect to any claim or "suit" we defend:

A. All expenses and "defense costs" we incur.

B. All costs taxed against the insured in the "suit".

C. The cost of bonds to release attachments, but only for bond amounts within the Limits of Insurance. We do not have to furnish these bonds.

D. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $500 per day because of time off from work.

E. Up to $1,000 for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any "automobile" to which "bodily injury" coverage applies. We do not have to furnish these bonds.

F. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

G. All interest on the full amount of any judgment that accrues after the entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

H. Up to $10,000 in medical expenses for "bodily injury" caused by an accident:

   1. On premises you own or rent;

   2. On ways next to premises you own or rent; or

   3. Because of your operations;

   Provided that:

   1. The accident takes place in the "coverage territory" during the policy period; and

   2. The expenses are incurred and reported to us within three (3) years from the date of the accident

   We will not pay medical expenses for "bodily injury":

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

Exhibit 1          0029

1. To any Insured, unless the "bodily injury" arises from the use of an "automobile";

2. To a person hired to do work for or on behalf of any Insured or a tenant of any Insured;

3. To a person injured on that part of the premises you own or rent that the person normally occupies;

4. Excluded under SECTION V - EXCLUSIONS;

5. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

6. To any person injured while taking part in athletics; or

7. To a person whether or not an employee of any Insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits or a similar law.

I. Up to $5,000 reimbursement to the Insured for legal expenses necessarily incurred by the Insured in defending a claim seeking relief or redress in any form other than monetary damages. This legal expense coverage does not apply to a dispute between any Insured and us. Reimbursable legal expenses are limited to:

1. Fees or expenses paid by the Insured to an attorney or law firm;

2. Fees or expenses paid by the Insured to the court having jurisdiction over such claim;

3. Fees or expenses paid by the Insured to witnesses that testify on the Insured's behalf except for any witness who is an Insured; or

4. The cost of any required court bonds paid by the Insured, but we do not have to provide such bonds.

In the event of multiple claims, all of which pertain to the same "occurrence", offense, error, omission or "wrongful act", $5,000 is the most we will reimburse the Insured for all covered legal expenses arising out of all such multiple claims, regardless of the number of claims or claimants.

The limits and expenses in SECTION III -- SUPPLEMENARY PAYMENTS are in addition to the limits afforded under SECTION II -- LIMITS OF INSURANCE.

> SECTION IV -- WHO IS AN INSURED

The term "Insured" as used herein means the entity designated in the Declarations as the Named Insured and, except as excluded by endorsement to this Coverage Part, the following:

A. A governmental agency or subdivision, department, municipal body, board, commission or not-for-profit corporation which is owned and controlled by you.

B. All persons who were, now are or shall be elected, appointed or employed as members of your board, commission or agency while acting within the scope of their duties.

C. Your employees or authorized volunteers but only for acts within the scope of employment by you or in the course of their duties for you and at your direction.

D. Your director or employee while serving on the board of directors of an organization that is a separate and distinct entity not subject to your direction and control, provided:

1. Such organization was established and is currently chartered as a non-profit organization; and

2. The primary purpose of such organization is to support and further the efforts and welfare of individuals or organizations that provide fire fighting services, emergency medical response or rescue services, or water, sewer or cemetery services.

E. Any person while providing services under a mutual aid agreement, joint powers agreement or similar arrangement, but only with respect to the conduct of your business and only to the extent of your participation or your interest.

F. The legal representative of any deceased natural person as defined in A., B., or C. above, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

G. Any owner of commandeered equipment while the equipment is in your temporary care, custody or control and is being used as part of "emergency operations".

H. Your director or employee with respect to "personal injury" resulting form his/her affiliation with you for acts outside the course and scope of his/her duties and then excess over any other insurance specifically insuring against "personal injury".

I. Any person while using any "owned automobile" or "hired automobile" and any person legally responsible for the use thereof, provided the actual use of the "automobile" is with your permission.

J. Any person designated in the foregoing paragraphs A., B. and C. while acting within the

CARSDI 1101 (8/99)                    Page 3 of 10

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

Exhibit 1          0030

course and scope of his/her duties with respect to the use of an "automobile" not owned by you. But the insurance provided to that person under this Coverage Part shall be excess over any other insurance specifically insuring said "automobile".

K. Your medical director, but only with respect to his/her "administrative duties" for you.

However, no medical director is an Insured for:

1. "Bodily injury", "personal injury" or "wrongful acts" arising out of his/her providing or failing to provide "professional health care services" as a physician, except while performing or failing to perform "administrative duties" as a medical director on your behalf; or

2. "Property damage" to property owned by, occupied by, rented to, or loaned to that medical director.

L. Your director, employee or medical director while acting as a Good Samaritan independent from you, but only while he/she encounters the scene of an emergency requiring sudden action. In no event will such director, employee or medical director who responds to the scene of an emergency with or for any other emergency service organization be an Insured.

However, no director, employee or medical director is an Insured for:

1. Damages or injury arising out of his/her providing or failing to provide, as a physician, on-line medical direction or medical command via telecommunication to emergency medical personnel; or

2. "Property damage" to property owned or occupied by, or rented or loaned to that director, employee, or medical director.

## SECTION V -- EXCLUSIONS

This Coverage Part does not apply to:

A. Expected or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the Insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

B. Contractual Liability

"Bodily injury" or "property damage" for which the Insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

1. That the Insured would have in the absence of the contract or agreement; or

2. Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

C. Aircraft

Liability or damages arising out of the ownership, maintenance, use, loading or unloading of aircraft owned by you.

D. Workers Compensation and Similar Laws

Any obligation of an Insured, or any carrier as insurer thereof, under any workers compensation law, unemployment compensation law, disability benefits law, or under any similar law.

E. Employer's Liability

"Bodily injury" to:

1. An employee of the Insured arising out of and in the course of:

   a. Employment by the Insured; or

   b. Performing duties related to the conduct of the Insured's business; or

2. The spouse, child, parent, brother or sister of that employee as a consequence of paragraph 1. above.

This exclusion applies:

1. Whether the Insured may be liable as an employer or in any other capacity; and

2. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the Insured under an "insured contract".

F. War

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

G. Costs Estimates and Failure to Award Contracts

Liability or damages arising out of estimates of probable costs, or cost estimates being exceeded, or failure to award contracts in accordance with statute or ordinance which under law must be submitted for bids.

CARSDI 1101 (8/99)                    Page 4 of 10

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

Exhibit 1                    0031

H. Failure to Perform or Breach of Contract

Liability or damages arising out of failure to perform or breach of a contractual obligation. This exclusion does not apply to liability or damages arising out of the failure to supply water.

I. Punitive or Exemplary Damages

Punitive or exemplary damages, statutory multiples of damages, civil or criminal fines or penalties, or any other damages over and above actual damages, by whatever name called, irrespective of whether the Insured has taken any action or passed any resolution electing to pay such damages.

J. Damage to Property

"Property damage" to:

1. Property owned by the Insured;

2. Property rented to or leased to the Insured where the Insured has assumed liability under contract for damage to or destruction of such property, unless the Insured would have been liable in the absence of such contract.

K. Pollution

Liability arising out of:

1. "Bodily injury", "property damage", "personal injury", "advertising injury", "professional liability" or "wrongful acts" which would not have occurred or taken place in whole or in part except for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; or

2. Any loss, cost or expense arising out of any:

   a. Request, demand, or order that an Insured, or any others, test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to, or assess the effects of "pollutants"; or

   b. Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning, removing, containing, treating, detoxifying, neutralizing, or in any way responding to, or assessing the effects of "pollutants".

However, this exclusion shall not apply to "bodily injury", "property damage", "personal injury", "advertising injury", "professional liability" or "wrongful acts" arising out of:

1. "Emergency operations" conducted away from premises owned by, or rented to, an Insured;

2. "Training operations" or

3. Water runoff from the cleaning of equipment used in "emergency operations".

This exclusion shall also not apply to "bodily injury", "property damage", "personal injury", "advertising injury", "professional liability" or "wrongful acts" arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

1. That is sudden an accidental, and neither expected nor intended by an Insured;

2. Arising out of the use, handling, storage, discharge, dispersal, release or escape of any chemical used in the water treatment process;

3. Arising out of explosion, lightning, windstorm, vandalism or malicious mischief, collapse, riot and civil commotion, flood, or earthquake;

4. Collision, upset or overturn of an "automobile" or equipment;

5. Arising out of the heat, smoke or fumes from a "hostile fire";

6. Arising out of weed abatement or spraying;

7. Arising out of pest abatement or spraying;

8. Arising out of propane or natural gas; or

9. Arising out of the "products hazard".

L. Asbestos

Liability or damages at any time arising out of:

1. The manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

2. Any obligation of the Insured to indemnify any party because of damage arising any time as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust; or

3. Any obligation to defend any "suit" or claim against the Insured seeking damages, if such "suit" or claim results from or is contributed to, by any or any combination of the following: manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

However, this exclusion shall not apply to "bodily injury", "property damage", "personal injury", "advertising injury", "professional liability" or

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

Exhibit 1          0032

"wrongful acts" arising out of fire fighting, rescue, or hazardous materials unit operations conducted away from premises owned by, or rented to, an insured.

M. **Nuclear Energy Liability**

Liability or damages:

1. With respect to which the insured under this policy is an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, the Mutual Atomic Energy Liability Underwriters, the American Nuclear Insurers, or the Nuclear Insurance Association of Canada, or any successor organizations, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability;

2. Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

   a. Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

   b. The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization; or

3. Resulting from the "hazardous properties" of "nuclear material" if:

   a. The "nuclear material":

      (1) Is at any "nuclear facility" owned by, or operated by or on behalf of, the insured; or

      (2) Has been discharged or dispersed therefrom;

   b. The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of the insured; or

   c. The "bodily injury" or "property damage" arises out of the furnishing by the insured of services, materials, parts or equipment in connection with the planing, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States

of America, its territories or possessions, or Canada, this subsection c. applies only to "property damage" to such "nuclear facility" and any property thereat.

As used in this exclusion M.:

1. "Hazardous properties" include radioactive, toxic or explosive properties.

2. "Nuclear facility" means:

   a. Any "nuclear reactor";

   b. Any equipment or device designed or used for:

      (1) Separating the isotopes of uranium or plutonium;

      (2) Processing or utilizing "spent fuel"; or

      (3) Handling, processing or packaging "waste";

   c. Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233, or more than 250 grams of uranium 235;

   d. Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

   and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

3. "Nuclear material" means "source material", "special nuclear material" or "byproduct material".

4. "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

5. "Property damage" includes all forms of radioactive contamination of property.

6. "Source material", "special nuclear material", and "byproduct material" have the meaning given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

7. "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

Exhibit 1          0033

8. "Waste" means any waste material:

   a. Containing "byproduct material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

   b. Resulting from the operation by any person or organization of any "nuclear facility" included within the definition of "nuclear facility" included under 2. a. and b. of the definition of "nuclear facility".

N. Personal Injury or Advertising Injury

"Personal injury" or "advertising injury":

1. Caused by or at the direction of the insured with knowledge that the act would violate the rights of another and would inflict "personal injury" or "advertising injury". This exclusion, however, does not apply to "employment practices liability";

2. Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

3. Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

4. Arising out of a criminal act committed by or at the direction of the insured;

5. For which the insured has assumed liability in a contract of agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

6. Arising out of a breach of contract, except an implied contract to use another's advertising idea in your advertisement; or

7. Arising out of the wrong description of the price of goods, products or services to conform to any statement of quality or performance made in your advertisement.

O. Automobile Racing

"Bodily injury" or "property damage" resulting from the use of an "automobile" in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity.

P. Personal Injury for Retaliatory Action

"Personal injury" resulting from retaliatory action by an insured against an employee:

1. Who declined to perform an illegal act in violation of public policy as specified in legislation, administrative rules, regulations or professional codes of ethics; or

2. Who filed a complaint or claim arising out of "employment practices liability".

Exclusions C. through P. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate Limit of Insurance applies to this coverage as described in SECTION II — LIMITS OF INSURANCE.

## SECTION VI – DEFINITIONS

A. "Administrative duties" means establishing medical protocol, creating training curriculum, providing medical training, conducting medical quality assurance programs, and carrying out similar duties for managing, training, advising, or monitoring medical services provided to you.

"Administrative duties" do not include:

1. The providing or failure to provide on-line medical direction via telecommunication to emergency medical personnel; or

2. Providing or failing to provide professional health care services to individuals or groups of patients.

B. "Advertising injury" means injury arising out of one or more of the following offenses:

1. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

2. Oral or written publication of material that violates a person's right of privacy;

3. Misappropriation of advertising ideas or style of doing business; or

4. Infringement of copyright, title or slogan.

C. "Automobile" means a land motor vehicle or trailer.

D. "Bodily injury" means bodily injury, sickness or disease, including mental anguish and death resulting therefrom, and care and loss of services by any person or organization.

E. "Coverage territory" means:

1. The United States of America (including its territories and possessions), Puerto Rico and Canada;

2. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in 1. above;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

Exhibit 1        0034

3. Anywhere in the world if:

   a. The injury or damage arises out of the activities of a person whose residence is in the United States (including its territories and possessions), Puerto Rico or Canada; and

   b. The Insured's responsibility to pay damages is determined in an actual trial in the United States (including its territories and possessions), Puerto Rico or Canada, or in a settlement to which we agree.

F. "Defense costs" means reasonable fees charged by an attorney and all other reasonable fees, costs and expenses attributable to the investigation, defense or appeal of a claim to which this Coverage Part applies, except salaries of employees of the Insured and the office expenses of the Insured.

G. "Emergency operations" means actions:

   1. Which are urgent responses necessary for protection of property, human life, health or safety;

   2. Which result from the performing or attempting to perform fire fighting services, hazardous materials unit services, first aid, ambulance or rescue squad services, or related services, including the stabilizing or securing of an emergency scene; and

   3. Which are sanctioned by an Insured.

H. "Employment practices liability" means:

   1. Refusal to employ that person;

   2. Termination of that person's employment;

   3. Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination; or

   4. Consequential loss to the spouse, child, parent, brother or sister of that person to whom any of the employment-related practices described in subsections 1., 2. and 3. above apply.

"Employment practices liability" applies:

   1. Whether the Insured may be liable as an employer or in any other capacity; and

   2. To any obligation to share damages with or repay someone else who must pay damages because of injury.

I. "Hostile fire" means a fire that becomes uncontrollable or breaks out from where it was intended to be.

J. "Hired automobile" means an "automobile" used under contract on behalf of, or loaned to, the Insured, provided such "automobile" is not owned by or registered in the name of the Insured or an employee or authorized volunteer of the Insured.

K. "Insured contract" means:

   1. A lease of premises;

   2. Any easement or license agreement;

   3. A sidetrack agreement;

   4. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   5. An elevator maintenance agreement; or

   6. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph 6. above does not include that part of any contract or agreement:

   a. That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

     (1) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

     (2) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

   b. Under which the Insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the Insured's rendering or failure to render professional services, including those listed in 2. above and supervisory, inspection, architectural or engineering activities; or

   c. That indemnifies any person or organization for damage by fire to premises rented or loaned to you.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

Exhibit 1          0035

L. "Liquid" shall not mean domestic water or agricultural water or recycled water or water furnished to commercial users.

M. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

N. "Owned automobile" means an "automobile" owned by or under long term lease to the Insured.

O. "Personal injury" means injury arising out of one or more of the following offenses:

1. False arrest, malicious prosecution or willful detention;

2. Libel, slander or defamation of character;

3. Invasion of privacy;

4. Wrongful entry or eviction, or other invasion of the right of private occupancy;

5. Assault and battery;

6. Non-employment discrimination prohibited by law or violation of federal civil rights laws, not intentionally committed by or at the direction of an Insured; and

7. "Employment practices liability".

P. "Pollutants" means any solid, semi-solid, noise, "liquid", gaseous or thermal irritant or contaminant, including smoke, vapor, soot, mists, fumes, acids, alkalis, chemicals, biological and other etiologic agents or materials, genetically engineered materials, teratogenic, carcinogenic and mutagenic materials, waste materials and any other irritant or contaminant. Waste material includes materials that are intended to be or have been recycled, reconditioned or reclaimed.

"Pollutants" does not include:

a. Waterborne asbestos;

b. Sewage that emanates form a sewer line or sewer system; or

c. Sewage that backs up from a sewer line or sewer system.

Q. "Products hazard" includes "bodily injury" or "property damage" arising out of the Insured's products or reliance upon a representation or warranty made at anytime with respect thereof, but only if the "bodily injury" or "property damage" occurs away from premises owned by, or rented to, the Insured and after physical possession of such Insured's products has been relinquished to others.

R. "Professional health care services" means:

1. Providing medical or nursing services;

2. Providing professional services of any other health care professional, including emergency medical technicians and paramedics;

3. Furnishing or dispensing drugs or medical, surgical or dental supplies or appliances;

4. Handling of patients:

a. From the place where they are accepted from movement into or onto the means of transport;

b. During transport; and

c. From the means of transport to the place where they are finally delivered;

5. Dispatching of, including the failure or refusal to dispatch, personnel to provide any of the above services;

6. Serving on, or carrying out the orders of, a health care accreditation board or similar professional board or committee; and

7. Establishing medical protocol, creating medical training curricula, providing medical training, conducting medical quality assurance programs and carrying out similar duties.

S. "Professional liability" means liability for damages resulting from any error or omission arising out of your professional activities as a fire, cemetery, water or wastewater district, or any other entity whose primary duty is the distribution and treatment of water or wastewater.

T. "Property damage" means:

1. Physical injury to or destruction of tangible property, including the loss of use thereof at any time resulting therefrom; and

2. Loss of use of tangible property that has not been physically injured or destroyed.

U. "Suit" means a civil proceeding in which damages are alleged because of "bodily injury", "property damage", personal injury", "advertising injury", "professional liability" or "wrongful acts" to which this insurance applies. "Suit" includes:

1. An arbitration proceeding in which such damages are claimed and to which an Insured must submit or does submit with our consent; or

2. Any other alternative dispute resolution proceeding in which such damages are claimed and to which an Insured submits with our consent.

V. "Training operations" means activities used to prepare, train or instruct members of a fire department, hazardous materials unit, or first aid,

CARSDI 1101 (8/99)                                Page 9 of 10

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

Exhibit 1                0036

ambulance or rescue squad in accepted and recognized emergency procedures, including municipal, state, and federal standards.

W.  "Wrongful act" means any actual or alleged error, omission, misstatement, misleading statement, neglect or breach of duty by any Insured in the discharge of his/her duties for you, including service with any other entity at your direction, except for the following:

1.  Willful commission of a crime or other dishonest, fraudulent, or malicious act;

2.  Obtaining financial gain to which the Insured is not legally entitled; or

3.  Faulty preparation or approval of maps, plans, reports, surveys, designs, bid documents, or specifications; but this exception does not apply to reports provided to any other water purveyor.

Notwithstanding the above exceptions, "wrongful act" also means:

1.  Violations of antitrust statutes; and

2.  Negligent ministerial acts.

"Wrongful act" does not include an error or omission resulting in "professional liability".

## SECTION VII -- CONDITIONS

A.  Other Insurance

The insurance afforded by this Coverage Part shall be excess of, and shall not contribute with:

1.  Any valid and collectible insurance or self-insurance; or

2.  Any other primary insurance available to you covering liability for damages arising out of the premises and operations for which you have been added as an additional insured.

When this Coverage Part is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

1.  The total amount that all such other insurance would pay for the loss in the absence of this Coverage Part; and

2.  The total of all deductible and self-insured amounts under that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this condition and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1997

Exhibit 1          0037

ENDORSEMENT NO.

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (Standard Time) | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 A.M. | NOON | | |
| | | | | | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CALIFORNIA UNINSURED MOTORISTS  COVERAGE -- BODILY INJURY

This endorsement modifies insurance provided under the following:
**LIABILITY COVERAGE PART**

For a covered "automobile" licensed or principally garaged in California this endorsement modifies insurance provided under the following:

**LIABILITY COVERAGE PART**

With respect to coverage provided by this endorsement, the provisions of the LIABILITY COVERAGE PART apply unless modified by this endorsement.

SCHEDULE

LIMIT OF INSURANCE

$1,000,000                                    Each Accident

A. Coverage

1. We will pay all sums the insured is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured motor vehicle." The damages must result from "bodily injury" sustained by the insured caused by an accident. The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "uninsured motor vehicle."

2. If this insurance provides a limit in excess of the amounts required by the applicable law where a covered "automobile" is principally garaged, we will pay only after all liability bonds or policies have been exhausted by judgments or payments.

3. Any judgment for damages arising out of a "suit" brought without our written consent is not binding on us.

B. Who Is An Insured

1. You.

2. If you are an individual, any "family member".

3. Anyone else "occupying" a covered "automobile" or a temporary substitute for a covered "automobile." The covered "automobile" must be out of service because of its breakdown, repair, servicing, loss or destruction.

4. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another insured.

C. Exclusions

This insurance does not apply to any of the following:

1. Punitive or exemplary damages.

2. Any claim settled without our consent. However, this exclusion does not apply to a settlement made with the insurer of a vehicle described in Paragraph b. of the definition of "uninsured motor vehicle".

3. The direct or indirect benefit of any insurer or self-insurer under any workers compensation, disability benefits or similar law or to the direct benefit of the United States, a state or its political subdivisions.

CARSDI 1202 (8/99)                    Page 1 of 4
Copyright, Insurance Services Office, Inc., 1996

Exhibit 1          0038

4. "Bodily injury" sustained by:

   a. You while "occupying" or when struck by any vehicle owned by you that is not a covered "automobile" for Uninsured Motorists Coverage under the LIABILITY COVERAGE PART;

   b. Any "family member" while "occupying" or when struck by any vehicle owned by that "family member" that is not a covered "automobile" for Uninsured Motorists Coverage under the LIABILITY COVERAGE PART; or

   c. Any "family member" while "occupying" or when struck by any vehicle owned by you that is insured for Uninsured Motorists Coverage on a primary basis under any other coverage form or policy.

5. "Bodily injury" sustained by you or any "family member" while "occupying" any vehicle leased by you or any "family member" under a written contract for a period of six (6) months or more that is not a covered "automobile".

6. Anyone using a vehicle without a reasonable belief that the person is entitled to do so.

7. "Bodily injury" sustained by an insured while "occupying" any "automobile" that is rented or leased to that insured for use as a public or livery conveyance. However, this exclusion does not apply if the insured is in the business of providing public or livery conveyance.

D. Limit Of Insurance

1. Regardless of the number of covered "automobiles," insureds, premiums paid, claims made or vehicles involved in the accident, the most we will pay for all damages resulting from any one accident is the Limit of Insurance for Uninsured Motorists Coverage shown in the Schedule.

2. For a vehicle described in paragraph b. of the definition of "uninsured motor vehicle," our Limit of Insurance shall be reduced by all sums paid because of "bodily injury" by or for anyone who is legally responsible, including all sums paid or payable under this policy's Liability Coverage.

3. No one will be entitled to receive duplicate payments for the same elements of loss under this Coverage and any Liability Coverage or Medical Payments Coverage provided by this policy's LIABILITY COVERAGE PART.

We will not make a duplicate payment under this Coverage for any element of loss for which payment has been made by or for anyone who is legally responsible.

We will not pay for any element of loss if a person is entitled to receive payment for the same element of loss under any workers compensation, disability benefits or similar law.

E. Changes In Conditions

The Conditions are changed for California Uninsured Motorists Coverage -- Bodily Injury as follows:

1. Duties In the Event of Occurrence, Offense, Claim or Suit is changed by adding the following:

   a. Promptly notify the police if a hit-and-run driver is involved, and

   b. Send us copies of the legal papers if a "suit" is brought. In addition, a person seeking coverage under Paragraph b. of the definition of "uninsured motor vehicle" must:

      (1) Provide us with a copy of the complaint by personal service or certified mail if the insured brings an action against the owner or operator of such "uninsured motor vehicle",

      (2) Within a reasonable time, make all pleadings and depositions available for copying by us or furnish us copies at our expense, and

      (3) Provide us with proof that the limits of insurance under any applicable liability bonds or policies have been exhausted by payment of judgments or settlements.

2. Legal Action Against Us is replaced by the following:

No legal action may be brought against us under this Coverage until there has been full compliance with all the terms of this Coverage and with respect to paragraphs a., c., and d. of the definition of "uninsured motor vehicle" unless within one (1) year from the date of the accident:

   a. Agreement as to the amount due under this insurance has been concluded;

   b. The insured has formally instituted arbitration proceedings against us. In the event that the insured decides to

Copyright, Insurance Services Office, Inc., 1996

Exhibit 1        0039

arbitrate, the Insured must formally begin arbitration proceedings by notifying us in writing, sent by certified mail, return receipt requested; or

c. "Suit" for "bodily injury" has been filed against the uninsured motorist in a court of competent jurisdiction.

Written notice of the "suit" must be given to us within a reasonable time after the Insured knew, or should have known, that the other motorist is uninsured. In no event, will such notice be required before one (1) year from the date of the accident. Failure of the Insured or his or her representative to give us such notice of the "suit" will relieve us of our obligations under this Coverage only if the failure to give notice prejudices our rights.

3. **Transfer of Rights of Recovery Against Others to Us** is replaced by the following:

   a. With respect to Paragraphs a., c. and d. of the definition of "uninsured motor vehicle," if we make any payment, we are entitled to recover what we paid from other parties. Any person to or for whom we make payment must transfer to us his or her rights of recovery against any other party. This person must do everything necessary to secure these rights and must do nothing that would jeopardize them.

   b. With respect to paragraph b. of the definition of "uninsured motor vehicle," if we make any payment and the Insured recovers from another party, the Insured shall hold the proceeds in trust for us and pay us back the amount we have paid.

4. **Other Insurance** is replaced by the following:

   If there is other applicable insurance available under one or more policies or provisions of coverage:

   a. The maximum recovery under all Coverage Forms or policies combined may equal but not exceed the highest applicable limit for any one vehicle under any Coverage Form or policy providing coverage on either a primary or excess basis.

   b. Any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible

uninsured motorists insurance providing coverage on a primary basis.

   c. If the coverage under this Coverage Part is provided:

   (1) On a primary basis, we will pay only our share of the loss that must be paid under insurance providing coverage on a primary basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on a primary basis.

   (2) On an excess basis we will pay only our share of the loss that must be paid under insurance providing coverage on an excess basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on a excess basis.

5. The following Condition is added:

   **Arbitration**

   a. If we and an Insured disagree whether the Insured is legally entitled to recover damages from the owner or driver of an "uninsured motor vehicle" or do not agree as to the amount of damages that are recoverable by that Insured, the disagreement will be settled by arbitration. Such arbitration may be initiated by a written demand for arbitration made by either party. The arbitration shall be conducted by a single neutral arbitrator. However, disputes concerning coverage under this endorsement may not be arbitrated. Each party will bear the expenses of the arbitrator equally.

   b. Unless both parties agree otherwise, arbitration will take place in the county in which the Insured lives. Local rules of law as to arbitration procedures and evidence will apply. The decision of the arbitrator will be binding.

F. **Additional Definitions**

   The following are added to the Definitions Section:

   1. "Family member" means your spouse, whether or not a resident of your household, and any other person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child.

Copyright, Insurance Services Office, Inc., 1996

Exhibit 1          0040

2. "Occupying" means in, upon, getting in, on, out or off.

3. "Uninsured motor vehicle" means a land motor vehicle or trailer:

    a. For which no liability bond or policy at the time of an accident provides at least the amounts required by the applicable law where a covered "automobile" is principally garaged;

    b. That is an underinsured motor vehicle. An underinsured motor vehicle is a motor vehicle or trailer for which the sum of all liability bonds or policies at the time of an accident provides at least the amounts required by the applicable law where a covered "automobile" is principally garaged but that sum is less than the Limit of Insurance for this coverage;

    c. For which an insuring or bonding company denies coverage or refuses to admit coverage except conditionally or with reservation or becomes insolvent; or

    d. That is a hit-and-run vehicle and neither the driver nor owner can be identified. The vehicle must make physical contact with an insured, a covered "automobile" or a vehicle an insured is "occupying."

However, "uninsured motor vehicle" does not include any vehicle:

    a. Owned or operated by a self-insurer under any applicable motor vehicle law except a self-insurer who is or becomes insolvent and cannot provide the amounts required by that motor vehicle law;

    b. Owned by a governmental unit or agency;

    c. Designed or modified for use primarily off public roads while not on public roads.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

AUTHORIZED REPRESENTATIVE

DATE

CARSDI 1202 (8/99)                          Page 4 of 4

Copyright, Insurance Services Office, Inc., 1996

Exhibit 1          0041

ENDORSEMENT NO. _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (Standard Time) | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 A.M. | NOON | | |
| | | | | | | | |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CALIFORNIA UNINSURED MOTORISTS COVERAGE -- PROPERTY DAMAGE

This endorsement modifies insurance provided under the following:
**LIABILITY COVERAGE PART**

For a covered "automobile" licensed or principally garaged in California this endorsement modifies insurance provided under the following:

**LIABILITY COVERAGE PART**

With respect to coverage provided by this endorsement, the provisions of the Coverage Part apply unless modified by the endorsement.

SCHEDULE
"Property Damage" Uninsured Motorists Coverage

| Designation or Description of Covered "Automobiles" | Premium |
|---|---|
| See Schedule on File | Included |

A. Coverage

1. We will pay all sums the insured is legally entitled to recover as compensatory damages from the owner or operator of an "uninsured motor vehicle." The damages must result from "property damage" caused by an accident. The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "uninsured motor vehicle".

2. Any judgment for damages arising out of a "suit" brought without our written consent is not binding on us.

B. Exclusions

This insurance does not apply to any of the following:

1. The direct or indirect benefit of any insurer of property.

2. Property contained in the covered "automobile".

3. "Property damage" to any motor vehicle owned by you or any "family member" that is not a covered "automobile".

4. "Property damage" to any motor vehicle owned by you to which collision coverage applies under this policy or any other policy.

5. Punitive or exemplary damages.

C. Limit of Insurance

1. Regardless of the number of covered "automobiles", claims made, premiums paid or vehicles involved in the accident, the most we will pay for all damages resulting from any one accident is the lesser of the following:

   a. $3,500; or

   b. The actual cash value of the damaged covered "automobile" at the time of the accident.

2. Any amount payable as damages under this coverage shall be reduced by all sums paid by or for anyone who is legally responsible.

D. Changes In Conditions

The Conditions are changed for California Uninsured Motorists Coverage -- Property Damage as follows:

CARSDI 1203 (8/99)              Page 1 of 3
Copyright, Insurance Services Office, Inc., 1996

Exhibit 1          0042

1. Duties in the Event of Occurrence, Offense, Claim or Suit is changed by adding the following:

   a. Promptly notify the police if a hit-and-run driver is involved;

   b. Report the accident or loss to us or to our agent within ten (10) business days; and

   c. Promptly send us copies of the legal papers if a "suit" is brought.

3. Other Insurance in the LIABILITY COVERAGE PART is replaced by the following:

   If there is other applicable insurance available under one or more policies or provisions of coverage:

   a. The maximum recovery under all Coverage Forms or policies combined may equal but not exceed the highest applicable limit for any one vehicle under any Coverage Form or policy providing coverage on either a primary or excess basis.

   b. Any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible uninsured motorists insurance providing coverage on a primary basis.

   c. If the coverage under this Coverage Part is provided:

      (1) On a primary basis, we will pay only our share of the loss that must be paid under insurance providing coverage on a primary basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on a primary basis.

      (2) On an excess basis we will pay only our share of the loss that must be paid under insurance providing coverage on an excess basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on an excess basis.

3. The following **Condition** is added:

   Arbitration

   a. If we and an insured disagree whether the insured is legally entitled to recover damages from the owner or operator of an "uninsured motor vehicle" or do not agree as to the amount of damages that are recoverable by that insured, the disagreement will be settled by arbitration. Such arbitration may be initiated by a written demand for arbitration made by either party within one (1) year. The arbitration shall be conducted by a single neutral arbitrator. However, disputes concerning coverage under this endorsement may not be arbitrated. Each party will bear the expenses of the arbitrator equally.

   b. Unless both parties agree otherwise, arbitration will take place in the county in which the insured lives. Local rules of law as to arbitration procedure and evidence will apply. The decision of the arbitrator will be binding.

E. Additional Definitions

1. The following words and phrases have special meaning for California Uninsured Motorists Coverage Property Damage:

   a. "Automobile" means a self-propelled motor vehicle. However, it does not include:

      (1) A vehicle transporting persons for hire, compensation or profit other than van pool vehicle;

      (2) A vehicle designed, used or maintained primarily for the transportation of property; or

      (3) Mobile equipment.

   b. Property damage" means injury to or destruction of a covered "automobile". However, "property damage" does not include loss of use.

2. As used in this endorsement:

   "Uninsured motor vehicle" means a land motor vehicle or trailer that is involved in a collision with a covered "automobile" and for which:

   a. No liability bond or policy at the time of an accident provides at least the amount required for "property damage" liability by the California Financial Responsibility Law; or

   b. The insuring or bonding company denies coverage or refuses to admit coverage except conditionally or with reservation or becomes insolvent.

   The collision must involve direct physical contact between a covered "automobile" and the "uninsured motor vehicle" and:

   a. The owner or operator of the "uninsured motor vehicle" must be identified; or

   b. The "uninsured motor vehicle" must be identified by its license number.

Copyright, Insurance Services Office, Inc., 1996

Exhibit 1

0043

However, "uninsured motor vehicle" does not include any vehicle:

a.  Owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer who is or becomes insolvent and cannot provide the amounts required by that motor vehicle law;

b.  Owned by a governmental unit or agency; or

c.  Designed for use mainly off public roads while not on public roads.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

AUTHORIZED REPRESENTATIVE

DATE

Exhibit 1

0044

ENDORSEMENT NO. _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE (Standard Time) | | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 A.M. | NOON | | |
| | | | | | | | |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:
**LIABILITY COVERAGE PART**

### SCHEDULE

Name of Person or Organization:
William Scotsman, Inc.
8211 Town Center Drive
Baltimore MD 21236-5997

SECTION IV — WHO IS AN INSURED is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your operations or premises owned by or rented to you.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

_____        _____
          AUTHORIZED REPRESENTATIVE                                    DATE

CARSDI 1206 (8/99)

Includes copyrighted material of the Insurance Services Offices, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1984

Exhibit 1          0045

# CALIFORNIA RURAL SPECIAL DISTRICTS INSURANCE PROGRAM
## CRIME COVERAGE PART

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is or is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing the insurance.

Words or phrases in quotation marks have special meaning and are defined in the DEFINITIONS sections of this Coverage Part.

All Coverage Parts included in this policy are subject to the Common Policy Provisions.

## EMPLOYEE DISHONESTY COVERAGE SUBPART

### A. COVERAGE

We will pay for loss of, and loss from damage to, Covered Property resulting directly from a Covered Cause of Loss.

1. Covered Property: "Money", "securities", and "property other than money and securities".

2. Covered Cause of Loss:

   a. "Employee dishonesty".

   b. Failure of any "employee" to faithfully perform his or her duties as prescribed by law, when such failure has as its direct and immediate result a loss of your Covered Property, including inability to faithfully perform those duties because of a criminal act committed by a person other than an "employee".

### B. LIMIT OF INSURANCE

The most we will pay for loss in any one "occurrence" is the Employee Dishonesty Limit of Insurance shown in the Declarations.

### C. DEDUCTIBLE

1. We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible shown in the Declarations. We will then pay the amount of loss in excess of the Deductible, up to the Employee Dishonesty Limit of Insurance.

2. You must:

   a. Give us notice as soon as possible of any loss of the type insured under this Coverage even though it falls entirely within the Deductible; and

   b. Upon our request, give us a statement describing the loss.

### D. ADDITIONAL EXCLUSIONS, CONDITIONS AND DEFINITIONS

In addition to the Crime General Provisions, this Employee Dishonesty Coverage Subpart is subject to the following:

1. Additional Exclusions: We will not pay for loss or damages as specified below:

   a. Employee Cancelled Under Prior Insurance: Loss caused by any "employee" for whom similar prior insurance has been cancelled and not reinstated since the last such cancellation.

   b. Inventory Shortages: Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

      (1) An inventory computation; or

      (2) A profit and loss computation.

   c. Damages: Damages for which you are legally liable as a result of:

      (1) The deprivation or violation of the civil rights of any person by an "employee"; or

      (2) The tortious conduct of an "employee" except conversion of property of other parties held by you in any capacity.

2. Additional Conditions

   a. Cancellation As To Any Employee: This Insurance is cancelled as to any "employee":

      (1) Immediately upon discovery by you or any official or "employee" authorized to manage, govern, or control your "employees" of any dishonest act committed by that "employee" whether before or after becoming employed by you.

Copyright, Insurance Services Office, Inc., 1983, 1984, 1989, 1990, 1994

Exhibit 1          0046

(2) On the date specified in a notice mailed to you. That date will be at least thirty (30) days after the date of mailing.

The mailing of notice to you at the last mailing address known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

b. **Sole Benefit:** This Employee Dishonesty Coverage Subpart is for your sole benefit. No legal proceeding of any kind to recover on account of loss under this Coverage Subpart may be brought by anyone other than you.

c. **Indemnification:** We will indemnify any of your officials who are required by law to give bonds for the faithful performance of their service against loss through dishonest acts of persons who serve under them, subject to the Employee Dishonesty Limit of Insurance.

3. **Additional Definitions**

a. "Employee Dishonesty" means only dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons with the manifest intent to:

(1) Cause you to sustain loss; and

(2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment) for:

(a) The "employee"; or

(b) Any person or organization intended by the "employee" to receive that benefit.

b. "Occurrence" means all loss caused by, or involving, one or more "employees", whether the result of a single act or series of acts.

## FORGERY OR ALTERATION COVERAGE SUBPART

### A. COVERAGE

We will pay for loss involving Covered Instruments resulting directly from the Covered Causes of Loss.

1. **Covered Instruments:** Checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

a. Made or drawn by or drawn upon you;

b. Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn;

2. **Covered Causes Of Loss:** Forgery or alteration of, on or in any Covered Instrument.

3. **Coverage Extension**

**Legal Expenses:** If you are sued for refusing to pay any Covered Instrument on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount we will pay under this extension is in addition to the Forgery or Alteration Limit of Insurance.

### B. LIMIT OF INSURANCE

The most we will pay for loss in any one "occurrence" is the Forgery or Alteration Limit of Insurance shown in the Declarations.

### C. DEDUCTIBLE

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible shown in the Declarations. We will then pay the amount of loss in excess of the Deductible, up to the Forgery or Alteration Limit of Insurance. This provision does not apply to legal expenses paid under the Legal Expenses Coverage Extension.

### D. ADDITIONAL EXCLUSION, CONDITIONS AND DEFINITIONS

In addition to the Crime General Provisions Section, this Forgery or Alteration Coverage Subpart is also subject to the following:

1. **Additional Exclusion**

**Acts of Employees:** We will not pay for loss resulting from any dishonest or criminal act committed by any of your "employees":

a. Whether acting alone or in collusion with other persons; or

b. Whether while performing services for you or otherwise.

2. **Additional Conditions**

a. **Facsimile Signatures:** We will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

b. **General Amendment:** As respects this Coverage Subpart, the words Covered Property in the Crime General Provisions mean Covered Instruments.

Copyright, Insurance Services Office, Inc., 1983, 1984, 1989, 1990, 1994

Exhibit 1          0047

c. **Proof of Loss:** You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

d. **Territory:** We will cover loss you sustain anywhere in the world. The Territory General Condition in the Crime General Provisions does not apply to this Coverage Subpart.

3. **Additional Definition**

"Occurrence" means all loss caused by any person or in which that person is involved, whether the loss involves one or more Covered Instruments.

---

**THEFT, DESTRUCTION AND DISAPPEARANCE COVERAGE SUBPART**

A. **COVERAGE**

We will pay for loss of Covered Property resulting directly from the Covered Causes of Loss.

1. **Inside the Premises**

a. **Covered Property:** "Money" and "securities" inside the "premises" or a "banking premises."

b. **Covered Causes of Loss**
   (1) "Theft"
   (2) Disappearance
   (3) Destruction

c. **Coverage Extensions**

   (1) **Containers of Covered Property:** We will pay for loss of, and loss from damage to, a locked safe, vault, cash register, cash box or cash drawer located in the "premises" resulting directly from an actual or attempted:

   (a) "Theft" of; or

   (b) Unlawful entry into those containers.

   (2) **Premises Damage:** We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of Covered Property if you are the owner of the "premises" or are liable for damage to it.

2. **Outside the Premises**

a. **Covered Property:** "Money" and "securities" outside the "premises" in the care and custody of a "messenger."

b. **Covered Causes of Loss**
   (1) "Theft"
   (2) Disappearance
   (3) Destruction

c. **Coverage Extension**

   **Conveyance of Property by Armored Motor Vehicle Company:** We will pay for loss of Covered Property resulting directly from the Covered Causes of Loss while outside the "premises" in the care and custody of an armored motor vehicle company.

   But we will pay only for the amount of loss that you cannot recover:

   (1) Under your contract with the armored motor vehicle company; and

   (2) From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

B. **LIMIT OF INSURANCE**

The most we will pay for loss in any one "occurrence" is the Theft, Destruction and Disappearance Limit of Insurance shown in the Declarations.

C. **DEDUCTIBLE**

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible shown in the Declarations. We will then pay the amount of loss in excess of the Deductible, up to the Theft, Destruction and Disappearance Limit of Insurance.

D. **ADDITIONAL EXCLUSIONS, CONDITION AND DEFINITIONS**

In addition to the provisions in the Crime General Provisions, this Coverage Subpart is subject to the following:

**Additional Exclusions:**

We will not pay for loss as specified below:

1. **Accounting or Arithmetic Errors or Omissions:** Loss resulting from accounting or arithmetic errors or omissions.

2. **Acts of Employees:** Loss resulting from any dishonest or criminal act committed by any of your "employees" or authorized representatives:

   a. Acting alone or in collusion with other persons; or

   b. While performing services for you or otherwise.

Copyright, Insurance Services Office, Inc., 1983, 1984, 1989, 1990, 1994

Exhibit 1          0048

3. **Exchanges or Purchases:** Loss resulting from the giving or surrendering of property in any exchange or purchase.

4. **Fire:** Loss from damage to the "premises" resulting from fire, however caused.

5. **Money Operated Devices:** Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

6. **Transfer or Surrender of Property**

   a. Loss of property after it has been transferred or surrendered to a person or place outside the "premises" or "banking premises":

      (1) On the basis of unauthorized instructions; or

      (2) As a result of a threat to do:

          (a) Bodily harm to any person; or

          (b) Damage to any property.

   b. But this exclusion does not apply under COVERAGE A.2. to loss of Covered Property while outside the "premises" or "banking premises" in the care and custody of a "messenger" if you:

      (1) Had no knowledge of any threat at the time the conveyance began; or

      (2) Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

7. **Vandalism:** Loss from damage to the "premises" or its exterior or to containers of Covered Property by vandalism or malicious mischief.

8. **Voluntary Parting of Title to or Possession of Property:** Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

**Additional Condition**

**Duties in the Event of Loss:** If you have reason to believe that any loss of, or loss from damage covered to, Covered Property involves a violation of law, you must notify the police.

**Additional Definitions**

1. "Banking premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

2. "Messenger" means you, any of your partners

or any "employee" while having care and custody of the property outside the "premises."

3. "Occurrence" means an:

   a. Act or series of related acts involving one or more persons; or

   b. Act or event, or a series of related acts or events not involving any person.

4. "Premises" means the interior of that portion of any building you occupy in conducting your business.

5. "Theft" means any act of stealing.

---

**COMPUTER FRAUD COVERAGE SUBPART**

---

A. **COVERAGE**

We will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss.

1. **Covered Property:** "Money", "Securities" and "Property Other Than Money and Securities".

2. **Covered Cause of Loss:** "Computer Fraud"

B. **LIMIT OF INSURANCE**

The most we will pay for loss in any one "occurrence" is the Computer Fraud Limit of Insurance shown in the DECLARATIONS.

C. **DEDUCTIBLE**

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible in the Declarations. We will then pay the amount of the loss in excess of the Deductible, up to the Computer Fraud Limit of Insurance. In the event that more than one Deductible could apply to the loss, only the highest Deductible may be applied.

D. **ADDITIONAL EXCLUSIONS, CONDITIONS AND DEFINITIONS**

In addition to to the provisions in the Crime General Provisions, this Coverage Subpart is subject to the following:

1. **Additional Exclusions:** We will not pay for loss as specified below:

   a. **Acts of Employees, Directors, Trustees or Representatives:** Loss resulting from any dishonest or criminal act committed by any of your "employees", directors, trustees or authorized representatives:

      (1) Acting alone or in collusion with other persons; or

      (2) While performing services for you or otherwise.

---

CARSDI 1102 (8/99)                    Page 4 of 8

Copyright, Insurance Services Office, Inc., 1983, 1984, 1989, 1990, 1994

Exhibit 1    0049

b. **Inventory Shortages:** Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) An inventory computation; or

(2) A profit and loss computation.

2. **Additional Conditions**

a. **Duties In the Event of Loss:** If you have reason to believe that any loss of, or loss from damage to, Covered Property involves a violation of law, you must notify the police.

b. **Special Limit of Insurance for Specified Property:** We will only pay up to $5,000 for any one "occurrence" of loss of, and loss from damage to, manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

3. **Additional Definitions**

a. "Banking premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

b. "Computer Fraud" means "theft" of property following and directly related to the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises" to a person (other than a "messenger") outside those "premises" or to a place outside those "premises".

c. "Messenger" means you, any of your partners or any "employee" while having care and custody of the property outside the "premises".

d. "Occurrence" means an:

(1) Act or series of related acts involving one or more persons; or

(2) Act or event, or a series of related acts or events not involving any person.

e. "Premises" means the interior of that portion of any building you occupy in conducting your business.

f. "Theft" means any act of stealing.

**CRIME GENERAL PROVISIONS**

Unless stated in any Crime Coverage Subpart, Declarations or endorsement, the following General Exclusions, General Conditions and General Definitions apply to all Crime Coverage Subparts forming part of this Coverage Part.

A. **GENERAL EXCLUSIONS**

We will not pay for loss as specified below:

1. **Acts Committed By Any Owner:** Loss resulting from any dishonest or criminal act committed by your owner or partner whether acting alone or in collusion with other persons.

2. **Governmental Action:** Loss resulting from seizure or destruction of property by order of governmental authority.

3. **Indirect Loss:** Loss that is an indirect result of any act or "occurrence" covered by this Coverage Part including, but not limited to loss resulting from:

a. Your inability to realize income that you would have realized had there been no loss of, or loss from damage to Covered Property.

b. Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this Coverage Part.

c. Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this Coverage Part.

4. **Legal Expenses:** Expenses related to any legal action.

5. **Nuclear:** Loss resulting from nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident.

6. **War and Similar Actions:** Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion or revolution, or any related act or incident.

B. **GENERAL CONDITIONS**

1. **Concealment, Misrepresentation Or Fraud:** This insurance is void in any case of fraud by you as it relates to this insurance at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

a. This insurance;

b. The Covered Property;

c. Your interest in the Covered Property; or

d. A claim under this insurance.

2. **Coverage Extensions:** Unless stated otherwise in any Coverage Subpart, Declarations, or endorsement, our liability under any Coverage Extension is part of, not

CARSDI 1102 (8/99)                   Page 5 of 8

Copyright, Insurance Services Office, Inc., 1983, 1984, 1989, 1990, 1994

Exhibit 1          0050

in addition to the Limit of Insurance applying to the Coverage Subpart.

3. **Discovery Period For Loss:** We will pay only for covered loss discovered no later than one (1) year from the end of the policy period.

4. **Duties In the Event of Loss:** After you discover a loss or a situation that may result in loss of, or loss from damage to, Covered Property you must:

   a. Notify us as soon as possible.

   b. Submit to examination under oath at our request and give us a signed statement of your answers.

   c. Give us a detailed, sworn proof of loss within one hundred twenty (120) days.

   d. Cooperate with us in the investigation and settlement of any claim.

5. **Joint Insured:**

   a. If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this Coverage Part. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

   b. If any Insured or partner or officer of that Insured has knowledge of any information relevant to this Coverage Part, that knowledge is considered knowledge of every Insured.

   c. An "employee" of any Insured is considered to be an "employee" of every Insured.

   d. If this Coverage Part or any of its Coverage Subparts are cancelled or terminated as to any Insured, loss sustained by that Insured is covered only if discovered no later than one (1) year from the date of that cancellation or termination.

   e. We will not pay more for loss sustained by more than one Insured than the amount we would pay if all the loss had been sustained by one Insured.

6. **Legal Action Against Us:** You may not bring any legal action against us involving loss:

   a. Unless you have complied with all the terms of this Coverage Part; and

   b. Until ninety (90) days after you have filed proof of loss with us; and

   c. Unless brought within two (2) years from the date you discover the loss.

7. **Loss Covered Under More Than One Coverage Subpart:** If two or more Coverage Subparts apply to the same loss, we will pay the lesser of:

   a. The actual amount of loss; or

   b. The sum of the Limits of Insurance applicable to those Coverage Subparts.

8. **Loss Sustained During Prior Insurance**

   a. If you, or any predecessor in interest, sustained loss during the period of any prior insurance that you or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, we will pay for it under this Coverage Part, provided:

     (1) This Coverage Part became effective at the time of cancellation or termination of the prior insurance; and

     (2) The loss would have been covered by this Coverage Part had it been in effect when the acts or events causing the loss were committed or occurred.

   b. The insurance under this Condition is part of, not in addition to, the Limits of Insurance applying to this Coverage Part and is limited to the lesser of the amount recoverable under:

     (1) This Coverage Part as of its effective date; or

     (2) The prior insurance had it remained in effect

9. **Non-Cumulation of Limit of Insurance:**

Regardless of the number of years this Coverage Part remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

10. **Other Insurance:** This Coverage Part does not apply to loss recoverable or recovered under other insurance or indemnity. However, if the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this Coverage Part will apply to that part of the loss, other than that falling within any Deductible, not recoverable or recovered under the other insurance or indemnity.

Copyright, Insurance Services Office, Inc., 1983, 1984, 1989, 1990, 1994

Exhibit 1          0051

However, this Coverage Part will not apply to the amount of loss that is more than the applicable Limits of Insurance shown in the Declarations.

11. **Ownership of Property; Interests Covered:** The property covered under this Coverage Part is limited to property:

a. That you own or hold; or

b. For which you are legally liable.

However, this Coverage Part is for your benefit only. It provides no rights or benefits to any other person or organization.

12. **Policy Period**

a. The Policy Period is shown in the Declarations.

b. Subject to the Loss Sustained During Prior Insurance condition, we will pay only for loss that you sustain through acts committed or events occurring during the Policy Period.

13. **Records:** You must keep records of all Covered Property so we can verify the amount of any loss.

14. **Recoveries**

a. Any recoveries, less the cost of obtaining them, made after settlement of loss covered by this Coverage Part will be distributed as follows:

(1) To you, until you are reimbursed for any loss that you sustain that exceeds the Limit of Insurance and the Deductible, if any;

(2) Then to us, until we are reimbursed for the settlement made;

(3) Then to you, until you are reimbursed for that part of the loss equal to the Deductible, if any.

b. Recoveries do not include any recovery:

(1) From Insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

(2) Of original "securities" after duplicates of them have been issued.

15. **Territory:** This insurance covers only acts committed or events occurring within the United States of America (including its territories or possessions), Puerto Rico and Canada.

16. **Valuation - Settlement**

1. Subject to the applicable Limit of Insurance, we will pay for:

a. Loss of "money" but only up to and including its face value. We may, at our option, pay for loss of "money" issued by any country other than the United States of America:

(1) At face value in the "money" issued by that country; or

(2) In the United States of America dollar equivalent determined by the rate of exchange on the day the loss was discovered.

b. Loss of "securities" but only up to and including their value at the close of business on the day the loss was discovered. We may, at our option:

(1) Pay the value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

(2) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities." However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

(a) Value of the "securities" at the close of business on the day the loss was discovered; or

(b) Applicable Limit of Insurance.

c. Loss of, or loss from damage to, "property other than money and securities" or loss from damage to the "premises" for not more than the:

(1) Actual cash value of the property on the day the loss was discovered;

(2) Cost of repairing the property or "premises"; or

(3) Cost of replacing the property with property of like kind and quality.

We may, at our option, pay the actual cash value of the property or repair or replace it.

Copyright, Insurance Services Office, Inc., 1983, 1984, 1989, 1990, 1994

Exhibit 1          0052

If we cannot agree with you upon the actual cash value or the cost of repair or replacement, the value or cost will be determined by arbitration.

2. We may, at our option, pay for loss of, or loss from damage to, property other than "money":

a. In the "money" of the country in which the loss occurred; or

b. In the United States of America dollar equivalent of the "money" of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered.

3. Any property that we pay for or replace becomes our property.

C. GENERAL DEFINITIONS

1. "Employee" means:

a. Any natural person:

(1) While in your service and for thirty (30) days after termination of service; and

(2) Whom you compensate directly by salary, wages or commissions; and

(3) Whom you have the right to direct and control while performing services for you; or

b. Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, however, any such person while having care and custody of property outside the "premises".

c. Any director or trustee of the insured while performing their fiduciary duties and responsibilities.

d. Any non-compensated natural person, other than one who is a fund solicitor, while performing services for you that are usual to the duties of an "employee".

But, "employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor, or representative of the same general character.

2. "Money" means:

a. Currency, coins and bank notes in current use and having a face value; and

b. Travelers checks, register checks and money orders held for sale to the public.

3. "Property other than money and securities" means any tangible property other than "money" and "securities" that has intrinsic value but does not include any property listed in any Crime Coverage Subpart as Property Not Covered.

4. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

Copyright, Insurance Services Office, Inc., 1983, 1984, 1989, 1990, 1994

Exhibit 1            0053

If we cannot agree with you upon the actual cash value or the cost of repair or replacement, the value or cost will be determined by arbitration.

2. We may, at our option, pay for loss of, or loss from damage to, property other than "money":

   a. In the "money" of the country in which the loss occurred; or

   b. In the United States of America dollar equivalent of the "money" of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered.

3. Any property that we pay for or replace becomes our property.

C. GENERAL DEFINITIONS

1. "Employee" means:

   a. Any natural person:

     (1) While in your service and for thirty (30) days after termination of service; and

     (2) Whom you compensate directly by salary, wages or commissions; and

     (3) Whom you have the right to direct and control while performing services for you; or

   b. Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, however, any such person while having care and custody of property outside the "premises".

   c. Any director or trustee of the Insured while performing their fiduciary duties and responsibilities.

   d. Any non-compensated natural person, other than one who is a fund solicitor, while performing services for you that are usual to the duties of an "employee".

But, "employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor, or representative of the same general character.

2. "Money" means:

   a. Currency, coins and bank notes in current use and having a face value; and

   b. Travelers checks, register checks and money orders held for sale to the public.

3. "Property other than money and securities" means any tangible property other than "money" and "securities" that has intrinsic value but does not include any property listed in any Crime Coverage Subpart as Property Not Covered.

4. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

   a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

Copyright, Insurance Services Office, Inc., 1983, 1984, 1989, 1990, 1994

Exhibit 1    0054

**Exhibit 2**

FILE COPY

LAW OFFICES

## BURKE, WILLIAMS & SORENSEN, LLP

611 WEST SIXTH STREET, SUITE 2500
LOS ANGELES, CALIFORNIA  90017-3102
Tel:  (213) 236-0600
Fax:  (213) 236-2700
www.bwslaw.com

ORANGE COUNTY OFFICE
5 PARK PLAZA, SUITE 1280
IRVINE, CALIFORNIA  92614-2547
Tel  (949) 863-3363
Fax  (949) 864-3350

SAN DIEGO OFFICE
402 WEST BROADWAY, SUITE 810
SAN DIEGO, CALIFORNIA  92101-3553
Tel  (619) 615-6672
Fax  (619) 615-6673

Writer's Direct Dial
(213) 236-2804
eshadur@bwslaw.com

SAN JOSE OFFICE
96 NORTH THIRD STREET, SUITE 620
SAN JOSE, CALIFORNIA  95112-5572
Tel  (408) 299-0422
Fax  (408) 299-0429

INLAND EMPIRE OFFICE
3403 TENTH STREET, SUITE 300
RIVERSIDE, CALIFORNIA  92501-3629
Tel  (909) 788-0100
Fax  (909) 788-5785

VENTURA COUNTY OFFICE
2310 EAST PONDEROSA DRIVE, SUITE 25
CAMARILLO, CALIFORNIA  93010-4747
Tel  (805) 987-3468
Fax  (805) 482-9834

OUR FILE NO.
04158.0012

January 18, 2005

<u>VIA OVERNIGHT MAIL</u>

Michael S. Franklin, Esq.
Nixon Peabody LLP
Two Embarcadero Center, Suite 2700
San Francisco, CA  94111-3996

   Re: Otay Water District
     *Barlett-May v. Otay Water District, et al.*
     *Dassarro v. Bonilla et al.*
     *Harron v. Otay Water District et al.*

Dear Michael:

   Following our previous discussions, enclosed are copies of statements for legal services rendered by counsel retained by Otay Water District (and/or by by Specialty National Insurance Company ("Kemper")) in the above-referenced matters (the "Actions").  You will note certain redactions in the documents.  In most instances, the description of work done discloses information concerning possible claims of Otay Water District against Kemper with respect to Kemper's obligations to provide legal counsel and indemnify the District for any losses suffered by the District or its insureds in any of the Actions.  We believe that that information is subject to the attorney-client privilege and/or attorney work product confidentiality.  In a few cases, a statement included matters for which the District does not seek reimbursement, and thus the description of the work done and the number of hours have been redacted.

   The enclosed statements, and the statements we have previously provided to you, include information that may be subject to the attorney-client privilege or attorney work product confidentiality with respect to the Actions (and in the case of documents previously sent to you, the Rodriguez matter).  In forwarding such statements to you, we do not waive any privilege held by the District or any of its insureds, or any claim of work product by any of the attorneys representing the defendants in the Actions.  Rather, we provide this information to you solely to permit you and your client to determine whether the fees and costs for which the District seeks reimbursement were genuinely applicable to the Actions (or to the Rodriguez matter).

LA #4826-7883-6992 v1

Exhibit 2

0055

Michael S. Franklin, Esq.
January 18, 2005
Page 2

Please feel free to contact me if you have any questions regarding any of the enclosed statements, or anything set forth in this letter.

Sincerely yours,

*ELLEN J. SHADUR*
FOR BURKE, WILLIAMS & SORENSEN, LLP

EJS/tn
Enclosures

cc:    Yuri A. Calderon, Esq.
       Bonny B. Garcia, Esq.

LA #4826-7883-6992 v1

Exhibit 2        0056

Exhibit 3



...*Dedicated to Community Service*

2554 SWEETWATER SPRINGS BOULEVARD, SPRING VALLEY, CALIFORNIA 91978-2004
TELEPHONE: 670-2222, AREA CODE 619                           www.otaywater.gov

January 8, 2007


Mr. Vince Tomkiewicz
Bollinger, Ruberry & Garvey
City Corp. Center, Ste. 2300
500 W. Madison Street
Chicago, IL  60661-2511


Dear Mr. Tomkiewicz:

Please find enclosed invoices for legal service performed in the Donna Bartlett-May, et. al. v. Otay Water District and the Tom Harron v. Otay Water District matters.  The District has paid these invoices (copies of checks also enclosed) and is seeking reimbursement for payment of the invoices as per the applicable insurance policy of the District.

Your attention to this matter is appreciated.  Thank you.

Sincerely,

Susan Cruz,
District Secretary


Enclosures


cc:  Yuri Calderon, OWD General Counsel

Exhibit 3          0057

Exhibit 4



...-Dedicated to Community Service

2554 SWEETWATER SPRINGS BOULEVARD, SPRING VALLEY, CALIFORNIA 91978-2004
TELEPHONE: 670-2222, AREA CODE 619          www.otaywater.gov

April 3, 2007


Mr. Vince Tomkiewicz
Bollinger, Ruberry & Garvey
City Corp. Center, Ste. 2300
500 W. Madison Street
Chicago, IL 60661-2511

Dear Mr. Tomkiewicz:

Please find enclosed additional invoices for legal services performed in the Donna
Bartlett-May, et. al. v. Otay Water District and the Tom Harron v. Otay Water District
matters. The District has paid these invoices (copies of the checks have also been
enclosed) and is seeking reimbursement for payment of the invoices as per the applicable
insurance policy of the District.

With regard to the invoices forward on January 8, 2007, could you please advise on the
status of payment for those invoices? I may be reached directly at 619-670-2280.

Thank you for your assistance and attention to this matter.

Sincerely,

Susan Cruz,
District Secretary


Enclosures

Exhibit 4          0058

Exhibit 5



.: *Dedicated to Community Service*

2554 SWEETWATER SPRINGS BOULEVARD, SPRING VALLEY, CALIFORNIA 91978-2004
TELEPHONE: 670-2222, AREA CODE 619                          www.otaywater.gov

April 30, 2007

Mr. Robert Brunner
Bollinger, Ruberry & Garvey
500 W. Madison Street, Ste. 2300
Chicago, IL 60661-2511

Dear Mr. Brunner:

As requested, please find enclosed the new copies of the invoices I had forwarded in early April with the detail of the legal services performed by the attorneys in the Donna Bartlett-May, et. al. v. Otay Water District and the Tom Harron v. Otay Water District matters. The District has paid these invoices (copies of the checks have also been enclosed) and is seeking reimbursement for payment of the invoices as per the applicable insurance policy of the District.

In my previous correspondence, I had also inquired about the status of payment for the invoices forwarded on January 8, 2007. I would appreciate it if you could please advise. I may be reached directly at 619-670-2280.

Thank you for your assistance and attention to this matter.

Sincerely,

Susan Cruz,
District Secretary

Enclosures

Exhibit 5          0059

Exhibit 6



July 10, 2007

**VIA FACSIMILE 312-466-8001 & U.S. MAIL**
Mr. Robert W. Brunner, Esq.
Bollinger, Ruberry & Garvey
500 West Madison Street, Suite 2300
Chicago, Illinois 60661

Re:     *Reimbursement for Certain Fees and Costs Incurred by the Otay Water District in
        Connection with Certain Litigation Matters
        Your File: 06309-321-OTAY*

Dear Mr. Brunner:

We are General Counsel for the Otay Water District (District). We are in receipt of your correspondence dated June 6, 2007 transmitting reimbursement to the District of approximately $465,557.00 in legal fees and costs incurred by the District in connection with two matters of litigation known as *Harron v. Otay Water District, et. al.*, and *Donna Barlett-May, et. al. v. Otay Water District*. We appreciate the assistance you have rendered thus far in connection with the reimbursement request, which included fees and costs for these two litigation matters through October 30, 2006. We are writing to request a separate detailed breakdown of costs and fees approved and denied for each litigation case included in that reimbursement request.

It is our understanding that a reimbursement request for certain costs and fees incurred by the District on those two matters through January of 2007 was forwarded to you in early April. Please be advised that the litigation entitled *Donna Barlett-May, et. al. v. Otay Water District* was settled in April of this year. We are gathering back-up documentation to make a final request for reimbursement on that matter and need to review and analyze your breakdown of reimbursed and denied fees and costs to complete it. On the other hand, the litigation entitled *Harron v. Otay Water District* is currently scheduled for trial on September 17, 2007.

We look forward to working with you over the next few months to conclude these matters in a fair and satisfactory manner for both our clients. If you have any questions concerning this request, you may contact me at (619) 564-8400.

Very truly yours,

Aerobel Banuelos, Esq.
OF GARCIA, CALDERON & RUIZ, LLP

cc:     Mark Watton

Exhibit 6          0060

**Exhibit 7**



...*Dedicated to Community Service*

2554 SWEETWATER SPRINGS BOULEVARD, SPRING VALLEY, CALIFORNIA 91978-2004
TELEPHONE: 670-2222, AREA CODE 619              *www.otaywater.gov*

February 12, 2008


Mr. Vince Tomkiewicz
Bollinger, Ruberry & Garvey
City Corp. Center, Ste. 2300
500 W. Madison Street
Chicago, IL  60661-2511


Dear Mr. Tomkiewicz:

Please find enclosed additional invoices for legal services performed in the Tom Harron v. Otay Water District matter.  The matter was settled in September 2007 and a copy of the settlement agreement has been enclosed.  The District has paid the enclosed invoices (copies of checks are also provided) and the monies in accordance with the settlement agreement (reference copy of wire transfer confirmation ) and is seeking reimbursement for payment as per the applicable insurance policy of the District.  It is believed that the enclosed are the last of the invoices related to this matter.

Your attention to this matter is appreciated.  Thank you.

Sincerely,

Susan Cruz,
District Secretary


Enclosures


cc:  Yuri Calderon, OWD General Counsel

Exhibit 7        0061

**Exhibit 8**

# BOLLINGER, RUBERRY & GARVEY

### ATTORNEYS AT LAW
CITIGROUP CENTER
SUITE 2300
500 WEST MADISON STREET
CHICAGO, ILLINOIS 60661-2593
(312) 466-8000
FACSIMILE (312) 466-8001

ROBERT W. BRUNNER
WRITER'S DIRECT DIAL NUMBER
(312) 559-4656

WRITER'S E-MAIL ADDRESS
robert.brunner@brg-law.net

April 24, 2008

## BY FACSIMILE AND U.S. MAIL

Yuri Calderon
Otay Water District
2554 Sweetwater Springs Boulevard
Spring Valley, California 91978

     Re:   *Thomas Harron v. Otay Water District, et al.*
       Our File:    06309-321-OTAY

Dear Mr. Calderon:

We have reviewed the numerous additional invoices submitted by the Otay Water District pertaining to the above, as well as a copy of the executed settlement agreement reached in the Harron suit. We understand that in September 2007 the case settled for $150,000, plus a payment of $300,000 to Mr. Harron's attorney. Kemper did not learn of the details concerning the settlement until February 2008. We should also mention that Kemper was not provided regular status reports from defense counsel concerning this litigation, and thus it came as somewhat of a surprise that the case had been settled.

We have carefully reviewed the invoices submitted to Kemper, and have the following questions and concerns about the bills.[1] First, based on all information received to date concerning the Harron suit, the District is seeking in excess of $2,500,000 in costs to defend the case. Given the fact that the case settled for $150,000 (obviously far less than the amount billed in defenses costs and fees), we would appreciate your providing us a report concerning why such a large amount what was billed in defense costs when the case was settled for a relatively small amount (when compared to the cost of defense). Is there a reason why the case was not settled prior to September 2007? What attempts were made by the District to settle the case prior to September 2007?

---

[1] As you know, Kemper has previously reimbursed the District for some of the defense costs incurred by the District in the Harron suit.

Exhibit 8     0062

BOLLINGER, RUBERRY & GARVEY

Yuri Calderon
April 24, 2008
Page 2

         With regard to the bills themselves, a significant amount of work performed by the
various law firms appears to be duplicative, or, at the very least, so similar as it would appear
that the work could have been divided up among the various firms in order to save both time and
money with regard to the defense efforts. We would appreciate your providing an explanation as
to why the different firms performed the same or very similar tasks associated with the defense
of this action.

         Many invoices submitted by the Carlton DiSante firm contain time that is block billed or
time that appears to be clearly excessive for the tasks performed. For example, the June 21, 2007
invoice from the Carlton firm totals $49,221 and contains numerous entries that are blocked
billed. As previously advised pertaining to the other lawsuits filed against the District, time must
be billed for each specific task performed and not in a block billed format. In addition, many of
the entries found on the June 21, 2007 invoice appear to be excessive. For example, many hours
of time was billed for legal research that, based on our understanding of the issues raised in the
case, appears excessive. Another example is that 7.5 hours was billed for drafting responses to
supplemental interrogatories and researching "potential defense arguments." Without some
additional explanation of the tasks performed, this time appears excessive.

         Block billing and excessive time are also found on many other invoices, including the
June 30, 2007 bills submitted by the Wilson Petty firm; the July 16, 2007 invoice submitted by
the Carlton DiSante firm; the August 14, 2007 bills submitted by the Carlton DiSante firm; the
July 31, 2007 bills submitted by the Wilson Petty firm; and the September 28, 2007 invoice
submitted by the Carlton DiSante firm. The invoice submitted by the Wilson Petty firm dated
September 30, 2007 totaling $178,879, and the October 12, 2007 bill totaling $151,969
submitted by the Carlton DiSante firm, contain what is perhaps the most blocked billed time on
any of the invoices submitted by the District. In fact, almost all of the time found on these two
invoices is in block billed format. As noted above, time must be billed for each specific task
performed and not in a block billed format.   We would ask that all invoices containing block
billing be resubmitted in a format that shows the time spent for each task performed.

         This request is being sent pursuant to an express reservation of rights under American
Protection Insurance Company Policy No. 3QX 113478 00. Please note that nothing contained
herein, nor any further actions taken by APIC, should be construed as a waiver of any rights
or defenses, whether or not stated herein, which APIC may possess under its policies and
applicable law.  No actions taken by APIC, or its agents, representatives or attorneys, do not
constitute and are not intended as a waiver of any rights or defenses available to APIC,
whether or not stated herein, that may be available now or at any point in time.

Exhibit 8          0063

## BOLLINGER, RUBERRY & GARVEY

Yuri Calderon
April 24, 2008
Page 3

Thank you for your anticipated cooperation regarding the above. Should you have any questions concerning this request, please do not hesitate to contact the undersigned.

Sincerely,

Robert W. Brunner

cc:  Susan Cruz

TOTAL P.04

Exhibit 8      0064

**Exhibit 9**

# Carlton DiSante
# & Freudenberger LLP
### ATTORNEYS

LOS ANGELES OFFICE
707 Wilshire Boulevard
Suite 5150
Los Angeles, California 90017
Telephone (213) 612-6300
Facsimile (213) 612-6301

SACRAMENTO OFFICE
8950 Cal Center Drive
Suite 160
Sacramento, California 95826
Telephone (916) 361-0991
Facsimile (916) 361-1480

2600 Michelson Drive
Suite 800
Irvine, California 92612
Telephone (949) 622-1661
Facsimile (949) 622-1669
www.cdflaborlaw.com

SAN DIEGO OFFICE
4510 Executive Drive
Suite 300
San Diego, California 92121
Telephone (858) 646-0007
Facsimile (858) 646-0008

SAN FRANCISCO OFFICE
601 Montgomery Street
Suite 350
San Francisco, California 94111
Telephone (415) 981-3233
Facsimile (415) 981-3246

Sender's e-mail:
ccarlton@cdflaborlaw.com

June 13, 2008

**VIA FACSIMILE & U.S. MAIL**

Robert W. Brunner, Esq.
Bollinger, Ruberry & Garvey
Citigroup Center
Suite 2300
500 West Madison Street
Chicago, Illinois 60661-2593

    Re:    Thomas Harron v. Otay Water District, et al.
           Your File No.:  06309-321-OTAY

Dear Mr. Brunner:

    I have been requested to respond to your letter dated April 24, 2008, in which you raised certain questions and concerns about the invoices submitted by the Otay Water District (the "District") in connection with above-referenced lawsuit brought by Thomas Harron against the District, Antonio Inocentes, and Jaime Bonilla.

## I.    Our Involvement and Role in the Harron Case

    As you know, Harron filed the complaint in this matter in San Diego County Superior Court in September 2001, and Kemper thereafter appointed Zimmerman & Kahanowitch to represent the District in the lawsuit. We did not become involved in the case until November 2003, when we substituted in as counsel of record for the District. At that time, the two individual defendants were represented by separate counsel. Once we were retained, we learned much about what transpired in the first two years or so of the litigation, but there may be some details of which we are unaware. To the extent you are still in communication with Mitchell Stanton of Zimmerman & Kahanowitch, he may have additional information about the first two years of the litigation that we were not able to glean from the file, our client, counsel for the individual defendants, and/or counsel for Harron.

    By the time we substituted in as counsel for the District in November 2003, the trial in the matter had been continued at least one time and the case had been stayed while the two individual defendants were pursuing their right to an immediate appeal of the trial court's denial of their motions to strike Harron's defamation claims against them. The stay was lifted in late

298913.1

Carlton DiSante & Freudenberger LLP

Robert W. Brunner, Esq.
June 13, 2008
Page 2


2006 (after the individual defendants were unsuccessful on their appeal), and we were thereafter
involved in preparing the case for trial. The trial was initially set for late June 2007, and it was
later continued to September 2007. On the eve of trial, after the trial court had spent at least two
days on significant motions in limine and before the court ruled on the most critical of the
motions, the parties settled the case. The settlement agreement was signed by the parties on
September 26, 2007. With this background, we respond to the questions and concerns raised in
your letter of April 24.

## II.    The Settlement Agreement with Harron

At the outset, we must point out that your April 24 letter mischaracterizes the terms of the
settlement with Harron. While your letter mentions that Harron was paid $150,000 and his
attorneys were paid $300,000 in the settlement, it does not mention several other terms of the
settlement agreement that had significant cost to the District, not to mention significant economic
value to Harron. For example, the District also agreed to do the following in the settlement
agreement: (1) take steps to ensure Harron's entitlement to a higher benefit rate under the
District's retirement plan; (2) place Harron on inactive employment status for one year beginning
on February 10, 2008, while paying him $222,000 and making full contributions for his
retirement and health benefits during that one-year period; and (3) take steps to ensure Harron's
entitlement to retiree health benefits upon the conclusion of his one year of inactive employment
on February 9, 2009. While it is not yet possible to quantify precisely all of the costs of the
retirement and health benefits conferred on Harron under the settlement agreement, it is safe to
assume that the total cost of the settlement agreement to the District, including the cash/salary
payments to and the benefits conferred on Harron, will be somewhere in the range of $750,000-
$1,000,000. As a result, it is not accurate to characterize the settlement with Harron as one for
$150,000, or even $450,000.

## III.    The History of Settlement Attempts/Negotiations

Your April 24 letter asks for the reason why the case did not settle until September 2007.
While there are multiple reasons (and it would take a mini-treatise to fully explain them all), we
offer the following relatively brief explanation:

- In May 2001, Harron made a pre-litigation settlement demand (directly to
  the District's insurance agent, Jim Swanson of Swanson Insurance
  Agency) of $2.5 million. Harron's counsel informed us (in 2005) that
  Kemper had somehow solicited this settlement demand from Harron. We
  do not know if there was a response to this settlement demand, but
  Harron's counsel told us (again, in 2005) that Kemper never even
  responded to the settlement demand that it had solicited. We obviously
  know that no settlement was reached at that time because Harron filed his
  lawsuit in September 2001.

298913.1

Exhibit 9    0066

Carlton DiSante & Freudenberger LLP

Robert W. Brunner, Esq.
June 13, 2008
Page 3

- During the two years or so that Stanton represented the District, it appears that Stanton, with the knowledge and/or involvement of Kemper's adjuster, Scott Towns of Sierra West Adjusters, engaged in settlement discussions with Harron and his counsel on various occasions. One of those occasions was at a mediation with a retired judge in August 2002. At that mediation, Stanton offered Harron $175,000 to settle all of his claims. Harron and his counsel viewed the offer as insulting, and the mediation ended abruptly. Subsequently, in January 2003, Harron's counsel sent Stanton a settlement demand that included the following: (1) a "severance salary" of $300,000 per year for five years (for a total of $1,500,000) with Harron providing no actual services to the District; (2) all fringe benefits, and increases in fringe benefits, received by other District management during the five-year severance period; (3) retiree medical and dental benefits at the conclusion of the five-year severance period; (4) an immediate cash payment of $100,000, and (5) an apology from the District's Board of Directors. Harron's counsel told us (in 2005) that he sent this settlement demand because Stanton had "asked him" to make a settlement demand in the range of $1.8 million. According to Harron's counsel, Stanton never responded to this settlement demand even though he had asked Harron's counsel to make it.

- After we substituted in as counsel for the District and while the case was still on appeal, we attempted on several occasions, beginning in late 2004, to persuade Harron's counsel to submit the matter to mediation again. While Harron's counsel expressed a general willingness to consider mediation again, he would never commit to doing so until September 2005, when he indicated that Harron would submit the matter to mediation only if certain "pre-conditions" were satisfied, including assurances that the monetary settlement would be "in the ballpark" of Harron's demand of January 2003 (as described above) and a "reputation-clearing" apology from the District's Board of Directors. The District believed that these "pre-conditions" were unreasonable and, as a result, would not agree to them.

- After the appeal concluded in late 2006 and the case was returned to the trial court, we continued to press Harron's counsel to agree to submit the matter to mediation or engage in meaningful settlement discussions. Harron's counsel rejected or put off all of our requests. Despite this refusal by Harron and his counsel to engage in settlement discussions, the District made a settlement offer in May 2007 to resolve all of Harron's claims against all of the defendants for a lump-sum payment of $250,000.

298913.1

Exhibit 9    0067

Carlton DiSante & Freudenberger LLP

Robert W. Brunner, Esq.
June 13, 2008
Page 4

Harron rejected this offer and refused to make a counter-offer. When we pressed Harron's counsel about what it would take to settle the action, he would only reply that it would take "a helluva lot more" to get "in the ballpark" of a settlement, or words to that effect, and he refused to give any indication of what he meant by "a helluva lot more." Based on all of this, we believed, as did the other defense counsel, that Harron wanted his "day in court" and would only settle if he received at least $2 or $3 million.

- In mid-August 2007, after all counsel had met to exchange various pre-trial documents and discuss the issues remaining to be tried at the trial scheduled for September 2007, Harron made a written settlement demand that including the following : (1) inactive employment for five years at a salary of $500,000 per year (for a total salary of $2,500,000); (2) health and pension benefits for the five years of inactive employment; and (3) a retroactive increase in his retirement benefits. The District rejected Harron's settlement demand but instructed us to continue pursuing settlement on more reasonable terms. As the trial was about to begin, and while the court was still hearing arguments on and ruling on the multitude of motions in limine and other pre-trial matters, we had lengthy discussions with Harron and his counsel about settlement. After a couple days of negotiations, the parties entered into the written settlement agreement described above.

While the monetary value of the settlement reached with Harron is certainly substantial, we believe that Harron was willing to accept it only because he believed, after reviewing our pre-trial papers and observing the hearings and rulings on the motions in limine and other pre-trial matters, that his case was not as much of a "slam dunk" as he had always thought it to be.

## IV.   <u>Your Claim of Not Receiving Regular Status Reports</u>

We were surprised that your April 24 letter claims that Kemper was not provided regular status reports from defense counsel concerning the Harron lawsuit or the settlement of the lawsuit. We were most surprised because Kemper never asked us to provide "regular status reports," which we assume means some type of written report. We were also surprised because we know that Kemper received a great deal of information about the status of the litigation even if it did not receive "regular status reports." For example, we copied Kemper's representative on all of our monthly invoices, so Kemper was aware, at a minimum, of the legal work that we were performing in the case. In addition, when an attorney at your firm, Vincent Tomkiewicz, contacted me by telephone in May 2006 for an update on the Harron lawsuit (as well as the "Bartlett-May" lawsuit against the District), I gave him an overview and also gave him the contact information for the District's outside general counsel, Yuri Calderon. Tomkiewicz

Exhibit 9          0068

Carlton DiSante & Freudenberger LLP

Robert W. Brunner, Esq.
June 13, 2008
Page 5

seemed satisfied with my verbal update, and he never contacted me again. (To my recollection, that was the only time anyone affiliated with Kemper ever contacted me about the Harron case.)

We understand that the District, Calderon, and/or his associate, Aerobel Banuelos, thereafter provided your firm with information about the Harron lawsuit on more than one occasion. Specifically, the District Secretary forwarded requests for reimbursement on the Harron matter in January 2007 and April 2007 and, following receipt by the District on June 6, 2007, of a reimbursement payment from Kemper in connection with the Harron and Bartlett-May matters, Banuelos and the District Secretary attempted on numerous occasions to obtain a detailed break-down of the reimbursement. Contact was made via telephone and also via email and U.S. mail. In a letter dated July 10, 2007, Banuelos informed you that the Harron lawsuit was scheduled for trial in September 2007. At no time did anyone from Kemper or your firm request that the District, Calderon, or Banuelos provide any other sort of status report. Moreover, no one from Kemper or your firm ever contacted us, the District, Calderon, or Banuelos to discuss strategy for the trial in September 2007, the possibility of settlement, or even the outcome of the trial.

## V.     Your Claim of Duplicative Work

Your letter of April 24 claims that "a significant amount of work performed by the various law firms appears to be duplicative, or, at the very least, so similar as it would appear that the work could have been divided up among the various firms." It is difficult to respond to this claim in the abstract since you do not cite any examples of allegedly duplicative work. Nonetheless, we can tell you that the District instructed us and the other defense firms to avoid duplicative work to the extent possible, and we believe that we and the other firms made every effort to do so. Specifically, we regularly divided up tasks with Wilson Petty Kosmo & Turner LLP ("Wilson Petty"), counsel for Bonilla. For example, we took the lead on the preparing the jury instructions and assembling the exhibits, and Wilson Petty took the lead on preparing the voir dire and the jury questionnaire. Similarly, we split up the responsibility for preparing the various motions in limine with Wilson Petty and even split up the responsibility for preparing opposition and reply papers regarding the various motions in limine. These are but a few examples of our work-sharing arrangements with Wilson Petty, and we could cite numerous other examples if necessary. Even with Haight Brown & Bonesteel, LLP ("Haight Brown"), counsel for Inocentes, we coordinated our pre-trial and trial activities as much as possible; in some instances, that was not possible because the District's interests were not always aligned with Inocentes' interests (because he had previously given testimony and/or taken positions that were adverse to, or at least unsupported by, the District and Bonilla), but we always took advantage of the opportunities to do so. In sum, we believe that we did our best to avoid duplicative work in the handling of this complicated case. If Kemper or you wish to identify specific work that you believe was duplicative, we would be happy to address any specific concerns or questions.

298913.1

Exhibit 9        0069

Carlton DiSante & Freudenberger LLP

Robert W. Brunner, Esq.
June 13, 2008
Page 6

## VI.    Your Concern About Block Billing

Admittedly, our invoices on the Harron matter contain block billing. That is our firm's standard billing practice. As mentioned above, we have copied Kemper's representative on each monthly invoice on this matter since we were retained in late 2003. Over that entire time, Kemper has never asked us to change the block-billing format of our invoices. It seems unfair for you to now ask us to re-format more than four years' of monthly invoices. If Kemper or you truly would like us to perform this tedious task (which could only result in our best estimate, at this time, of the how our time broke down between the various tasks included in any daily entry), will Kemper commit to pay our fees for the time it takes to complete this task?

With respect to your claim that we were previously advised not to block bill in connection with another matter for the District, please note that we do not recall receiving such direction.

## VII.    Your Claim of Excessive Billing

We pride ourselves on being efficient and productive in all the work we perform for our clients, so we are troubled that your letter of April 24 claims that our invoices for the period May 2007 to September 2007 contain many entries that are excessive. Despite the broad accusation, you cited only two examples of allegedly excessive billing in your letter: (1) unspecified entries in May 2007 that you claim were for "legal research" and (2) an entry for 7.5 hours on one day in May 2007 that you claim was for "drafting responses to supplemental interrogatories and researching 'potential defense arguments'." We have reviewed the two cited examples, and we respectfully submit that there was nothing excessive about our billing.

First, we do not agree with your conclusion that our time for legal research in May 2007 "appears excessive." There are only four entries in our May 2007 invoice that include time for legal research:

- On May 2, 2007, I conducted legal research on the limited waiver of the attorney-client and closed-session privileges. This was an important issue on which we attempted to reverse the positions previously taken by Stanton.

- On May 9 and 10, 2007, my associate, Jeremy Horowitz, conducted legal research on ways to challenge the validity of Harron's employment contract. This was an area where we identified and ultimately asserted several defenses that had not been previously asserted by Stanton.

- On May 15, 2007, Horowitz conducted legal research on governmental immunity and Brown Act requirements for potential arguments for the

Exhibit 9    0070

Carlton DiSante & Freudenberger LLP

Robert W. Brunner, Esq.
June 13, 2008
Page 7


District in challenging the enforcement of Harron's employment contract.
Again, this was an area where we identified arguments that had not
previously been raised by Stanton.

All four of these entries clearly identified the nature of the legal research conducted, and the
research amounted to less than 10 hours of work. We believe that that this research, in
conjunction with other legal research we conducted, turned out to be immensely valuable in
preparing the District's defense in the case. We also believe that this legal research was
conducted efficiently. We truly see no reasonable basis for calling it excessive.

Second, with respect to your claim about the billing of 7.5 hours on one day in May 2007,
we do not agree with your conclusion that this work, or any part of it, was excessive. The entry
in question was for Horowitz's time on May 15, 2007. You did not include it in your letter, but
the complete entry for Horowitz's time on that day states as follows:

Draft responses to supplemental interrogatories; teleconf with A. Banuelos and
S. Cruz re plaintiff's request of production of documents; research re
governmental immunity and Brown Act requirements for potential defense
arguments.

The initial part of this entry relates to time Horowitz spent preparing supplements to the
District's previous responses to form and special interrogatories, which had been prepared and
served years earlier when Stanton was representing the District. This was no easy task as it
required Horowitz to review the prior responses and then, among other things, determine how
best to supplement those responses in light of the new arguments and defenses that we had
decided to assert on behalf of the District. The second part of the time entry, which you did not
mention in your April 24 letter, relates to conferences that Horowitz had with the District's
outside general counsel and its Secretary regarding how to respond to Harron's "catch all"
document request. This, too, was a challenging task as it required Horowitz to determine how
best to produce documents that Stanton, for whatever reason, had previously not identified
and/or not produced. The final part of the time entry relates to the legal research on
governmental immunity and Brown Act requirements that is discussed above. As indicated
above, this research was certainly worthwhile and valuable to the District and was done
efficiently. In sum, we again see no reasonable basis for calling Horowitz's work on May 15,
2007, excessive.

Since we believe that your two specific claims of excessive time are unfounded, we
naturally believe that your broad, unsubstantiated claim that "excessive time [is] found on many
other invoices" of our firm and Wilson Petty is also unfounded. Nonetheless, if Kemper or you
truly believes that either law firm billed the District for excessive time, we request that you
provide the particulars of your accusations -- i.e., the specific work that you claim was
excessive, the date(s) the allegedly excessive work was performed, and the basis for your

Exhibit 9      0071

Carlton DiSante & Freudenberger LLP

Robert W. Brunner, Esq.
June 13, 2008
Page 8

conclusion that the work was excessive.  If you provide these particulars, we and Wilson Petty will be happy to provide our explanation of the work performed, the reason it was performed, and the appropriateness of the billing.  Both firms are highly confident that we can easily establish the reasonableness of our billings.

I trust that this letter fully and fairly responds to the questions and concerns raised in your April 24 letter.  If you have any further questions or concerns, please do not hesitate to contact Yuri Calderon or me.

Sincerely,

Christopher W. Carlton
CARLTON DiSANTE & FREUDENBERGER LLP

cc:    Yuri Calderon, Esq.
       Aerobel Banuelos, Esq.
       Ms. Susan Cruz

298913.1

Exhibit 9        0072

**Exhibit 10**



August 27, 2007

**VIA FACSIMILE & U.S. MAIL**
Mr. Robert W. Brunner, Esq.
Bollinger, Ruberry & Garvey
500 West Madison Street, Suite 2300
Chicago, Illinois 60661
Fax No.: (312) 466-8001

Re:    *Third Request for Reimbursement from the Otay Water District in Connection with Donna Barlett-May, et. al. v. Otay Water District Litigation - Your File: 06309-321-OTAY*

Dear Mr. Brunner:

As we have previously advised you, we are General Counsel for the Otay Water District (District). Please find enclosed a third request for reimbursement of the District's legal fees and costs in connection with the *Donna Barlett-May, et. al. v. Otay Water District Litigation* to and including June 30, 2007. We have previously requested, and have not yet received, a detailed breakdown of the reimbursement in the amount of $465,557.00 forwarded by your office to the District under correspondence dated June 6, 2007 concerning both the referenced matter and the *Harron v. Otay Water District* matter. A second request for reimbursement for those two matters was forwarded to your office by the District on 4/3/07, with additional detail on the same forwarded under cover letter from the District dated 4/30/07. The District has not received a response to that second request.

As we informed you in our July 10, 2007 correspondence, the litigation entitled *Donna Barlett-May, et. al. v. Otay Water District* was settled in April of this year. The amount of the settlement payment, which did not include wages, was the aggregate amount of $371,250.00, including all six plaintiffs. The District paid the settlement in April of 2007. To facilitate identifying the legal fees and costs approved or disapproved by your client, this reimbursement covers only fees and costs incurred by the District for the referenced matter, as follows:

| | |
|---|---|
| Settlement payment: | $371,250.00 |
| Legal fees and costs for invoices received from January 1, 2007 to June 30, 2007 | $ 85,121.30 |
| **Total:** | **$456,371.30** |

We are enclosing, with this request for payment, the following documentation:

- Attachment A - Copy of the settlement agreement;

- Attachment B - Copy of the settlement check; and

Exhibit 10    0073

Robert W. Brunner, Esq.
August 27, 2007
Page 2

       Attachment C – Copies of a spreadsheet with a detailed breakdown of legal fees and costs for this matter and copies of the invoices paid by District.

    We look forward to hearing from you.  If you have any questions or information concerning this request, you may contact me at (619) 564-8400.

           Very truly yours,

           Aerobel Banuelos, Esq.
           OF GARCIA, CALDERÓN & RUÍZ, LLP

cc:    Mark Watton, General Manager (w/out encl.)



SD #4819-8089-2416 v1

**Exhibit 11**

LAW OFFICES
# BURKE, WILLIAMS & SORENSEN, LLP
402 WEST BROADWAY, SUITE 810
SAN DIEGO, CALIFORNIA 92101-3553
Tel: (619) 615-6672
Fax: (619) 615-6673
www.bwslaw.com

LOS ANGELES OFFICE
611 WEST SIXTH STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-3102
Tel: (213) 236-0600
Fax: (213) 236-2700

ORANGE COUNTY OFFICE
18301 VON KARMAN AVENUE, SUITE 1050
IRVINE, CALIFORNIA 92612-1009
Tel: (949) 863-3363
Fax: (949) 863-3350

INLAND EMPIRE OFFICE
3403 TENTH STREET, SUITE 300
RIVERSIDE, CALIFORNIA 92501-3629
Tel: (909) 788-0100
Fax: (909) 788-5785
ycaldera@bwslaw.com

SAN FRANCISCO OFFICE
450 SANSOME STREET, SUITE 1700
SAN FRANCISCO, CALIFORNIA 94111-3320
Tel: (415) 955-4160
Fax: (415) 982-0824

VENTURA COUNTY OFFICE
2310 EAST PONDEROSA DRIVE, SUITE 25
CAMARILLO, CALIFORNIA 93010-4747
Tel: (805) 987-3468
Fax: (805) 482-9834

OUR FILE NO.
04469-0001

May 9, 2003

MAY 13 2003

Mr. James Swanson
Swanson Insurance
1161 East Main Street, Suite 201
El Cajon, California 92021

Re:     *Pamela Aubrey v. Otay Water District*; Cause No. GIC804495; In the Superior
Court of California, County of San Diego, Case No. GIE017207

Dear Mr. Swanson:

By this letter, Otay Water District tenders the above-referenced lawsuit, enclosed herein for your convenience, and demands that American International Companies, National Union Fire Insurance Company of Pitts., Pa. or the appropriate insurance company defend and indemnify the Otay Water District in this action pursuant to the terms and conditions of the District's insurance policy.  **Please refer this letter immediately to the appropriate claims representative.**

The lawsuit states three causes of action against the Otay Water District under the California Fair Employment and Housing Act (Government Code Section 129000, *et seq.*).  Ms. Aubrey claims that the Otay Water District discriminated against and harassed her on the basis of her sex, age, national origin and her skin color.  Additionally, Ms. Aubrey claims that the District retaliated against her for engaging in protected activity, namely the alleged reporting of the alleged discrimination and harassment.  Her complaint states only vague factual information to support her allegations.

It is the position of the District that Ms. Aubrey's claims are frivolous.

The actions of the District were within the policy coverage and the District therefore request that the insurer provide for a defense in this matter as well as indemnification in the event of a loss.

SD #48895 v1

Exhibit 11        0075

Mr. James Swanson
May 9, 2003
Page 2

Your prompt attention to this matter is greatly appreciated.  If you have any questions, I can be reached at (619) 615-6672.

Very truly yours,

Yuri A. Calderon
of BURKE, WILLIAMS & SORENSEN, LLP

Enclosures

cc:   Robert Griego (w/out encl.)
      General Manager, Otay Water District

      Bonifacio Garcia (w/out encl.)
      Burke, Williams & Sorensen, LLP

Exhibit 11      0076

**Exhibit 12**

FILE COPY

LAW OFFICES

# BURKE, WILLIAMS & SORENSEN, LLP

611 WEST SIXTH STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-3102
Tel: (213) 236-0600
Fax: (213) 236-2700
www.bwslaw.com

ORANGE COUNTY OFFICE
18901 VON KARMAN AVENUE, SUITE 1050
IRVINE, CALIFORNIA 92612-1099
Tel: (949) 863-3363
Fax: (949) 863-3350

SAN DIEGO OFFICE
402 WEST BROADWAY, SUITE 810
SAN DIEGO, CALIFORNIA 92101-3584
Tel: (619) 615-6672
Fax: (619) 615-6673

Writer's Direct Dial
(213) 236-2805
e.shadur@bwslaw.com

INLAND EMPIRE OFFICE
3403 TENTH STREET, SUITE 300
RIVERSIDE, CALIFORNIA 92501-3629
Tel: (909) 788-0100
Fax: (909) 788-5785

SAN FRANCISCO OFFICE
450 SANSOME STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94111-3320
Tel: (415) 955-1160
Fax: (415) 982-0824

VENTURA COUNTY OFFICE
2310 EAST PONDEROSA DRIVE, SUITE 25
CAMARILLO, CALIFORNIA 93010-4747
Tel: (805) 987-3468
Fax: (805) 482-9834

OUR FILE NO.
04458.0012

November 5, 2003

Mr. Scott Towns
Sierra West Adjusters
Post Office Box 7187
Stockton, California 95267

Re:     Aubrey v. Otay Water District
        San Diego County Superior Court, Case No. GIE 017207

Dear Mr. Towns:

On behalf of our client, Otay Water District (the "District"), we hereby tender to Special National Insurance Company, for indemnification and defense, claims asserted by Pamela Aubrey against the District in the above-referenced matter. In brief, Ms. Aubrey alleges that the District and unnamed Does engaged in a pattern of unlawful discrimination and harassment against her. For your review, we attach a copy of the First Amended Complaint. Currently, John Yslas and Yuri Calderon, of our firm, are representing the District. As he is now and has, in the past, handled other matters for the District, we request that SNIC appoint Chris Carlton to represent the District.

Please feel to call me if you have any questions regarding this matter.

Very truly yours,

*Ellen J Shadur*

ELLEN J. SHADUR
For BURKE, WILLIAMS & SORENSEN, LLP

Enclosure

cc:     Bonifacio Bonny Garcia, Esq.
        Yuri A. Calderon, Esq.

Ref: 140077

Exhibit 12        0077

**Exhibit 13**

APR-04-2008   09:26         BOLLINGER RUBERRY GARVEY                     312 466 8001     P.04

# BOLLINGER, RUBERRY & GARVEY

### ATTORNEYS AT LAW
CITIGROUP CENTER
SUITE 2300
500 WEST MADISON STREET
CHICAGO, ILLINOIS 60661-2593
(312) 466-8000
FACSIMILE (312) 466-8001

ROBERT W. BRUNNER
WRITER'S DIRECT DIAL NUMBER
(312) 559-4656

WRITER'S E-MAIL ADDRESS
robert.brunner@brg-law.net

April 3, 2008

BY FACSIMILE
Yuri Calderon
Garcia Calderon Ruiz
625 Broadway
Suite 900
San Diego, California 92101

Re:    *Pam Aubrey v. Otay Water District, et al.*
     Our File:    06309-321-OTAY

Dear Mr. Calderon:

As you know, we have been retained by American Protection Insurance Company ("APIC") as its coverage counsel with regard to the various lawsuits filed against the Otay Water District (the "District") arising from claims alleging wrongful termination of employment. We have reviewed the voluminous set of invoices submitted by the District pertaining to defense costs incurred relating to the above-entitled lawsuit filed by Pamela Aubrey ("Aubrey"). The following will serve as Kemper's supplemental response to the District's request, based on all information provided to Kemper, which follows our previous communications pertaining to this request.[1]

The Aubrey lawsuit was filed in April 2003. Kemper was first notified of the Aubrey suit in June 2007, more than four years after the suit was filed. American Protection Insurance Company ("APIC") issued Policy No. 3QX 1J3478 00 to the Otay Water District effective June 1, 2000 to June 1, 2003 (the "Policy"). The Policy provides, in pertinent part, as follows:

    3.     You and any other involved Insured must:

       a.     Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

       b.     Authorize us to obtain records and other information;

---

[1] Our many prior communications concerning this matter have been with Susan Cruz of the District.

Exhibit 13          0078

APR-01-2008   09:25      i   LINGER RUBERRY GARVEY              312 466 8001     P.02

BOLLINGER, RUBERRY & GARVEY

Yuri Calderon
Garcia Calderon Ruiz
April 3, 2008
Page 2

        c.     Cooperate with us in the investigation, settlement or defense of the claim or "suit" .

Based on the clear and unambiguous terms of the Policy, the Water District was obligated to immediately send Kemper a copy of the Aubrey suit, and any other demands, notices, summonses or legal papers received in connection with the suit. Given the more than four year delay in providing notice of the Aubrey suit, the District clearly did not comply with these policy terms.

Kemper has been provided copies of invoices pertaining to defense costs incurred in the Aubrey suit. After Kemper received the invoices, we advised the District that, after a careful and thorough review of its files, Kemper had never received notice of the Aubrey suit prior to June 2007. We asked the District for any information pertaining to when notice of the Aubrey suit was first provided. After sending this request, we were advised that notice was not provided to Kemper, but instead was provided to the Swanson Insurance Agency ("Swanson"), an insurance broker. We then asked for specific documentation pertaining to communications that the District had with the Swanson agency. We were provided a copy of a May 9, 2003 letter sent by the District's corporate counsel, Burke Williams & Sorenson, notifying Swanson of the Aubrey suit. This letter was never sent to Kemper, nor did the Swanson agency ever advise Kemper of the Aubrey suit.[2]

As the APIC Policy makes clear, the District was required to immediately send Kemper copies of all demands, notices, summonses or legal papers received in connection with a claim or suit. Notice to an insurance broker such as Swanson does not constitute notice to Kemper as Swanson is not Kemper's agent. *Oliver v. Coregis Ins. Co.*, 41 Fed. Appx. 101, 102 (9th Cir. 2002); *Strangio v. Consolidated Indemnity & Ins. Co.*, 66 F.2d 330, 335 (9th Circuit 1933) (independent insurance broker is the agent of the insured and not of the insurer). The District's failure to notify Kemper of the Aubrey suit until more than four years after suit was filed is a clear violation of the plain terms of the Policy.

The Policy also provides:

        No Insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

_____

[2] The letter to Swanson indicates that National Union Fire Insurance of Pittsburgh, PA and American International Companies were placed on notice of the Aubrey suit. Please advise as to whether either carrier contributed to the defense or settlement of the Aubrey suit. Also, please provide us with copies of any responses that were made by either carrier if notice was in fact given to these carriers of the Aubrey suit.

Exhibit 13          0079

APR-04-2008  09:26      B LINGER RUBERRY GARVEY                    312 466 8001    P.03



BOLLINGER, RUBERRY & GARVEY

Yuri Calderon
Garcia Calderon Ruiz
April 3, 2008
Page 3

The voluntary payments provision in the Policy precludes recovery of the fees voluntarily incurred by the District in the Aubrey suit without the prior consent of Kemper.

For the above reasons, it is apparent that the APIC Policy does not provide coverage for the Aubrey suit, including any obligation to defend or indemnify the District concerning this litigation. Accordingly, Kemper is constrained to deny any obligation to reimburse the District for the defense costs incurred in the Aubrey matter. Of course, if you have any further information relevant to this coverage determination, please forward such information to my attention and we will immediately consider it.

Please note that nothing contained herein, nor any further actions taken by Kemper or this law firm, should be construed as a waiver of any rights or defenses, whether or not stated herein, which Kemper may possess under its policies and applicable law. It should be understood that any actions taken by Kemper, or its agents, representatives or attorneys, do not constitute and are not intended as a waiver of any rights or defenses available to Kemper, whether or not stated herein, and shall not estop Kemper from asserting at a later date any rights or defenses whether or not stated herein, that may be available now or at any point in time. Please be advised that as we are always willing to engage in any discussions which you might care to initiate relative to this matter.

Sincerely,

Robert W. Brunner

cc:   Michael Mulligan
      Susan Cruz (by fax)

Exhibit 13    0080

**Exhibit 14**



# HILDING LAW FIRM

A PROFESSIONAL CORPORATION

501 W. BROADWAY, SUITE 1760
SAN DIEGO, CALIFORNIA 92101

TELEPHONE
(619) 233-4200

FACSIMILE
(619) 233-4211

June 24, 2008

Robert W. Brunner, Esq.                    **VIA FACSIMILE & U.S. MAIL**
Bollinger, Ruberry & Garvey
Citigroup Center, Suite 2300
500 West Madison Street
Chicago, Illinois 60661-2593

> Re:    **Otay Water District's Request for Reimbursement of Fees, Costs and
> Settlement Payments Paid in Defense of the *Harron* and *Bartlett-May*
> Litigation Matters
> Your File NO:  06309-321-OTAY**

Dear Mr. Brunner:

As we have discussed in connection with the related insurance coverage dispute between Otay Water District and American Protection Insurance Company ("APIC") concerning the underlying litigation filed by Pamela Aubrey, this firm has been hired by Otay Water District ("OWD") to represent it regarding its ongoing coverage and reimbursement disputes with APIC. This letter concerns OWD's efforts to obtain reimbursement for defense costs and settlement payments they made in the underlying *Harron* and *Bartlett-May* lawsuits which APIC agreed to defend.

Based upon my review of the correspondence and related documents, it is my understanding that in January 2007, OWD forwarded invoices for its defense fees and costs in the *Harron* and *Bartlett-May* through October 2006. The total amount of the defense fees and costs reflected in the invoices was $612,298.90 for the *Harron* litigation, and $340,456.53 for the *Bartlett-May* litigation. In April 2007, OWD sent further invoices for defense costs incurred in those matters during the November-December 2006 period, which totaled: $21,510.56 for the *Harron* matter and $135,001.44 for *Bartlett-May*.

On or about June 6, 2007, APIC sent a reimbursement check to OWD for these matters in the amount of $465,557.00, though it failed to provide any analysis, allocation or audit to explain which of the invoices it was reimbursing by the check or the amount of the payment to allocate to either *Harron* or *Bartlett-May*. Presumably the partial reimbursement payment was limited to the first set of invoices for the period ending October 31, 2006 which totaled $952,755.43.

Exhibit 14    0081

Robert W. Brunner, Esq.
June 24, 2008
Page 2

As you are aware, Aerobel Banuelos, Esq., counsel for OWD, sent you a letter on July 10, 2007 requesting that APIC provide a "separate detailed breakdown of costs and fees approved and denied for each litigation case included in that reimbursement request [i.e. the January 2007 request for reimbursement through October 2006]." On August 27, 2007, after receiving no response to her previous letter, Ms. Banuelos sent a follow up letter reminding your office of OWD's request for a detailed breakdown, and again requesting reimbursement of the invoices totaling $156,512 for the November-December 2006 period. That letter further reminded APIC that the *Bartlett-May* case had settled in April 2007 and requested reimbursement for the $371,250 settlement payment and $85,121.30 in defense fees and costs incurred by OWD in that case during the January-June 2007 period, all of which was detailed in documents enclosed with that letter. To date, APIC has failed to respond to either OWD's request for a detailed breakdown of the June 6, 2007 partial reimbursement payment or its April 2007 and August 2007 requests for reimbursement.

On February 12, 2008, OWD sent to your office another request for APIC to reimburse fees and costs it paid in the underlying *Harron* litigation for work performed in 2007. As shown by the invoices enclosed with the letter, OWD paid $880,054.60 for defense fees and costs in the *Harron* case during the 2007 period. The letter also advised of OWD's September 2007 settlement agreement in that case and its settlement payment to Mr. Harron and his counsel. OWD was required to pay a total of $672,000 to settle the case, including a $150,000 lump sum payment, $300,000 in attorney fees and $222,000 representing a "salary" to Mr. Harron for the February 2008-February 2009 period, even though he would not actually be working or providing any services to OWD during that period. The February reimbursement request included copies of the checks, invoices, settlement agreement and settlement payment.

On April 24, 2008, you sent a letter responding to OWD's February 2008 reimbursement request relating to the *Harron* matter, in which you indicated there were "question and concerns about the bills." You asked numerous questions about the underlying settlement, the amount of fees and costs incurred in the matter and the reason for the expense in preparing the case for trial. Yet, your letter makes no mention of the fact that neither your firm nor APIC has provided any response to Ms. Banuelos' July 2007 letter, which had advised you and APIC of the then pending September 17, 2007 trial date, and that no one from APIC made any effort to communicate with underlying defense counsel about the upcoming trial. Your letter also fails to mention that APIC has completely ignored OWD's April, July and August letters seeking reimbursement for certain fees, costs and payments during the November 2006-June 2007 period and seeking a breakdown of the June 6, 2007 partial reimbursement payment.

In a good faith effort to cooperate with APIC, OWD had its underlying defense counsel, Christopher W. Carlton of Carlton DiSante & Freudenberger LLP, respond to the questions presented in your April 24 letter regarding the *Harron* litigation and that letter was sent to you by Mr. Carlton on or about June 13, 2008. Now that your questions about the *Harron* action have been answered, it is time for APIC to completely fulfill its defense, indemnity and reimbursement obligations to OWD for the *Bartlett-May* and *Harron* actions which were settled in April and September 2007, respectively. Accordingly, this letter constitutes OWD's formal

Exhibit 14     0082

Robert W. Brunner, Esq.
June 24, 2008
Page 3

and final demand for the following:

1) A detailed breakdown of APIC's June 6, 2007 partial payment of $465,557.00, specifying the invoices or entries on the invoices that were paid, denied or reduced, and the basis for any denials or reductions;

2) Payment for the defense invoices previously submitted to APIC for the *Bartlett-May* matter totaling $220,122.74 for the November 2006-June 2007 period;

3) Payment for the $371,250 settlement OWD paid in the *Bartlett-May* litigation;

4) Payment for the defense invoices previously submitted to APIC for the *Harron* matter totaling $901,565.16 for the November 2006-December 2007 period;

5) Payment for $450,000 of the underlying *Harron* settlement (which excludes the $222,000 "salary" portion of the settlement payment, as well as any costs incurred by OWD in connection with extending certain benefits to Mr. Harron); and

6) Payment of the remaining $487,198.43 in defense costs incurred by OWD in the *Harron* and *Bartlett-May* matters through October 2006 which were not reimbursed by APIC's June 6, 2007 payment of $465,557.00.

The full amount of OWD's reimbursement requests for the *Bartlett-May* litigation have been outstanding since August 2007, with some of the requests dating to January and April 2007. In addition, OWD's requests for the *Harron* litigation also date back to January and April 2007, with the final requests dating to February 2008. Moreover, the cases settled in April and September 2007. Thus, in the interest of avoiding litigation of this ongoing insurance dispute, OWD demands that APIC satisfy its outstanding obligations as to these matters immediately, by making full payment no later than **July 2, 2008**. In the event that APIC disputes its obligations as to any particular invoice entries, or settlement payments, OWD demands that APIC pay the total undisputed amount by July 2, and further provide by that date a detailed breakdown of the invoices paid and those left unpaid, or reduced, as well as a complete explanation for APIC's refusal to pay the full amount of the unpaid/reduced invoices.

I look forward to APIC's prompt response and payment, consistent with the requirements of California's Fair Claims Practices regulations.

Very Truly Yours,

Peter Q. Schluederberg
HILDING LAW FIRM

cc:  Aerobel Banuelos, Esq.

Exhibit 14      0083

Exhibit 15



HILDING LAW FIRM

A PROFESSIONAL CORPORATION

501 W. BROADWAY, SUITE 1760
SAN DIEGO, CALIFORNIA 92101

TELEPHONE
(619) 233-4300

FACSIMILE
(619) 233-4311

July 2, 2008

Robert W. Brunner, Esq.                    **VIA FACSIMILE & U.S. MAIL**
Bollinger, Ruberry & Garvey
Citigroup Center, Suite 2300
500 West Madison Street
Chicago, Illinois 60661-2593

Re:    **Otay Water District's Request for Reimbursement of Fees, Costs and
Settlement Payments Paid in Defense of the *Harron* and *Bartlett-May*
Litigation Matters
Your File No.: 06309-321-OTAY**

Dear Mr. Brunner:

This letter is to confirm our telephone discussion last Wednesday, June 25, 2008, wherein Otay Water District agreed to American Protection Insurance Company's ("APIC") request for a two week extension of time to respond to Otay Water's June 24 demand for reimbursement of payments it made for defense costs and settlements in the underlying *Harron* and *Bartlett-May* actions. Thus, the deadline for APIC's response is now July 16, 2008. As we discussed, in exchange for such extension, APIC has agreed to extend the time for Otay Water to file its answer and other pleadings in response to APIC's complaint for declaratory judgment until August 13, 2008 and to participate in the filing of a joint motion for an order granting the extension of time for Otay Water to file its responsive pleading.

You will recall from our discussion that the extension from July 7 until August 13 is necessary to enable Otay Water's Board to consider APIC's response to its most recent demand for reimbursement and to decide at its August 6 Board meeting whether to include claims relating to APIC's failure to defend and indemnify it in the *Harron* and *Bartlett-May* actions as part of the counterclaim it is filing for APIC's breach of the duty to defend it in the *Aubrey* lawsuit. As you are aware, the unreimbursed amount Otay Water paid to defend and settle *Harron* and *Bartlett-May* exceeds $2.4 million and its reimbursement requests to APIC date back 3 ½ years to January 2005. APIC's delay in paying the long outstanding invoices is unreasonable and has caused the Otay Water District substantial harm. Thus, it is critical that APIC make a full payment of its outstanding defense and indemnity obligations arising from the *Harron* and *Bartlett-May* actions and that it make such reimbursement payment on July 16, 2008. At the very least, in the event APIC disputes its obligation to reimburse any portion of the

Exhibit 15        0084

Robert W. Brunner, Esq.
July 2, 2008
Page 2

bills, invoices or settlement payments, APIC must pay the full amount it does not dispute, reference the specific invoices, bills and payments it is reimbursing, and provide a full and detailed explanation identifying any bills that it contends it is not required to reimburse and the basis for such contention.

Furthermore, APIC's continued failure to provide any explanation, allocation, audit or other information detailing how APIC calculated its single June 6, 2008 reimbursement payment and which invoices and billing entries the reimbursement should be allocated to, is jeopardizing the District's ability to reconcile its accounts. In our telephone conversation, you indicated that an allocation or audit should be available and that you would try to locate it and forward it to us. Please do so immediately as the numerous requests for such a detailed allocation have been ignored by APIC since July 2007.

Thank you for your anticipated cooperation in resolving this long outstanding matter. We look forward to APIC's July 16 payment and response.

Very Truly Yours,

Peter Q. Schluederberg
HILDING LAW FIRM

cc:  Acrobel Bannelos, Esq.

Exhibit 15      0085

**Exhibit 16**

**BOLLINGER, RUBERRY & GARVEY**
ATTORNEYS AT LAW
CITICORP CENTER
SUITE 2300
500 WEST MADISON STREET
CHICAGO, ILLINOIS 60661-2511
(312) 466-8000
FACSIMILE (312) 466-8001

ROBERT W. BRUNNER
WRITER'S DIRECT DIAL NUMBER
(312) 559-4656

WRITER'S E-MAIL ADDRESS
robert.brunner@brg-law.net

July 17, 2008

BY E-MAIL;
ORIGINAL BY U.S. MAIL
Peter Q. Schluederberg
Hilding Law Firm
501 W. Broadway
Suite 1760
San Diego, California 92101

Re:  *Harron v. Otay Water District, et al.*
     *Bartlett-May v. Otay Water District, et al.*
     Our File:    06309-321-OTAY

Dear Mr. Schluederberg,

The following will respond to the issues raised in recent correspondence concerning the above-referenced lawsuits.[1]

As you know, the Otay Water District ("Otay" or the "District"), has tendered to Kemper multiple sets of invoices pertaining to defense costs incurred by Otay relating to the employment discrimination lawsuits filed by Tom Harron ("Harron") and Donna Bartlett-May ("Bartlett-May"). These suits were brought against the District; Jaime Bonilla ("Bonilla"); Antonio Inocentes ("Inocentes"); Alfredo Cardenas ("Cardenas"); and Bob Greigo ("Greigo"). After receiving the invoices, we requested additional information from Otay concerning the fees charged by the various law firms involved in the defense of these lawsuits. While we have received some of the information requested, Kemper has still not received all of the information necessary for it to reimburse Otay for all of these defense costs. (We should note that Kemper has, to date, reimbursed Otay for more than $1,000,000 in defense costs incurred in all of the litigation filed against Otay and its board members.)[2]

---

[1] The correspondence includes a June 13, 2008 letter from Christopher Carlton, as well as June 24, 2008 and July 2, 2008 letters from you.

[2] As you are aware, other discrimination lawsuits have been filed against Otay.

Exhibit 16        0086

## BOLLINGER RUBERRY & GARVEY

Peter Q. Schluederberg
July 17, 2008
Page 2

Harron alleged the following causes of action against Otay arising out of his termination: race discrimination; breach of employment contract; slander; wrongful termination; and breach of covenant of good faith and fair dealing. The Harron settled for $450,000 (which includes a payment of $150,000 to Harron, and $300,000 in attorney fees), in addition to other benefits outlined in the settlement agreement.

The lawsuits filed by the Bartlett-May group of claimants alleged employment discrimination based on gender and race; wrongful discharge; civil rights violation claims; and violation of plaintiffs' due process rights. The Bartlett-May plaintiffs settled the litigation for $371,250, which includes an undisclosed amount to be paid to their attorneys.

### January 2007 Invoices

In January 2007, invoices and spreadsheets were sent to Kemper by Otay which covered the July 2001 to October 2006 period (the "January 2007 bills"). The invoices submitted totaled $430,338.96. The amount of time listed on the spreadsheets, however, totals $952,755.43. We have previously asked for clarification regarding the discrepancies, but, to date, have not received a full explanation. Based on information found on the spreadsheets, approximately $611,236 was billed on the Harron matter, and $314,519 was billed on the Bartlett-May matter.

As you know, Kemper made a partial payment of $465,557 on the January 2007 as follows:

| | |
|---|---|
| Carlton, DiSante: | $150,729 ($26,641 for work performed in the Harron case and $124,088 for work performed in the Bartlett-May case) |
| Wilson Petty: | $14,828 (for work performed in the Bartlett-May case) |
| Foley & Lardner: | $300,000 |

Your correspondence states that we have never advised Otay of how the payments should be applied. With regard to work done by the Carlton, DiSante and Wilson Petty firms, this information is readily available based on the invoices that were submitted to Kemper. With regard to work done by the Carlton, DiSante firm, $26,641 was billed in the Harron case, and $124,088 was billed in the Bartlett-May case. The $150,729 paid on the Carlton DiSante bills should be applied as follows: $26,641 applies to work performed in the Harron case and $124,088 applies to work performed in the Bartlett-May case. With regard to work done by the Wilson Petty firm, $14,828 was billed for work performed in the Bartlett-May case. The $14,828 paid on the Wilson Petty bills should, of course, be applied to the Bartlett-May case.

With regard to the Foley bills, $660,905 was billed by the Foley firm for the July 2001 to October 2006 period. Because a number of invoices submitted by the Foley firm did not contain detailed time entries concerning work performed, we thought it was appropriate to make a partial

Exhibit 16          0087

## BOLLINGER RUBERRY & GARVEY

Peter Q. Schluederberg
July 17, 2008
Page 3

payment on the total amount owed (nearly half of the total amount billed by the Foley firm). The partial payment can be applied as the District wishes. However, given that 77% of the time billed by the Foley firm was to the Harron suit (for this time period), then we think an appropriate allocation would be $231,000 to the Harron case, and the remaining $69,000 to the Bartlett-May suit.

Otay claims that $487,198 is still owed on the January 2007 bills. This figure must be based on figures found on the spreadsheets. Again, the invoices submitted total $430,338.96, while the amount listed on the spreadsheets totals $952,755.43. As I am sure you understand, Kemper needs to receive some explanation as to the discrepancy (which is obviously very significant) before making any additional payment on the January 2007 invoices.

In addition, back in April 2007 Kemper requested additional specific information concerning many of the invoices that were submitted with the January 2007 bills. For example, many of the invoices submitted concerning the Foley firm did not include a description of work that was actually performed. For each invoice submitted, we requested a detailed description of the work done by the Foley firm. To date, we have never received this information.

Many of the invoices submitted concerning the law firm of Garcia Calderon & Ruiz do not include descriptions of work performed by the firm. For each invoice submitted, we requested a detailed description of the work done by the Garcia firm. To date, we have never received this information.

None of the invoices submitted concerning the Burke, Williams & Sorensen firm includes a description of work that was performed by the Burke firm. Furthermore, we have never been given an explanation as to exactly what work was done by the Burke firm with regard to the defense of these lawsuits. Especially given the very large amount of billings generated by this firm, Kemper needs some explanation as to what the Burke firm did. To date, we have never received this information.

### February 2008 Invoices

The following will respond to Mr. Carlton's letter concerning the issues raised by Kemper concerning the $901,565 billed on the *Harron* suit for the period November 2006 to December 2007. Kemper received these invoices in February 2008.

In response to the concern that Kemper was not provided regular status reports concerning the Harron litigation, the District has advised that because Otay copied Kemper on all of its monthly invoices, Kemper "was aware, at a minimum" of the legal work that was being performed in the case. Counsel points to requests for reimbursement that were sent to Kemper in the Harron matter in January 2007 and April 2007, which allegedly "outlined the work that was being done." Kemper takes strong exception to this argument, as providing invoices to Kemper is clearly not a substitute for status reports. The District's defense counsel was

Exhibit 16          0088

## BOLLINGER RUBERRY & GARVEY

Peter Q. Schluederberg
July 17, 2008
Page 4

obligated, at a minimum, to keep Kemper apprised of what was occurring in the litigation by means of written status reports. Defense counsel did not provide regular status reports to Kemper. Providing bills to Kemper which outline in a cursory fashion what activity was taking place in a case is clearly no substitute, especially when the bills were sent to Kemper months after the activity took place.

Mr. Carlton has stated that "at no time" did anyone from Kemper or our firm request that status reports be provided. This is not correct, as requests were made for reports. Plus, it goes without saying that defense counsel has an obligation to provide status reports to an insurance carrier when a defense is being afforded and an insured expects that its insurance carriers will pay the bills. This clearly was not done.

With regard to what appears to be excessive and/or duplicate time spent on work performed, the District has requested more specific examples of the time Kemper is referring to. We offer the following examples (which are not meant to be exhaustive):

| Date | Description | Hours |
|------|-------------|-------|
| 1/2/07 | Review deposition transcript (Carlton firm) | 4.20 |
| 1/3/07 | Review deposition transcript (Carlton firm) | 3.70 |
| 1/8/07 | Review deposition transcript (Carlton firm) | 2.60 |
| 1/30/07 | Brief review of file; attend meeting (Garcia firm) | 5.70 |
| 2/15/07 | E-mail correspondence with co-counsel (Wilson firm) | 2.20 |
| 2/21/07 | Develop joint exhibit list (Wilson firm) | 3.60 |
| 2/26/07 | Review case activity report; revise list of depositions (Carlton firm) | 2.20 |
| 2/26/07 | Review case file; exchange e-mails (Carlton firm) | 2.20 |
| 2/26/07 | Review case file; exchange e-mails; draft letter (Carlton firm) | 6.30 |
| 2/27/07 | Review deposition transcript (Carlton firm) | 4.10 |
| 2/28/07 | Review deposition transcripts (Carlton firm) | 6.40 |
| 3/2/07 | Review deposition transcripts (Carlton firm) | 5.80 |

Exhibit 16    0089

BOLLINGER RUBERRY & GARVEY

Peter Q. Schluederberg
July 17, 2008
Page 5

| | | |
|---|---|---|
| 3/5/07 | Review motion to unseal records; draft memo (Carlton firm) | 5.50 |
| 3/7/07 | Review discovery and correspondence files (Carlton firm) | 6.60 |
| 3/8/07 | Review correspondence files and medical records (Carlton firm) | 6.10 |
| 3/9/07 | Review deposition transcripts (Carlton firm) | 6.40 |
| 3/14/07 | Review deposition transcripts; prepare e-mail (Carlton firm) | 3.10 |
| 3/23/07 | Review draft of memo (Carlton firm) | 2.20 |
| 3/26/07 | Review and draft discovery; telephone calls (Carlton firm) | 5.40 |
| 3/28/07 | Continue to review draft of memo (Carlton firm) | 2.40 |
| 4/13/07 | Prepare e-mails; compile deposition transcripts (Carlton firm) | 2.60 |
| 4/18/07 | Prepare e-mails; review proposed exhibits; (Carlton firm) | 6.80 |
| 4/19/07 | Review deposition transcript (Carlton firm) | 2.50 |
| 4/20/07 | Review deposition transcript (Carlton firm) | 4.10 |
| 4/24/07 | Review deposition transcript (Carlton firm) | 2.30 |
| 4/24/07 | Review deposition transcript; prepare e-mails (Carlton firm) | 5.70 |
| 4/25/07 | Telephone calls; review deposition transcript (Carlton firm) | 2.80 |
| 5/1/07 | Finalize discovery responses; telephone calls (Carlton firm) | 2.80 |

Exhibit 16    0090

## BOLLINGER RUBERRY & GARVEY

Peter Q. Schluederberg
July 17, 2008
Page 6

| | | |
|---|---|---|
| 5/8/07 | Review deposition transcripts (Carlton firm) | 5.50 |
| 5/10/07 | Telephone calls; prepare letters (Wilson firm) | 3.90 |
| 5/15/07 | Draft discovery responses; telephone calls; Research immunity issue (Carlton firm) | 7.50 |
| 5/21/07 | Review deposition transcript in preparation for meeting (Carlton firm) | 6.20 |
| 5/23/07 | Exchange e-mails; review "various materials" (Carlton firm) | 3.70 |
| 5/24/07 | Prepare responses to discovery; review documents (Carlton firm) | 9.00 |
| 6/6/07 | Telephone calls; review documents Exchange e-mails (Carlton firm) | 4.00 |
| 6/12/07 | Review documents; prepare e-mails; send list of depositions requiring summary; review severance agreements (Carlton firm) | 7.10 |
| 6/19/07 | Research duty to mitigate damages; compile documents (Carlton firm) | 5.40 |
| 6/20/07 | Research duty to mitigate damages (Carlton firm) | 7.90 |
| 6/22/07 | Research motion to sever; draft one section of memo (Carlton firm) | 6.00 |
| 6/25/07 | Research contract claim defenses; draft meet and confer letter (Carlton firm) | 7.50 |
| 6/26/07 | Research re: liquidated damages; research Government Code 53260 and 53261; review discovery (Carlton firm) | 5.10 |
| 6/27/07 | Research procedure for severing contract issue; draft section of memo; write meet and confer letters (Carlton firm) | 7.70 |

Exhibit 16    0091

BOLLINGER RUBERRY & GARVEY

Peter Q. Schluederberg
July 17, 2008
Page 7

| Date | Description | Hours |
|------|-------------|-------|
| 6/29/07 | Research and revise memo re: contract claim; research Brown Act (Carlton firm) | 5.60 |
| 7/2/07 | Research and revise memo re: contract Claim and Brown Act (Carlton firm) | 4.20 |
| 7/3/07 | Research public policy re: contract issues (Carlton firm) | 4.30 |
| 7/9/07 | Review binders of documents (Carlton firm) | 2.40 |
| 7/9/07 | Research and revise memo re: contract claim (Carlton firm) | 4.60 |
| 7/11/07 | Research and draft contract claim memo re: damages; telephone calls; prepare e-mails (Carlton firm) | 6.30 |
| 7/12/07 | Research and revise memo re: contract claim; telephone calls; send e-mails (Carlton firm) | 3.50 |
| 7/16/07 | Research re: Brown Act violations; prepare e-mails (Carlton firm) | 4.60 |
| 7/18/07 | Research and revise memo re: contract claim; attend meeting (Carlton firm) | 8.80 |
| 7/20/07 | Research and revise memo re: contract claim; telephone calls (Carlton firm) | 6.40 |
| 7/23/07 | Review contract claim memo (Carlton firm) | 1.30 |
| 7/25/07 | Review legislative history; prepare e-mails (Carlton firm) | 3.20 |
| 9/3/07 | Research and draft trial brief (Carlton firm) | 8.70 |
| 9/4/07 | Revise trial brief; telephone calls (Carlton firm) | 5.50 |
| 9/16/07 | Revise trial brief; send documents (Carlton firm) | 7.50 |
| 9/17/07 | Revise trial brief (Carlton firm) | 10.40 |

Exhibit 16     0092

BOLLINGER RUBERRY & GARVEY

Peter Q. Schluederberg
July 17, 2008
Page 8

As noted above, these are _examples_ of work that appears excessive and/or duplicative. There are many more examples, too many to list here. As just one example, you will note the very large amount of time researching, preparing and revising a memo regarding contract claims. We have to assume that counsel, with many years of practicing law in California, would not need to spend so much time researching and revising memos regarding contract claims under California law. Kemper is willing to negotiate the amount it pays with regard to the time that it believes is excessive or duplicative.

The District recognizes Kemper's concern that a majority of the time found on many of the invoices submitted are in block-billed format. As previously advised, time must be billed for each specific task performed and not in a block-billed format. We assume that defense counsel was aware of this requirement. Rather than going through and revising years of time that is in block-billed format, Kemper would be willing to negotiate the amount it pays on the bills which contain block-billed time. Or, if the District chooses, it may resubmit the block-billed time in the appropriate format. Kemper will not, however, pay counsel to revise the bills.

### Coverage For Settlements

The Insuring Agreement of the Liability Coverage Part of Policy No. 3QX 113478 00 provides, in pertinent part, as follows:

> A.    We shall pay on behalf of the Insured those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage", "personal injury", "advertising injury", "professional liability" or "wrongful acts" to which this Coverage Part applies. We shall have the right and duty to defend the Insured against any "suit" seeking those damages, even if the allegations are groundless, false or fraudulent.  . . . .

> . . . .

> E.    This Coverage Part applies to "wrongful acts" which take place during the policy period.  . . . .

Section 533 of the California Insurance Code provides that "an insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." Cal. Ins. Code § 533. Section 533 precludes coverage for claims of intentional discrimination. _Combs v. State Farm Fire & Casualty Co._, 143 Cal. App. 4th 1338 (Cal. App. 1st Dist. 2006). The _Harron_ and _Bartlett-May_ suits allege intentional discrimination and other intentional willful acts on the part of the District and its board members. Accordingly, section 533 precludes coverage for any portion of the settlement reached in the _Harron_ and _Bartlett-May_ suits.

Exhibit 16      0093

**BOLLINGER RUBERRY & GARVEY**

Peter Q. Schluederberg
July 17, 2008
Page 9

The Liability Coverage Part of the Policy excludes coverage for the following:

Liability or damages arising out of failure to perform or breach of a contractual obligation. This exclusion does not apply to liability or damages arising out of the failure to supply water.

No coverage is provided for the allegations of breach of employment contract.

The Harron settlement of $450,000 included a payment of $300,000 to his attorneys. The plaintiffs in the Bartlett-May suit settled the case for $371,250, which includes an undisclosed amount to be paid to their attorneys. The APIC Policy provides no coverage for any attorney fees awarded since they do not constitute "damages" under the Policy. *Cutler-Orosi Unified School Dist. v. Tulare County School etc. Authority*, 37 Cal. Rptr. 2d 106 (Cal. App. 5th Dist. 1994).

<u>Conclusion</u>

Kemper has every intention of reimbursing the District for all reasonable defense costs incurred by the District in these matters once it obtains the information it has requested in the past and requests again now, as outlined above. Please forward that information to us at your earliest convenience and we will immediately consider it.

We understand that Otay may consider filing a counterclaim to resolve the issues raised above with regard to defense costs. We hope that Otay does not elect this course, as Kemper is confident that the parties can amicably resolve the dispute without incurring the time and expense of litigation.

This letter is being sent pursuant to a reservation of rights under American Protection Insurance Company Policy No. 3QX 113478 00. Please note that nothing contained herein, nor any further actions taken by APIC, should be construed as a waiver of any rights or defenses, whether or not stated herein, which APIC may possess under its policies and applicable law. No actions taken by APIC, or its agents, representatives or attorneys, do not constitute and are not intended as a waiver of any rights or defenses available to APIC, whether or not stated herein, that may be available now or at any point in time.

We look forward to receiving the information requested herein. If you have any questions, or would like to discuss this matter, please do not hesitate to contact us.

Exhibit 16        0094

## BOLLINGER RUBERRY & GARVEY

Peter Q. Schluederberg
July 17, 2008
Page 10

Sincerely,


Robert W. Brunner

Exhibit 16        0095

**Exhibit 17**

# HILDING LAW FIRM
A PROFESSIONAL CORPORATION

501 W. BROADWAY, SUITE 1760
SAN DIEGO, CALIFORNIA 92101

TELEPHONE
(619) 233-4200

FACSIMILE
(619) 233-4211

July 29, 2008

Robert W. Brunner, Esq.
Bollinger, Ruberry & Garvey
Citigroup Center, Suite 2300
500 West Madison Street
Chicago, Illinois 60661-2593

<u>VIA FACSIMILE, U.S. MAIL & EMAIL</u>

Re:     Otay Water District's Request for Reimbursement of Fees, Costs and
        Settlement Payments Paid in Defense of the *Harron* and *Bartlett-May*
        Litigation Matters
        Your File No.: 06309-321-OTAY

Dear Mr. Brunner:

This will respond to your lengthy letter of July 17, 2008 which offered many pages of excuses and outright falsehoods, but not a single penny of payment, in response to Otay Water District's demand for reimbursement of $2.4 million in defense costs and settlement payments in the *Harron* and *Bartlett-May* matters. Three and a half years after submitting the first of these invoices, the best your client could manage to say is that "Kemper has every intention of reimbursing the District for all reasonable defense costs incurred by the District in these matters." Obviously, this platitude is not acceptable to the District.

In a final effort to set the record straight, and to recover payment without bad faith litigation, this letter will address the excuses you have raised, and will extend the time for payment of the amount due one final time, until 5:00 p.m. PST, August 5, 2008.

## I.     JANUARY 2007 INVOICES FOR 2001-OCTOBER 31, 2006 TIME PERIOD

### A.     <u>Purported Discrepancy Between Spreadsheets and Invoices Submitted</u>

As acknowledged in your letter, the District sent spreadsheets and invoices to APIC for reimbursement on January 8, 2007. You state in your letter, however, that the invoices submitted totaled $430,338.96 while the time set forth on the spreadsheets totaled $952,755.43. Your letter further states that "we have previously asked for clarification regarding the discrepancies, but, to date, have not received a full explanation." This claim is false. Prior to

Exhibit 17     0096

Robert W. Brunner, Esq.
July 29, 2008
Page 2

your July 17 letter, APIC has never stated that there was a $522,416.46 discrepancy between the invoices and spreadsheets the District provided for the 2001 through October 2006 time period.

In fact, the District provided invoices to APIC for reimbursement in January 2005 and then again in January 2007. The District provided further invoices for reimbursement on April 3, 2007 relating to the November-December 2006 time period. On April 20, 2007, you sent a letter to the District stating that the amount due according to the invoices was actually higher than the time on the spreadsheets and asked for clarification. This is exactly the opposite of the discrepancy APIC now claims.

Your April 20 letter also noted that some of the invoices for Foley & Lardner, Garcia Calderon & Ruiz, and Burke, Williams & Sorensen did not include detailed description of the work performed and a request was made for such detailed information. On April 30, ten days after your firm's request for more information, the District promptly sent another set of invoices for the 2001-October 2006 period, with full descriptions of the work performed as requested by APIC. Obviously, if the information provided at that time was incomplete, you should have informed the District of such problems upon receipt, more than a year ago.

Since the spreadsheets the District provided list every single invoice by law firm, invoice number, matter, date paid, and amount, it was certainly reasonable for the District to assume that APIC would inform the District of any missing invoices if the discrepancy it now claims existed. Yet, APIC never informed the District that there were missing invoices. Instead, on June 6, 2007, you sent a letter to the District with a check from Kemper for $465,557, which you now acknowledge was only a partial payment of the $952,755.43 owed. That letter makes no mention of any discrepancy between the invoices and spreadsheets provided by the District, or of any problems involving missing descriptions of work performed.

It is only now, over a year later, after the District sent several letters requesting a detailed explanation of APIC's partial payment, that APIC has first raised the false claim that it was not provided with invoices totaling over $522,000. Your July 17 letter, however, still fails to identify which of the invoices listed on the spreadsheets were purportedly not received by APIC. Your letter further fails to provide any explanation for APIC paying $465,557 if the invoices totaled only $430,338.96 as claimed in your letter.

B.     **APIC's False Claim That it Was Not Provided Detailed Invoices**

If the new set of invoices the District provided on April 30, 2007, in direct response to your April 20 letter, continued to lack detailed descriptions of work performed, and this was the basis for APIC withholding payment, you certainly should have mentioned this in your June 6, 2007 letter. Yet, your letter makes no mention of any such problems. That is because the invoices the District provided on April 30 included the full detailed descriptions requested by your client. Thus, the repeated statements in your July 17, 2008 letter that "[t]o date, we have never received this information" are simply false. Moreover, your off-hand assertion in your July 17 letter that because some of the Foley & Lardner invoices purportedly did not contain

Exhibit 17     0097

Robert W. Brunner, Esq.
July 29, 2008
Page 3

detailed information, "we thought it was appropriate" to pay only $300,000 toward their invoices, which APIC acknowledges totaled $660,905, is outrageous.

The truth is, after the District's repeated requests for an explanation for APIC's partial payment of the invoices submitted, it appears that APIC arbitrarily decided to pay only 45% of the Foley & Lardner invoices for the July 2001-October 2006 period, while paying the full amount of the Carlton DiSante invoices for the period, without explanation.

Your July 17 letter also claims that APIC made full payment on the Wilson Petty invoices it received for the period. However, the amount paid was only $14,828, rather than the $20,213.33 amount invoiced, a shortfall of approximately 26.7 percent. Again, your prior June 6, 2007 letter did not state that any of the Wilson Petty invoices identified on the spreadsheets were missing from those provided, and neither your June 6 letter nor your July 17, 2008 letter identifies any such missing invoices.

APIC also made no payment for the Zimmerman & Kahanowitch invoices submitted by the District for that time period, which totaled over $30,000, even though your client selected that law firm to represent the District. In addition, APIC paid none of the invoices submitted from Burke, Williams & Sorensen or Garcia, Calderon & Ruiz for work performed in defending the District in the *Harron* and *Bartlett May* lawsuits. Again, the only excuse APIC now gives for such non-payment is its assertion that the District did not provide it with detailed invoices. As discussed, however, APIC's assertion is absolutely false since the District provided APIC with detailed invoices on April 30, 2007, at your request, for work performed by those firms. As a result, APIC has breached its duty to defend causing damages in the amount of the unpaid invoices for the period, which you recognized in your letter total $487,198.

C.    **APIC's Failure to Pay Any Part of February 2008 Invoices**

Your July 17 letter also provides no explanation for APIC's failure to make any payment toward the invoices the District submitted in February 2008 for defense costs and fees it incurred in the *Harron* matter during 2007. As you are aware, the total of such invoices was $880,054.60. Though APIC claims some of the time spent on work performed by the law firms representing the District and its co-defendants was "excessive and/or duplicative," APIC does not state in the letter the amount of time it considers appropriate or make any offer to pay an undisputed amount. Instead, it simply repeats arguments that were previously addressed by attorney Christopher Carlton in his June 13, 2008 letter to you. Meanwhile, APIC continued with its breach of contract by paying nothing toward the invoices.

With regard to APIC's contention that the Carlton DiSante firm submitted improper invoices for their defense work in *Harron* for the 2007 period, because some of the entries are "block-billed," it is important to note that APIC made no such complaint when it paid the full amount of Carlton DiSante's invoices for the 2001-2006 time period. A review of the Carlton DiSante firm's invoices for the July 2001-October 31, 2006 period reveals that such invoices included the same block-billing format which APIC now claims to be unacceptable. If Carlton

Exhibit 17       0098

Robert W. Brunner, Esq.
July 29, 2008
Page 4

DiSante's billing format was unacceptable, this should have been corrected by APIC back when it first received invoices from the firm several years ago. By its failure to raise the issue when the firm's invoices were first provided, and by its June 6, 2007 payment of the full amount of the Carlton DiSante invoices submitted for the 2001-2006 period, APIC is now estopped to assert the "block-billed" format as an excuse for non-payment of that firm's invoices for the 2007 period. *Skulnick v. Roberts Express, Inc.* (1992) 2 Cal.App.4[th] 1017, 1027.

## II.    INVOICES COVERING NOVEMBER-DECEMBER 2006 PERIOD

As discussed in our June 24, 2008 letter to you, on April 3, 2007, the District provided APIC with invoices for defense costs it incurred in the *Harron* and *Bartlett-May* matters for the November-December 2006 time period and requested reimbursement. The total amount for such invoices was $21,510.56 for the *Harron* matter, and $135,001.44 for *Bartlett-May*. APIC has never paid any of these invoices. Moreover, your July 17 letter does not discuss these invoices or provide any explanation for APIC's failure to pay them.

## III.    APIC PROVIDES NO RESPONSE TO DISTRICT'S AUGUST 2007 REQUEST FOR REIMBURSEMENT OF DEFENSE COSTS IN *BARTLETT-MAY* ACTION

As you are aware, and as was further discussed in our June 24, 2008 letter, on August 27, 2007, the District provided APIC with invoices for defense costs it incurred in the *Bartlett-May* matter during the period from January 1, 2007 through submission of that action, totaling $85,121.30. APIC never paid these invoices and has not responded to the District's request for reimbursement of such defense costs. Your July 17 letter also fails to discuss these invoices.

## IV.    APIC REFUSES TO REIMBURSE THE DISTRICT FOR THE SETTLEMENTS

The District provided APIC with the *Bartlett-May* settlement agreement and a copy of the settlement check on August 27, 2007, seeking reimbursement of the $371,250 settlement payment. On February 12, 2008, the District provided APIC with the *Harron* settlement agreement and wire transfer documents evidencing the October 2007 settlement payments totaling $450,000 it made pursuant to the *Harron* settlement. The District requested reimbursement of such settlement payments in its February 12 letter and repeated the request in our June 24, 2008 letter. APIC never paid anything toward these settlements and your July 17 letter was the first time APIC stated the purported reasons for its refusal to reimburse the District for the settlement payments. The reasons provided in your letter, however, are without merit.

First, APIC claims that under California Insurance Code section 533 it is precluded from providing coverage for intentional discrimination. This misrepresents the law. Where, as here, the insured District is innocent of the intentional conduct, but remains vicariously liable for the actions of its co-insureds, section 533 is not applicable. *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4[th] 291, 305; *Arenson v. National Auto. And Cas. Ins. Co.* (1955) 45 Cal.2d 81, 84.

Exhibit 17        0099

Robert W. Brunner, Esq.
July 29, 2008
Page 5

Second, APIC falsely claims that its policy "provides no coverage for any attorney fees awarded," even though the policy expressly provides for such costs taxed against its insured under the Supplementary Payments Section III.B. In short, APIC has breached its contract by refusing to pay for the settlements in *Harron* and *Bartlett-May*.

**V.    CONCLUSION**

As mentioned above, the District has authorized us to extend the time to accept its demand until 5:00 p.m. on August 5, 2008. However, given the lack of substance in your responsive letter, they have instructed us to increase the demand amount to include recoverable interest at the legal rate of 10% (Civil Code sections 3287 and 3289). Thus, the amount required to settle this claim at this time is $2,745,190.

Respectfully, your client would be well-served to pay the amount owing now, rather than compound its exposure by forcing the District to sue it for bad faith. Its delays and excuses will not be well received in a bad faith trial.

Very Truly Yours,

Peter Q. Schluederberg
HILDING LAW FIRM

cc:   Acrobel Banuelos, Esq.

Exhibit 17    0100